# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| *v.* | ) | **Case No. 1:23-cr-00005 (APM)** |
| | ) | |
| **ERIC CHRISTIE,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S OPPOSED MOTION TO REVOKE DETENTION ORDER AND FOR BAIL MODIFICATION RELEASING HIM PENDING TRIAL, AND FOR A HEARING

Comes now the Defendant, ERIC CHRISTIE, by and through undersigned counsel, and respectfully moves this Court pursuant to the Bail Reform Act of 1984, 18 U.S.C. 3141 et seq., to review and revoke the magistrate's detention order from a proceeding held on December 23, 2022 in the U.S. District Court for the Central District of California; and to release Mr. Christie on personal recognizance, or alternately if the Court is not amenable to releasing Mr. Christie on personal recognizance, to release him with the proposed conditions of release contained herein, or any as the Court sees fit. The Government opposes release under any conditions. Mr. Christie requests an oral hearing and submits the following in support of his request for release:

## I. INTRODUCTION

The Government agreed to submit its response within a few days of entry of this motion. Charges for this case arise from the events that took place on January 6, 2021 at the U.S. Capitol, while the pretrial detention was based solely on theatric creations in 2022 in California by the government so it could jail Mr. Christie.  This motion will not investigate  political, anti-gay, or other motivations of the DOJ and FBI as they try to incarcerate as many January 6 defendants, such as Mr. Christie, as possible despite the norm for bail. That oversight rightly belongs with the U.S. Congress. This motion will show that Mr. Christie should never have been denied bail by the

California magistrate, and requests this Court to release a nonviolent, peaceful man who will appear before this Court when required. The Bail Reform Act (the Act) is based on the foundation involving a major reason why the United States of America separated itself from England and its tyranny: people should not be held indefinitely in jail based on allegations by the government. Pretrial release is favored in America, and pretrial detention is the carefully limited exception. See *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Act is not overly complicated. Unless the Government shows the defendant to be a flight risk by a preponderance of evidence; or that he poses a continuing danger to a particularized person or community by clear and convincing evidence, and that no listed or conceivable conditions can mitigate the alleged risks, the Act requires pretrial release. 18 U.S.C. 3141 et seq. A bond hearing is not a substitute for trial and is not supposed to be a dry run of a trial on the charges.

Mr. Christie went to Washington D.C. to exercise his First Amendment rights and was outside on the east side of the U.S. Capitol on January 6, 2021. Mr. Christie was a gay advocate for "Make America Great Again" (MAGA). He wore an LGTBQ flag draped from his head and shoulders. He did not push aside barriers, assault police, participate in any violence, encourage any violence, enter the building, or do anything besides use protected First Amendment speech in a peaceful manner in a location that he believed was permitted and approved for speech. From his viewpoint, and when expecting entry to the grounds for a First Amendment speech event, he was toward the rear of the crowd on the east side when he saw the crowd moving forward. He ran forward in joy. He believed he could lawfully go forward. His speech in the recordings shows he was happy, referring to a "MAGA party."

He is charged with the misdemeanors of 18 U.S.C. Sections 1752(a)(1)-(a)(2) for being on restricted grounds. He is alleged under Section 1752(b)(1) to have had a deadly or dangerous

weapon - a hammer hooked in a belt loop. At no time did Mr. Christie grab, brandish, hold, wave, present as a threat, or use a hammer on January 6, 2021. Further, no evidence showing intent to use, or actual use of a hammer by Mr. Christie on January 6, 2021, exists. Whether he had a hammer and for what purpose he may have possessed the legal instrument, is a matter for motions and trial. The mere possession of a hammer without use or intent to cause harm does not make being on restricted grounds a crime of violence and does not qualify for felony charges.

Mr. Christie was peaceful and used a megaphone to encourage others to move towards him at the base of the steps to observe "our house." He did not encourage anyone to break into the building or crash in doors. Mr. Christie has no history of not appearing at court proceedings. He took no measures to prepare to flee. Nothing from the charges or his history supported a detention hearing under 18 U.S.C. 3142(f). But, in violation of the Bail Reform Act, where § 3142(f)(1) for a crime of violence did not apply to Mr. Christie for use to deny bail, and although the government said the detention hearing was for Mr. Christie falling under § 3142(f)(2) as a "flight risk" who would not show up in court, it then proceeded to present allegations (with apparent misrepresentations and mischaracterizations) of dangerousness, and the magistrate judge ruled that Mr. Christie was a danger (to unspecified parties) where no conditions of release could be used. The magistrate denied bond under § 3142(f)(1) and (f)(2) despite the proceeding being announced as only for § 3142(f)(2).

Mr. Christie is now in jail unjustifiably while the magistrate should have considered release conditions after the government described Mr. Christie's encounters with law enforcement as "not obeying." "Not obeying" illegitimate directives from agents and police acting under color of law has nothing to do with failure to appear before a Court. Release cannot be denied because of suspicion the defendant will not comply with conditions. Revocation of bail is the solution in such

a case. No flight risk and no failure to appear in any court when required was shown or addressed with any honest facts. Instead, the government used an eleven year old ordinance violation that was dismissed - but where Mr. Christie did in fact attend every court appearance with a lawyer prior to the matter being dismissed as a non-crime. The government failed to mention the exculpatory evidence about Mr. Christie's appearances at those court proceedings.

The government also misrepresented an illegitimate, never properly served subpoena within the Federal Rules of Criminal Procedure that without coordination demanded that Mr. Christie go to D.C. to incriminate himself before a grand jury. The paper itself violated DOJ's own policies where taxpayer money is not supposed to be wasted when a subject will only invoke the Fifth Amendment. Legal scholars have written that demanding a display of the subject invoking the Fifth Amendment before a grand jury is a tactic to make the jurors believe there is guilt. DOJ dropped the matter where no contempt was ever brought forth after never having attempted to gain a voluntary appearance as contained in the DOJ manual.[1]

The remainder of the government's case was a matter of narrative where the government created criminal interpretations from innocent acts. Driving off after a ruse by the California Highway Patrol planned by the FBI on December 16, 2022, where the officer never said that Mr. Christie was under arrest and instead drove fear into his heart by threatening to break his car window becomes "fleeing arrest" in the government story. The government narrative states that Mr. Christie resisted "arrest" by not leaving his home on December 22, 2022 when he was

---

[1] [B]efore a known "target" (as defined in <u>JM 9-11.151</u>) is subpoenaed to testify before the grand jury about his or her involvement in the crime under investigation, an effort should be made to secure the target's voluntary appearance. If a voluntary appearance cannot be obtained, the target should be subpoenaed only after the United States Attorney, or the responsible Assistant Attorney General have approved the subpoena." DOJ Justice Manual  https://www.justice.gov/jm/jm-9-11000-grand-jury#9-11.140

specifically told - and the FBI affirmed - that he was not under arrest. Despite the FBI's bad actions, harassment, and threats, Mr. Christie never threatened any law enforcement. At most he hid in his home when he believed they would murder him.

The government will likely cite an audio recording where a friend of Mr. Christie's had a PTSD meltdown when equating the raid on Mr. Christie with Iran's execution of her sister and will say that her words about "shooting" came from Mr. Christie - when they did not. The government will misrepresent his words about "they better come in shooting" when the government will not provide the twelve - thirteen minutes prior to that recording that likely contains exculpatory context. Mr. Christie described that the government was trying to abduct him or kill him. He said their plan was falling apart, which he believed was to kill or abduct him, because he had called witnesses to come to the scene. His use of the words "they better come in shooting" was because he was not going to walk into the street to be murdered before his witnesses arrived. The context was that going in shooting was all the FBI had left for their failed plan.

No release conditions were considered by the magistrate, which was yet another violation in implementing and applying the Act. The detention order and transcript never once addressed a single release condition as proposed by the Defense.

Mr. Christie's detention should be of grave concern within the justice system because aside from the fact that nothing warranted pretrial detention, the government manufactured events in 2022 to obtain Mr. Christie's detention, as if now the DOJ and FBI receive notches on their belts for every January 6th defendant jailed. Mr. Christie committed no violent act and presented no danger to anyone on January 6, 2021, or any time before or after. The December 23, 2022 detention hearing consisted of very apparent government misrepresentations that were made to the magistrate and that will be addressed herein. It is not hyperbole to say the FBI manufactured

events, and the outrageous raid on Mr. Christie's home was designed and planned as theater and with excessive force. Apparently it is no longer enough to drag people out of their homes in their underwear while CNN films the scene. Instead of FBI agents being rightfully suspended or fired, or FBI offices placed under investigation, Mr. Christie is in jail.

This honorable Court has the opportunity to halt the bad behavior by government actors who believe they have the mission to jail Americans with opposing political viewpoints, and who plan to wreck lives, property, and homes just because they can where there is no accountability.

The FBI's abhorrent treatment of Mr. Christie, as if he was Al Qaida or an ISIS terrorist - for the misdemeanor of unknowing trespass - is on display here. There is a rotten odor emanating from FBI Joint Terrorism Task Force (JTTF) field offices with ongoing abuse of the Patriot Act. The FBI's event orchestration on December 22, 2022 led to denial of bond because of the misrepresentations presented to the magistrate and the illegitimate, unnoticed use by the AUSA of Section 3142(f)(1).

The truth will be argued here, where the truth should set Mr. Christie free.

For the period encompassing almost two years after January 6, 2021, Mr. Christie had peacefully and lawfully conducted his normal life. He committed no crimes. He did not try to hide or flee his community. For two years the FBI did not alert local police that he could be a danger or would flee - because that was not true. Yet the government set up a raid with excessive force as if he were a terrorist. Mr. Christie retained a lawyer in California before December 2022 because of the FBI's harassing behavior. Eric was harassed repeatedly by the FBI after telling an agent he did not want to speak with him, as was Eric's right. On December 22, 2022, the FBI employed the same tactics against the peaceful Mr. Christie in his home that were and are used by U.S. Special Operations Forces and the CIA overseas against terrorists in kill or capture missions for those who

plant IEDs or kill soldiers and innocent civilians as part of lethal, designated terrorist group operations. The FBI JTTF's are now creating targeting "baseball cards" for American citizens on U.S. soil very similar to the cards created for Al Qaida and ISIS terrorists designated for kill and capture missions overseas. National law enforcement efforts against gays and others with opposing viewpoints to the current administration include the unsupervised, no limits government policy of declaring innocent people as domestic terrorists. These acts and the egregious action taken against Mr. Christie place our justice system in danger. Sadly, FBI behavior as shown here has caused a serious deterioration of trust in what was once an agency held in high regard.

Mr. Christie places his faith in this Court to fairly hear his argument and revoke his detention order. This motion will not present Mr. Christie's trial defense for the January 6, 2021 charges because pretrial release under the Bail Reform Act (the Act) is not based on Mr. Christie proving he is innocent of the charges. Mr. Christie declares his innocence. He is presumed innocent. Any requirement to defend against the indicted charges and prove innocence would make the Act unconstitutional. Likewise, the Government's job now is not to try to prove guilt of the charges against Mr. Christie for January 6, 2021 so it can deny Mr. Christie bail prior to discovery, defense preparation, and a trial. Since Section 3142(f)(1) should not apply here, the government should either show a preponderance of evidence that Eric will not show up in Court and will flee, or it should not oppose this motion and instead discuss conditions of release. Mr. Christie notes that January 6th protestors who allegedly assaulted police were regularly released on bail. Other January 6th defendants who cursed or allegedly issued threats to police at the U.S. Capitol were released on bail. He did none of that.

If demanding denial of bail through the claim that Mr. Christie presents a prospective danger to anyone while awaiting trial - if Section 3142(f)(1) applied - the government must provide

*clear and convincing evidence* of dangerousness to a specific person or group using the Act's standards. Section 3142(f)(1) should not apply here to deny bail, and the government should not try to backdoor it in here as was done in California. The government also had no claim of danger as it sat on Mr. Christie's charges for almost two years and Mr. Christie remained in his community. The government identified Mr. Christie in early 2021, where nothing he did, and nothing the FBI investigated using "domestic terrorism" invasions of his personal information showed any danger. The government invented a mirage of dangerousness. The FBI orchestrated theater on December 22, 2022 for a manufactured story of "danger."

Since Section 3142(f)(1) should not apply, then the Court should look to release conditions rather than release on personal recognizance if it finds any credibility in FBI claims. If asserting that Eric will not show up for court appearances, the government must show by a preponderance of evidence that he is a flight risk. He has no history of failing to appear, where the one case where he could appear he in fact did appear.

Nothing for the two years after January 6, 2021 or in his history presented even hint that Eric Christie was dangerous, would not show up in court, or would flee prosecution. The assertion based on no reality that he would flee ignores the value Mr. Christie places on his reputation, honoring the law, restoring his home and life, being with friends and in his long term community, and living up to his Christian beliefs. A number of character letters and statements about what the government did are attached as exhibits to corroborate that the government painted a false picture of Mr. Christie as a person. This motion shows that with true information the government objectively fails to overcome the Bail Reform Act's presumption of release, where Mr. Christie should be released immediately. He places his faith in this honorable Court.

## II.    PROCEDURAL HISTORY AND FACTS

**A**.  The arrest warrant applied for with the complaint and statement of facts provided by SA Hicks of a California JTTF on December 15, 2022 was issued by a D.C. Magistrate on the night of December 15, 2022. ECF No. 5, 6.

**B**.  The complaint's statement of facts by SA Hicks shows that the FBI identified Mr. Christie on January 12, 2021 as being outside the U.S. Capitol on January 6, 2021. ECF No. 1-1 at 2-3.

**C**.  SA Hicks signed the executed arrest warrant paperwork noting that the offenses charged were in the category of "other misdemeanor." See Rule 5 documents, CR-64.

**D**.  The arrest warrant and criminal complaint listed the charges as 18 U.S.C. § 1752(a)(l) and (b)(1)(A) - Entering and Remaining in a Restricted Building or Grounds with a Deadly Weapon; 18 U.S.C. §1752(a)(2) and (b)(1)(A) - Disorderly or Disruptive Conduct in Restricted Building or Grounds with a Deadly Weapon. The face of the warrant that law enforcement and the California magistrate would see omitted "dangerous" and declared only "deadly weapon" which served as a trigger for the orchestrated violent raid against Mr. Christie. ECFs No. 1, 5.

**E**.  The search warrant for Mr. Christie's home issued by a U.S District Court magistrate in L.A., was applied for by the AUSA on December 15, 2022 (almost simultaneous in time with the D.C. arrest warrant) and was supported by documents provided by SA Hicks that misrepresented the charges alleged against Mr. Christie.

**F**.  The charges in the search warrant and its attachment B for items to be searched for and seized listed the purpose as evidence, contraband, fruits, or instrumentalities of violations of:

> 18 U.S.C. §§ 111 (assault of a federal officer);
> 231(a)(3) (civil disorder);
> 641 (theft of Government property);
> 1512(c)(2) (obstruction of an official proceeding);
> 1361 (destruction of Government property);

1752(a)(1) (knowingly entering and remaining in a restricted area without lawful authority);
1752(a)(2) (disorderly or disruptive conduct in a restricted area); and
1752(b)(1)(A) (using or carrying a deadly or dangerous weapon during and in relation to a violation Section 1752(a)

2:22-mj-04923-DUTY ECF Nos. 3 and 3-1 Search Warrant Sealed, Attachment B at ii.

**G**. SA Hicks attested by telephone to an affidavit that listed the same unsupported charges with five felonies as shown in F. directly above. 2:22-mj-04923-DUTY, ECF No. 3-1 Search Warrant sealed at 38 (numbered a bottom of page as 28).

**H**. In his affidavit under penalty of perjury that falsely lists the multiple felonies, SA Hicks swore that the search would produce evidence of the crimes. The affidavit in no way aligns with the statement of facts for the arrest warrant, that listed only two Section 1752(a) misdemeanors. As C. above shows, SA Hicks knew the charges for arrest were misdemeanors but swore to the manufactured laundry list of felonies as submitted for the search warrant in F. above. *Id*.

**I**. The first thirty-six items of probable cause for the search had nothing to do with Mr. Christie and were highly prejudicial claims of acts by others not located with Mr. Christie. (Search Warrant affidavit 2:22-mj-04923-DUTY *SEALED* Document 3-1 *SEALED* at 11-21.

**J**. Items thirty-seven to forty-eight make the same allegations as the statement of facts, where the buried item forty-eight only lists "violations of 18 U.S.C. §§ 1752(a), (b), and (b)(1)(A)" that SA Hicks submitted in the arrest warrant. *Id*. at 31 - showing the misrepresentation to the magistrate at the very beginning of the search warrant was deliberate.

**K**. The laundry list of manufactured felonies in F. above was in the case file/docket and was before the magistrate for Mr. Christie's bond hearing.

**L**. The majority of the search warrant describes reasons to seize Mr. Christie's phone, almost two years after he was in Washington, D.C. and where the statement of facts makes clear Mr.

Christie was on a vehicle roof by the bottom of the east steps to the Capitol. Nothing justified the excessive use of force in assaulting the home when the main goal was to get Mr. Christie's phone.

**M**.  The FBI used the search warrant that was illegitimately obtained by listing false charges without probable cause to assault Mr. Christie's home on December 22, 2022. Without sending a letter for self-surrender, calling his phone to ask for surrender, attempting to speak with Mr. Christie's attorney, or asking for his phone, the FBI arrived with at least a forty-person heavily armed force with a large Special Weapons and Tactics (SWAT) team and crisis negotiators as they planned to create a crisis. See Reconsideration, 2:22-mj-05016-DUTY ECF No. 15 at 4-7.

**N**.  By around 9:45 a.m. on December 22, 2022 the FBI conducted a no-knock assault where they smashed the sliding glass doors to Mr. Christie's bedroom on the second floor (and might have killed him with the flying glass had he been in the room), smashed the upstairs hallway skylight where that glass might have killed or seriously injured him had he been in the hallway, rammed in his first floor front door, sent a drone flying around inside his condo, delivered a cannister with aerosol pepper gas, may have delivered a flash bang since something burned the wood floor and left black residue on the wall by the stairwell; and as was preplanned turned off the water and electricity to the home. The front door was rammed off its frame, the lock was broken out, and the front door was open, as were the sliding glass doors that no longer had glass. See statements at Exhibits 1 and 2.

**O**.  Although the assault described above would generally always be followed by entry and arrest, the FBI instead immediately and abnormally began its planned Crisis Negotiation Team (CNT) calls where they used Mr. Christie's friends to talk about guns. See Exhibit 1.

**P**.  Mr. Christie suffers from and has been treated for anxiety, where the FBI would have known this based on their domestic terrorism investigation requests and subpoenas, and the

invasion of his call logs, credit cards, and other records, as well as from talking to people about him.

**Q**. Mr. Christie's family believes he has high-functioning autism. See Exhibit 3.

**R**. Given potential high functioning autism with anxiety, Mr. Christie went into a panic in the belief the FBI was there to kill him. He believed that if he walked outside he would be shot. He called his friends and ensured his attorney was called. He wanted witnesses to what the FBI was going to do to him.

**S**. The FBI CNT demanded that Mr. Christie's friends who arrived at the scene of the search inject talk with Mr. Christie about his having two handguns. They directed that Ms. Chambers repeatedly demand that Mr. Christie lock his guns in their cases or put them under the bed when he said nothing about using his guns. Mr. Christie instead talked about his Second Amendment right to have them in his home. They were talking past each other. Mr. Christie spoke on the phone to his lawyer about his right to leave and go to a shooting range.

**T**. The CNT scared Ms. Shirafkan and she went into what appears to have been her own PTSD episode after they told her to ask Mr. Christie where his guns were located (The FBI's lack of knowledge about where the handguns were located contradicted claims that he was intending to use them and was pointing at the front door). Without any such words or supporting action from Mr. Christie, in her desire to save him from what she believed was a replica of Iranian IRGC murders, Ms. Shirafkan told the FBI that he would shoot. The audio indicates she was sobbing and hysterical. See Exhibit 2.

**U**. Mr. Christie was on the second floor landing where his direct view down the stairs was at the bathroom door. It was impossible for him to point at the front door which if in its proper place was at a ninety-degree angle to his position.

**V**.  The FBI crisis team and agent in charge had Yvet tell me Christie after swearing to her it was truth, that they were not there to arrest Mr. Christie. See Exhibit 1. Mr. Christie cannot have tried to evade an arrest that was not supposed to happen.

**W**.  Mr. Christie asked for the search warrant as was his right. The FBI did not have it on site. It took forty-five minutes to get it to the site. See Exhibit 1. The FBI then sent some form of the search warrant in via a robot that had trouble climbing the stairs.

**X**.  Even though he thought he would be shot or taken to jail after being lied to that he was not under arrest, Mr. Christie agreed to come out of his condo. He was tackled and arrested by an FBI team that planned the event carefully to create a "crisis" in arresting Mr. Christie. The home search was *planned* so carefully that the FBI included three - four "crisis negotiators" at the scene from the start.  Reconsideration, 2:22-mj-05016-DUTY ECF No. 15 at 4.

**Y**.  The government moved for detention under 18 U.S.C. Section 3142(f)(2), and a hearing was held on December 23, 2022 before the Hon. Alka Sagar, United States Magistrate Judge. The government then proceeded to illegitimately present Section 3142(f)(1) and (f)(2) claims despite Section 3142(f)(1) not being noticed and not applicable under the Bail Reform Act standards.

**Z**.  The magistrate denied bond on December 23, 2022 using standards for both Section 3142(f)(1) and (f)(2), closed the case, and Mr. Christie was moved to the D.C. DCF and then CTF jail after being processed through the U.S. Marshals' center in Oklahoma.

**aa**.  The government claimed at the detention hearing that Mr. Christie was served with a subpoena to testify before the grand jury in February 2022.  Mr. Christie was not properly served a subpoena under Fed. R. Crim P. Rule 17(d). As the transcript from the detention hearing shows, SA Hicks tried to hand the subpoena to Mr. Christie and left it on his car windshield. SA Hicks

was a party imbedded as part of the prosecution and was not authorized to properly serve a subpoena. It is untrue that Mr. Christie was "served." See Fed. R. Crim P. Rule 17(d).

**bb**. The alleged subpoena violated the DOJ's own rules where a "target" or "subject" should not be called without coordinating for voluntary testimony and ensuring the subject knows they can provide a letter they will invoke the Fifth Amendment right to not self-incriminate where testimony can be excused. The subpoena stated Mr. Christie was a target/subject. See alleged Subpoena, Exhibit 4.

**cc**. No mention at all was made in SA Hicks' statement of facts for the arrest  and complaint about any prior subpoena, and the subject of grand jury testimony was never raised again until the detention hearing.

**dd**. On or about December 16, 2022 the FBI coordinated a pretextual operation with the California Highway Patrol to stop Mr. Christie and claim a traffic violation. After he handed over his license and vehicle registration, to which was clipped the license plate sticker not on the exterior tag since theft was at issue, and after the CHP Officer knew Mr. Christie had a valid tag, registration, sticker, and license, he demanded that Mr. Christie get out of his car. Eric asked for the reason and the officer (Gov't Exhibit No. 7 Detention Hearing) threatened that if Eric did not get out of the car the CHP officer was going to break his window. As a normal person would fear such a threat given the number of deadly beatings by police as reported in news media, and knowing attacks on gay persons happen, Eric drove off in fear for his life. He knew the CHP did not look for tag stickers and should not threaten an attack. The video shows that the CHP officer never said that Eric was under arrest. The government claimed Mr. Christie fled arrest and did not comply with orders. No American is required to comply after threat of violent assault by law enforcement.

**ee**.  The Pretrial Services report from December 23, 2022 falsely listed Mr. Christie's charges a being for a crime of violence and recommended denying bond for dangerousness.

## III.    LEGAL STANDARD

Still true today is that "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

"If a person is ordered detained by a magistrate judge, or by a person other than a judge of a court having original jurisdiction over the offense and other than a Federal appellate court, the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). "Courts in this district review a magistrate judge's release order *de novo*. *See United States v. Beauchamp-Perez*, 822 F.Supp.2d 7, 9 (D.D.C. 2011) (citing *United States v. Hudspeth*, 143 F.Supp.2d 32, 35-36 (D.D.C. 2001) (citing cases))." *United States v. Louallen*, Criminal Action No. 19-66 (JDB), 2 (D.D.C. Feb. 28, 2019).

Under the Bail Reform Act, the judge can release a defendant on personal recognizance under subsection (b); release the defendant with conditions as referenced in subsection (c); temporarily detain the defendant for revocation of prior conditional release or deportation under subsection (d); or detain the defendant under subsection (e). 18 U.S.C. § 3142. Although it is at the end of the statute, in subsection (j) Congress wrote that "nothing shall be construed as modifying or limiting the presumption of innocence."

"Congress limited pretrial detention of persons who are presumed innocent to a subset of defendants charged with crimes that are 'the most serious' compared to other federal offenses." *United States v. Singleton*, 182 F.3d 7, 13 (D.C. Cir. 1999) (quoting *United States v. Salerno*, 481 U.S. 739, 747 (1987)). The Bail Reform Act authorizes a judicial officer to conduct a detention

hearing as defined by 18 U.S.C. § 3142(f) to consider detaining a defendant without bond under very limited circumstances so that detention can be decided **only if** at least one of the serious, specified circumstances exists:

> **Under § 3142(f)(1) As Relevant Here**
> (A) a crime of violence. . . ;
> (B) an offense for which the maximum sentence is life imprisonment or death;
> (C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act ( 21 U.S.C. 801 et seq.). . . ;
> (D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph . . ; or
> (E) <u>any felony that is not otherwise a crime of violence that involves</u> a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code; or
>
> **Under § 3142(f)(2)**
> (A) a serious risk that such person will flee; or
> (B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.

18 U.S.C. § 3142(f)

> The threshold question, however, is whether detention is available at all for one of the [] enumerated reasons; **if not, then no matter how dangerous or antisocial a defendant may be, Congress has concluded that such a defendant must be released**, either on personal recognizance or on the least restrictive condition or combination of conditions that will reasonably assure the defendant's appearance and the safety of any other person and the community. *See* 18 U.S.C. § 3142(a)(1)-(3); 18 U.S.C. § 3142(c).

*U.S. v. Gloster*, 969 F. Supp. 92, 94 (D.D.C. 1997)(Emphasis added).

The term *crime of violence* means "(A) an offense that has **as an element of the offense** the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 3156, Definitions. (Emphasis added). The Supreme Court defined "physical force" as "force capable of causing physical pain or injury to another person." *Johnson v. United States*, 559 U.S. 133, 140 (2010). Or, in a residual clause that is likely unconstitutional given U.S. Supreme

16

Court rulings for statutes with the same language using the overly broad and vague term *substantial risk*: "(B) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."18 U.S.C. § 3156(a)(4).

The government cannot just declare a utility item that is not designed as a weapon to be a dangerous weapon.  Intent to use or actual use as a dangerous or deadly weapon is required:

> For an object that is not inherently deadly, the government concedes that the following additional element is required:
> (4) the object must be capable of causing serious bodily injury or death to another person *and* the defendant must use it in that manner. Appellee's Br. at 19; *see United States v. Murphy,* 35 F.3d 143, 147 (4th Cir. 1994); 1 LEONARD B. SAND ET AL., MODERN FEDERAL JURY INSTRUCTIONS (CRIMINAL) ¶ 14.01, at 14-25 (2002); 2 KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE INSTRUCTIONS (CRIMINAL) § 24.06, at 68, 71 (5th ed. 2000). That is, for a car to qualify as a deadly weapon, the defendant must use it as a deadly weapon and not simply as a mode of transportation.

*U.S. v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002)(Emphasis added).

Or as explained in another case settling a case from the District of Columbia "a 'deadly or dangerous weapon' is anything that is *'likely* to produce death or great bodily injury by the use made of it.'" *U.S. v. Vinton*, 594 F.3d 14, 22 (D.C. Cir. 2010) (citing *Broadie*, 452 F.3d at 881)((quoting *Strong v. United States*, 581 A.2d 383, 386 (D.C. 1990)). Further,

> Two categories of objects are likely to produce such harm:
> (1) those that are "inherently dangerous," *i.e.*, where "the design of the object is such that in its ordinary use it is likely to cause great bodily injury"; and (2) those that ostensibly may be used as a tool in certain trades or hobbies or . . . may be carried for utilitarian reasons, but where the surrounding circumstances indicate that the purpose of carrying the object . . . is its use as a weapon.

*U.S. v. Vinton*, 594 F.3d 14, 22 (D.C. Cir. 2010)

"In common parlance, the relevant inquiry is whether the defendant is a flight risk or a danger to the community." *United States v. Munchel*, 991 F.3d 1273, 1279 (D.C. Cir. 2021) ((citing *United States v. Vasquez-Benitez*, 919 F.3d 546, 550 (D.C. Cir. 2019)).

For a detention decision under § 3142(f)(1) "the Government must convince a neutral decisionmaker by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person." *Salerno*, 481 U.S. at 750 ((citing 18 U.S.C. § 3142(f)).

### 18 U.S.C. § 3142(g) factors that must be considered to assess whether to release or detain for dangerousness or flight risk:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person;
> A. The person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
> B. Whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by his release.

§ 3142(g); *see also Munchel*, 991 F.3d at 1279–80.

To deny bail, the government must establish that the defendant poses a continued "articulable threat to an individual or the community" that cannot be sufficiently mitigated by release conditions. *Salerno*, 481 U.S. at 751. "The Bail Reform Act requires that a pretrial detention order 'include written findings of fact and a written statement of the reasons for the detention.' 18 U.S.C. § 3142(i)(1)." *U.S. v. Nwokoro*, 651 F.3d 108, 109 (D.C. Cir. 2011). "A defendant's detention based on dangerousness accords with due process only insofar as the district court determines that the defendant's history, characteristics, and alleged criminal conduct make clear that he or she poses *a concrete, prospective threat to public safety*." *Munchel*, 991 F.3d at 1279-80. (Emphasis added). Referencing *Salerno*, *Munchel* noted that for dangerousness the threat must be a continued, identified, and articulable threat to the community or to another person. "[W]hether a

defendant poses a particular threat depends on the nature of the threat identified and the resources and capabilities of the defendant. *Cf. Nwokoro*, 651 F.3d at 110 –11 (noting that evidence 'favoring appellant's pretrial release' included the fact that appellant had no assets under his control, no ability to flee the country, and 'no prior criminal record')." *Munchel*, 991 F.3d at 1283.

"Detention cannot be based on a finding that the defendant is unlikely to comply with conditions of release absent the requisite finding of dangerousness or risk of flight; otherwise, the scope of detention would extend beyond the limits set by Congress."  *Id.*

### Assessing Flight Risk

In addition to factors in 3142(g), the D.C. Circuit "ruled that such a finding need only be supported by a preponderance of the evidence." *U.S. v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987) ((quoting *United States v. Vortis,* 785 F.2d 327, 329 (D.C. Cir. 1986)). To show preponderance of the evidence, the magistrate's memorandum must address significant counterbalancing factors presented by the defense including witnesses or testimony representations such as "family ties, employment, . . . length of residence in the community, community ties, . . . and record concerning appearance at court proceedings  .  .  .  that are relevant to the assessment of the risk of flight." *Simpkins*, 826 F.2d at 97. Judges must address the defense's proposed release conditions.

Chief Judge Howell outlined six factors to be considered in assessing the nature and circumstances of January 6, 2021 related offenses, including whether a defendant:

> (1) has been charged with misdemeanors or felonies;
> (2) engaged in prior planning before arriving at the Capitol, for example by obtaining weapons or tactical gear;
> (3) carried or used a dangerous weapon, be it a firearm, large pipe, wooden club, or other offensive use instrument;
> (4) coordinated with participants before, during, or after the riot;
> (5) assumed either a formal or de facto leadership role by encouraging other rioters misconduct; the nature of the defendant's words and movements during the riot.
> (6) The Defendant's Words and Movements During the Riot.

## IV.    ARGUMENT

Release is warranted in this case, because (1) The government cannot prove by clear and convincing evidence when there is no evidence at all that Mr. Christie poses an articulable, continuing threat or danger to any person or the community, should the Court deem § 3142(f)(1) applies, and (2) the government cannot prove by a preponderance of the evidence or any evidence at all that Mr. Jackson is a flight risk, and (3) Assuming arguendo that government somehow can meet its burden using the creations by the FBI in December 2022 with the December 16th CHP pretextual traffic stop and the FBI's assault on Mr. Christie's home on December 22nd,, the government cannot prove that there is no condition, or no combination of conditions that will not reasonably assure Mr. Christie's appearance in court and the safety of any person or the community. Because of this, Mr. Christie should be released subject only to the least restrictive condition or combination of conditions necessary to ensure his return to court and the safety of the community.

With his faith in Christ and the strong values of his upbringing, Mr. Christie retains his trust in the judicial system and the nobility of the Court in its roles in the justice system. This instant review verifies that safeguards for justice under the Act in fact exist. Mr. Christie's release should be ordered. The truth is the truth. Revoking the magistrate's detention order (2:22-mj-05016-DUTY ECF No. 6) and providing release on personal recognizance or with conditions is justified and just.

### A.  The Magistrate's Order for Detention Should be Revoked

1.  Detention was by motion, announced by the government under 18 U.S.C. § 3142(f)(2) alleging a serious risk Mr. Christie would flee. But the government then added § 3142(f)(1) in argument and closing, for which the charged crimes under Section 1752(a) and the (b)

enhancement do not fall within those that Congress determined can have a detention hearing on motion by the government for dangerousness. The AUSA stated the "government is seeking detention in this case pursuant to 18 United States Code Section 3142(f)(2)." Transcript at 23:15-17. Although there is no indication the defense ever received a copy, the government also filed notice that 3142(f)(2) was the basis for seeking detention. 2:22-mj-05016-DUTY ECF No. 4.

In its holding that may well have violated Mr. Christie's due process under the Fifth Amendment as well as the Act based on what was noticed and what was argued and decided, the court found that "no condition or combination of conditions will reasonably assure: the appearance of the defendant as required and the safety of any person or the community." 2:22-mj-05016-DUTY ECF No. 6 at 2.  Because the magistrate found dangerousness that can only be found under Section 3142(f)(1), where that did not apply here, the order should be revoked, and the government should be precluded from injecting "dangerousness" in any opposition or argument in this case.

2.  The legal standard for an order denying bail requires that it must be written, contain specifics, *and explain why no conditions can allow bail*. The magistrate's order is deficient. While a transcript can be used, nothing in the transcript for this hearing cures the defects of the order. There was no identification of a continuing, articulable, specific danger to anyone - where the proceeding was noticed as only for non-appearance / flight risk. There was no clear and convincing evidence of dangerousness should Section 3142(f)(1) have applied. The "danger" was manufactured by the government on December 22, 2022. See Exhibit 1. There was no preponderance of evidence that Mr. Christie would fail to appear. The government misled the court by mischaracterizing a subpoena that never legitimately was served. The government claimed Mr. Christie fled from arrest by the California Highway Patrol (CHP) when the CHP threatened him and never said he was under arrest. The government said Mr. Christie was barricaded in his condo

when no such thing happened, and the doors were open. The government claimed Mr. Christie was evading and resisting arrest on December 22, 2022 when the FBI told him, his attorney, and his friends that he was not being arrested. Further, the order made no finding as to why no conditions of release could apply. There was no mention of any proposed release condition in the decision and why Mr. Christie's proposed conditions were unsatisfactory either alone or in combination.

3.  Mr. Christie was not treated the same as those similarly situated to him. Mr. Christie, if afforded the same justice as applied to others similarly situated, would have immediately been released. The government used gun ownership to create theater that Mr. Christie pointed a gun at anyone. Given his location in his condo, that was a physical impossibility. (see Exhibit 5). If Mr. Christie had grabbed a handgun, where only one of the two he owned allegedly had a single round in it, that happened when glass was exploding around him, and the no-knock raid busted open his front door while spreading OC gas through his condo. The FBI had no idea whether Mr. Christie later held any weapon, as shown when they demanded Mr. Christie's friend ask him where his guns were located. The government cannot have it both ways here, i.e., claiming he had a gun in hand and then not knowing where the guns were in the condo. Aside from the fact that he could not have pointed a handgun at the front door from upstairs as falsely claimed by the government, Mr. Christie indicated no intent to use a weapon and was in shock, standing barefoot with shattered glass all around him. The assault on his home was a manufactured situation.

Mr. Christie's behavior on January 6, 2021 was peaceful. Other defendants accused of assaulting police, damaging property, and removing bicycle racks have been released on bail. Despite the government's false claim that Mr. Christie pointed a gun at the door, the reality was that armored SWAT team members were on his roof, balcony, and surrounding the building where none were observed by bystanders as crouched in any apparent avoidance of a threat from inside.

Instead, SWAT members were highly visible in a demonstration of force with long guns scaring bystanders. Mr. Christie posed no threat to anyone and should be released.

**B.  Dangerousness Under § 3142(f)(1) Should Not Be Applied in This Case**.

1.  The charges of Sections 1752(a)(1) and (a)(2) are misdemeanors that do not meet any of the requirements for a detention hearing under Section 3142(f)(1)(A). The elements of the base crime do not equal a crime of violence. A crime of violence must have **as an element of the offense** the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 3156, Definitions. Adding the punishment enhancement in Section 1752(b)(1) for carrying a dangerous or deadly weapon still does not rise to meeting the floor set by Congress because no use, attempted use, or threatened use was alleged. A hammer is not an inherently dangerous weapon and must be used or threatened to be used to cause serious bodily harm. *Arrington*, 309 F.3d at 45 *supra*. Because of this, a detention hearing cannot be held under Section 3142(f)(1)(A), and release with or without conditions should be considered.

2.  Likewise, a detention hearing cannot be held under Section 3142(f)(1)(E) in this case. That requires a felony base offense that involves a dangerous weapon. Sections 1752(a)(1)-(2) are not felonies. The addition of Section 1752(b)(1) might meet the dangerous weapon requirement, but the base charges remain misdemeanors. The law was written for crimes like burglary that are not necessarily violent, but a detention hearing is in order when the defendant is alleged to have carried a dangerous weapon, such as a gun. Because no felony is involved here within the criteria, Section 3142(f)(1)(E) does not apply in this case for a detention hearing.

3.  As held in *Gloster*,  even if there is some dangerous quality to the alleged offense, where the defendant is presumed innocent, and despite any antisocial qualities of a defendant, Congress wrote the Act and concluded that such a defendant must be released. Mr. Christie is neither

dangerous nor antisocial. The government's allegations do not warrant detention for dangerousness under Section 3142(f)(1).

**C.  The Government's Illegally Obtained Picture of Mr. Christie's Condo Unit Door Sign on November 28, 2022 Should Be Suppressed From Evidence**.

1.  In its exhibit for the detention hearing on December 23, 2022 the government tried to enter pictures and made statements about the door sign on Mr. Christie's condo unit entrance that it photographed on November 28, 2022.  FBI Agent Turner described the acquisition as coming from a "spot check."  (Transcript at 32:2-24). The area the FBI illegally entered was normally a locked, private hallway with access to the six condo units. The outer door to the alley and the outer front door are supposed to be locked. Only residents and their guests or invited licensees are authorized to be inside the interior private hallway. The FBI was not granted legal access (by Mr. Christie  or anyone who will admit it) to be inside the building on or before November 28, 2022. Yet it was regularly entering to harass Mr. Christie. Agent Turner claimed over six instances of "spot checks" on Mr. Christie occurred since March 2022. SA Hicks kept gaining uninvited and apparently illegal entry to leave cards on Mr. Christie's door after being told Mr. Christie did not want to talk to him. As such, the picture of the door sign that was visible only to residents and authorized persons (and where none objected) was illegally obtained. Mr. Christie was not on probation or any conditions where the FBI had any authority to conduct "spot checks". The picture should not be allowed into any proceeding or argument because it was illegally obtained by the FBI agent(s).

2.  If the picture is considered, it should not be viewed under the misrepresentation as was done in the California hearing. Mr. Christie's anxiety increased when he became aware that someone had illegally accessed his condo and drilled a hole in the wall from the outside of his end unit. He has no idea who did this, whether government, thieves casing his unit, or a perverted

voyeur. He suspected surveillance equipment had been used. Compounding that, the building manager ("John") and residents were well aware of trespassers occupying the outdoor common area, and potential thieves getting inside the garage and then the hallway through the alley door by what appeared on surveillance video to be through use of a key. Exhibits 6-7.  Mr. Christie observed and reported trespassers outdoors with knives and a machete on the condominium's private property. The trespass by vagrants and potential drug addicts or thieves had been ongoing. The sign was inside as a deterrent, and not visible from outdoors. The government attempted to misrepresent the sign as a threat, even though Agent Turner said the SWAT raid was because Mr. Christie had not accepted a subpoena and he did not get out of his car for the CHP. The sign is immaterial and probative of nothing given Agent Turner's testimony at the California detention hearing.

### D.  The False Allegation that Mr. Christie's Purchase of a Second Handgun in February 2022 Had Anything to Do With An Alleged Subpoena Should be Ignored.

The government engaged in pure speculation by claiming that Mr. Christie's legal purchase and registration of a firearm had anything to do with the government or the proximity in time to the subpoena that was never properly served. Mr. Christie never made a verbal threat. There is no law that restricts the time between seeing an alleged subpoena and when one might then continue with a planned, legal purchase. The government manipulated an innocent act to make a false claim in the detention hearing. Any repeated attempt should be ignored as a fiction story.

### E. Mr. Christie is Not a Flight Risk And The Government's False Claim That He Tried to Flee or Resist Arrest Once or Multiple Times Should Be Ignored.

During the detention hearing the Government made multiple false claims that Mr. Christie tried to flee arrest. (Transcript at 91 onwards).  The California Highway Patrol (CHP) traffic stop was admittedly a pretext for the FBI to arrest him. The CHP is shown on video demanding the

license and registration, where Mr. Christie complied. Without cause, the officer demanded that Mr. Christie exit the car. Few Americans feel safe these days being stopped for no apparent reason, especially if it is clear the stop is made by an entity that does not normally operate in the area. The CHP may have statewide jurisdiction, but they are not residential traffic police. The CHP officer became belligerent when Mr. Christie, a gay man, felt threatened by the abnormal demand that he shut down and exit his car when his license, registration, tag, and sticker were all valid. As a man harassed for months by the FBI, where he believed they wanted to "disappear him" to a jail as a terrorist, was terrified at the demand. When he tried to calmly argue and ask for reasons, the CHP officer did not say "you are under arrest." Instead, he allegedly said that Mr. Christie might be arrested for obstruction (where Mr. Christie does not recall hearing this), and that if he did not exit the vehicle the officer was going to break his window. Mr. Christie heard the unreasonable threat of assault and slowly drove away in fear. Although they had an arrest warrant, the FBI did not try to stop or arrest Mr. Christie on December 16, 2022 when the CHP pretextual stop failed.

In its closing argument the government made false and unsupported claims that Mr. Christie has no respect for law enforcement and the rule of law. This was incredible in that over his entire life having been born in 1966, Mr. Christie has no criminal record. The government misrepresented a charge that was dismissed. It involved police entrapment where a plainclothes officer flirted and said he wanted to 'get together' with Mr. Christie. No money was involved, and no sex happened because a number of other plainclothes police immediately tackled Mr. Christie.

The government's representation of an unauthenticated, almost 12 year-old report omitted that the original charges were dismissed because no crime was committed. More importantly, the government hid that Mr. Christie attended all court sessions even when not required.

The government's closing argument went beyond misrepresentation. The true description of events for December 22, 2022 cannot be ignored: the SWAT operations were abnormal, and the assault raid was staged theater. Mr. Christie was in fear for his life given the sequence of events. He was essentially called an anarchist for wanting to see the search warrant - which the FBI did not have on site. He threatened nobody, did not point a weapon at anyone, and certainly did not attempt to flee. He did not exit immediately because he anticipated being murdered.

The entire conduct of the SWAT operation was abnormal where an assault for violent entry was effected - without the entry. Instead, with his front door being rammed open, his bedroom glass doors being smashed, his skylight being smashed, and OC spray being dropped (not once but twice), the Crisis Negotiation Team was calling Mr. Christie on the phone within the very first minute. With operations executed as if for a terrorist takedown, the SWAT members attempted no entry to arrest and search. Mr. Christie was lied to by the FBI who said he was not going to be arrested. And after he was arrested, he was not given Miranda rights warning, and instead in the car en route to the prison, the FBI began questioning Mr. Christie, to include presenting him with a picture of a person at the January 6, 2021 events.

The AUSA mischaracterized that Mr. Christie does not follow the rule of law and has no respect for courts. The assault operation by the FBI SWAT team was uncalled for, where Mr. Christie who is known to have anxiety, remained peaceful while argumentative as to whether the search warrant signature was valid. There are no charges against Mr. Christie for evading or resisting arrest. There can be none because Mr. Christie was not told he was under arrest.

Despite what the government said in its arguments at the detention hearing, the Act and caselaw are clear - the assumption that a defendant will not comply with conditions of release is

not allowed when at his detention hearing, the government did not and cannot show by any preponderance of evidence that Mr. Christie is a flight risk or danger to anyone.

The standards required include showing evidence that he prepared to flee, that he have overseas connections, transportation, and a place to flee, and that he have the means and resources to flee. None of this exists. And, again as the government omitted, the only other time Mr. Christie had a court proceeding about twelve years ago, that he was present without issue. The other standards that are in Mr. Christie's favor are that he has lived in the Los Angeles area for approximately forty years. He owns a home. He has worked with his company and in the sector for twenty years. His friends, church, and family are nearby. He is deeply rooted and will not leave the place and people he loves. The preponderance of evidence goes to Mr. Christie's column.

Because no clear and convincing evidence shows Mr. Christie is a danger to the community or any person, and no legitimate let alone preponderance of evidence shows him to be a flight risk, he should be released. The magistrate gave no findings or discussion of why no release conditions could be implemented, such as GPS monitor or curfew.

### F.  Mr. Christie Should be Released Upon Assessment of 18 U.S.C. § 3142(g) factors:

(1)  The nature and circumstances of the offense charged, including whether the offense is a crime of violence favor release. This was addressed above but in summary Mr. Christie is not accused of a crime of violence. Mr. Christie is charged with 18 U.S.C. Section 1752(a)(1) and 1752(a)(2) misdemeanors for being on restricted grounds, with the added enhancement of carrying a dangerous weapon - a hammer on his belt loop. Mr. Christie is not charged with using the hammer or showing any intent to use the hammer; or assaulting or injuring anyone. He was on the east side of the Capitol and not involved in violence. This factor favors release because he was peaceful and had no intent to violate the law or be where he was not allowed. He saw no signs saying the area

was closed or restricted. From his vantage point he was unaware of anything riotous happening anywhere while he was present.

(2) The weight of the evidence against Mr. Christie favors release because it is:

(A) weak for the enhancement of Section 1752(b)(1) - carrying a dangerous weapon.  He did not use, threaten to use, or have any intent to use the hammer to injure anyone at the Capitol. A hammer is not an inherently dangerous weapon unless used as a weapon with intent to cause injury.

(B) weak for the Section 1752(a)(1) and (a)(2) misdemeanor charges because he had no intent to knowingly enter a restricted area, caused no damage, disrupted no ongoing business, was involved in no violence; did not interfere with police, and did not enter the building. When the gates were opened to allow people to move forward, Mr. Christie was back in the crowd and reasonably believed the police had allowed people to enter.

(3) The history and characteristics of Mr. Christie favor release:

A. Mr. Christie has been a law abiding citizen his whole life. He is respected in his community, works hard, has family living nearby, owns his home, was employed with his company for approximately twenty years where he has been told he can return to work upon release, has lived in the greater Los Angeles community for forty years, is rooted in his community, has no history of criminal conduct, is not a substance abuser, and for the one case where he had a court case he made his appearance every day. He is not a flight risk and intends to have his day in court for these charges. He is an upstanding citizen and Christian who is valued by friends, and who donates his time and money to help those in need without any fanfare for himself. See Character Letters at Exhibit 8. He has anxiety where he has received treatment, but he may require a diagnosis for high functioning autism, with treatment and therapy that is not available in jail.

B. Mr. Christie was not at the time of the current offense or arrest on probation, on parole, or on other release. This factor is in his favor for release.

(4) There is no seriousness of danger to any person or the community that would  be posed by his release. Mr. Christie has never physically injured anyone and has no bad intent against anyone. He is a church-going Christian who was raised by loving parents with strong values that he brings into his life daily. See Exhibits 1, 2, 3, 8.

### G.  Mr. Christie Should be Released Based Upon the *Chrestman* Factors:

(1) He is charged with the misdemeanors of Section 1752(a)(1) and (a) (2) with the Section 1752(b)(1) punishment enhancement added because he is accused of having a hammer hanging off his belt loop that was never used, and never intended to use offensively to cause injury. The Section 1752(B)(1) charge is serious but because he never gave any indication of intent and never took any action with a hammer, this "dangerous weapon" allegation should be dismissed, making this factor be in Mr. Christie's favor.

(2) Mr. Christie engaged in no prior planning before arriving at the Capitol outside of travel arrangements. He had no gas mask and wore no tactical gear. He was there for a happy event. He draped an LGBTQ flag near his head and shoulders. He did have a megaphone, but his words did not encourage violence or for anyone to enter the Capitol. He never had any intent to go inside the building. He never called for anyone to go where he did not believe they had a legal right to be present. Mr. Christie believed he was legally in a location he could be present at. This factor favors release.

(3)  Mr. Christie carried no weapon for offensive use. He knew that knives and guns should not be carried, and he did not carry either. Having been alerted to Antifa intent to dress as Trump supporters and attack, which had happened at other First Amendment rallies, Mr. Christie

had a hammer on a pants belt loop in the remote event he needed to defend his life to the extent that he could safely retreat from the danger. He never took the hammer off his pants belt loop, never demonstrated any intent to use it or cause harm and was under the belief that it was a legal item to possess. A distinction is that Mr. Christie never intended any offensive use and never used the hammer. This favors his release.

(4) A riot has violence and Mr. Christie was not involved with any participants in a riot anywhere on the grounds before, during, or after January 6.  This factor favors his release.

(5) Mr. Christie never assumed either a formal or de facto leadership role by encouraging other rioters misconduct. He only called for protestors to come closer to his position for a "MAGA party." He was in charge of nobody and led nobody. This factor favors release.

(6) The Defendant's words and movements while on the grounds: Mr. Christie was on the east front side and did not encourage anyone to assault police or riot, where a riot includes violence. He was not involved in any violence. He did not destroy property or vandalize the Capitol building. Mr. Christie did not engage with police through shouting or cursing. He did not enter the Capitol building. Mr. Christie was behind a crowd of people gathered on the east side as he expected the gates to open for permitted protest and rallying. When he saw that people were being allowed onto the plaza, he moved to be toward the front. He used his megaphone to call for people to come forward to his location near the bottom of the steps. He called it "our house" and said there was a "MAGA party" and that Hollywood was present. His tone was nonviolent and not angry. None of his actions or speech supported violence or rioting. This factor goes in Mr. Christie's favor because he believed he was legally present and called for legal speech outside the building. There was nothing nefarious in his referring to the building as "our house." This factor favors release of Mr. Christie.

**H.  Mr. Christie Should be Released on his Own Recognizance but the Following Conditions Can Alleviate Any Concerns:**

Mr. Christie through counsel, respectfully requests a hearing and that he be released on personal recognizance. If release conditions are decided, he requests the standard conditions used by the Court that include: stay out of D.C. except for court requirements; comply with courtesy [CD CA] Pretrial Services monitoring; surrender any passport and not apply for a new one; no travel outside the Central District of California without prior notification of Pretrial Services; no travel outside the continental U.S. without approval of this Court; obtain or continue employment; do not commit any crimes; and do not use any controlled substances without a valid prescription. An added condition may be to obtain a specialist's evaluation for high functioning autism and recommended therapy.

## V.      CONCLUSION

The magistrate's order should be revoked, and Eric Christie should be released on bond because he is eligible using the standards of the Bail Reform Act.

WHEREFORE, for good cause shown and the foregoing reasons, and any others which may appear in our reply or at the hearing requested for this matter, and any others this Court deems just and proper, Defendant Eric Christie through counsel respectfully requests that he be released on personal recognizance or with the conditions of release shown in the proposed order.

Dated February 10, 2023                        Respectfully submitted,

                                               /s/ *Carolyn A. Stewart*
                                               Carolyn A. Stewart, Bar No. FL-0098
                                               Defense Attorney
                                               Stewart Country Law PA
                                               1204 Swilley Rd.
                                               Plant City, FL 33567
                                               Tel: (813) 659-5178
                                               Email: Carolstewart_esq@protonmail.com

## CERTIFICATE OF SERVICE

I hereby certify on the 10th day of February 2023, a copy of the foregoing was served

upon all parties as forwarded through the Electronic Case Filing (ECF) System.

                              /s/ Carolyn Stewart Esq.
                              Carolyn Stewart, Esq.