**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 23-CR-005 (APM)** |
| **v.** | : | |
| | : | |
| **ERIC CHRISTIE,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S**
**MOTION FOR REVOCATION OF DETENTION ORDER**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby opposes Defendant Eric Christie's Motion for Revocation of Detention Order. (ECF No. 15.)   At the detention hearing in the district of arrest, the Honorable Alka Sagar stated that "the Court does not find this to be a difficult case."  Ex. 10, 12/23/22 Hearing Transcript ("Tr.") at 95.  Indeed, rarely is a Magistrate Judge presented with such clear evidence of risk of flight: Christie fled in his vehicle when patrol officers first attempted to arrest him, and he triggered a three-hour armed standoff when an FBI SWAT team arrested him a week later.  Judge Sagar held accordingly that "there is a serious risk of nonappearance due to this defendant's demonstrated disregard for law enforcement and his refusal to comply with law enforcement's directions." *Id*. Because Judge Sagar correctly concluded that no condition or combination of conditions could assure Christie's appearance at trial and the safety of the community if Christie were to be released, Christie's motion should be denied.

## **BACKGROUND**

*a. Christie's Breach of the Restricted Area and Encouragement of Rioters—while Carrying a Weapon—during the Capitol Riot*

The defendant Eric Christie is charged with participating in the riot at the United States Capitol on January 6, 2021.  As set forth in the Statement of Facts supporting the arrest warrant (ECF 1), Christie stormed into the restricted area of the Capitol Grounds after seeing rioters demolish security barricades on the East Front.  Through a bullhorn, he encouraged rioters to push past police as they struggled to keep the rioters from advancing up the Capitol steps to the East Rotunda door, as shown in Image 1 below:



*Image 1*

ECF 1 at 4.  Christie then hopped on top of a police car.  From there, he continued shouting through his bullhorn and encouraging rioters as they overran the police line and made their way to the East Rotunda door, which the rioters would eventually breach as well.   Christie did all this while

carrying an exposed hammer, as shown in Image 2 (Christie circled in red), Image 3, and 4 (close-up view of the hammer) below.



*Image 2*



*Image 3*



*Image 4.*

ECF 1 at 6-8.  In short, Christie illegally entered the restricted area, carrying a dangerous weapon, and played an instrumental role in fomenting the ongoing riot.

The Honorable Robin M. Meriweather issued a warrant for Christie's arrest on December 15, 2022.  The arrest warrant charged two crimes: violations of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon); and 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon).  ECF 5.

On January 4, 2023, a duly empaneled grand jury in the District of Columbia indicted Christie on the same two charges in the arrest warrant.   These are felony charges that carry a statutory maximum of ten years in prison.  18 U.S.C. § 1752(b)(1)(A) ("The punishment for a violation of subsection (a) is—(1) a fine under this title or imprisonment for not more than 10 years, or both, if—(A) the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm").

     *b.   Christie's Demonstrated Potential for Non-Compliance with a Lawful Arrest*

Following issuance of the arrest warrant, the FBI had to assess the safest and most efficacious manner to detain Christie.  The FBI determined that there was a risk that Christie would not comply with lawful orders.  The FBI's assessment was based on the following:

(1) Christie's refusal to accept service of a grand jury subpoena that two FBI agents had attempted to serve on him on February 21, 2022 (Ex. 1) (FBI memorandum documenting attempted subpoena service); (Tr. 28:14-30:04);

(2) Christie's purchase of a firearm within a week of refusing to accept service of the subpoena (Ex. 2) (record showing purchase of a Smith and Wesson revolver on March 1, 2022); (Tr. 31:22-32:02); and

(3) a warning sign that Christie had posted on his door, which the FBI had observed in December 2022, and which the FBI reasonably construed as a threat. The sign included the following text:

> To all 'Officers of the Law', if you have come to protect me, you are welcome.  If you have come to harass me, **KEEP OUT – DO NOT TRESPASS** (including common areas)!! <span style="color:red">**Survivors will be prosecuted**</span>."

(Ex. 6) (emphasis and color in original); (Tr. 33:13-34:14).  The FBI also considered a 2011 police report that stated that Christie physically assaulted police officers when they attempted to arrest him for soliciting a lewd act in public.[1]  The FBI determined that the safest, most reliable way to execute the federal arrest warrant would be through a traffic stop carried out in public, in broad daylight, by the California Highway Patrol ("CHP").    Tr. 34:21-23.

### c. *Christie's Refusal to Comply with CHP Directives*

On the afternoon of December 16, 2022, two CHP officers, in coordination with the FBI, attempted to arrest Christie by carrying out a routine traffic stop and then requesting that he exit

---

[1] The Government does not contend that Christie's reported conduct in 2011 should bear on the Court's determination of whether Christie today presents a risk of flight or danger to the community.  Rather, the Government cites this fact merely to contextualize the FBI's approach to executing the arrest warrant in December 2022.  The Government has not submitted the police report as an exhibit here but can provide it to the Court upon request.

his vehicle.  Ex. 4 (CHP report).  A dashboard camera recorded the incident, and the video has been submitted to the Court.[2]  Ex. 7 (dashboard camera video from CHP).  Christie initially provided the officers his driver's license and registration cards through his window.  Over the course of the next three minutes, however, Christie refused at least seven separate requests by the police to exit his vehicle.  The officers made their requests to Christie calmly and politely (e.*g*., "do you mind stepping out the vehicle").  *Id.* at 2:28.   The officer who spoke to Christie while standing next to the driver's side window made clear to Christie that "you are not free to leave." *Id.* at 2:58; Tr. 39:5-7.   The officer asked Christie to shut off the car's engine, but Christie did not do so.  Ex. 7 at 3:19.

When Christie refused repeated requests to step out of his vehicle, the officer told him, "If you're not going to comply, I'm going to place you under arrest for obstructing."  *Id.* at 3:23.   The officer again told Christie that Christie had been stopped and he had to comply with the police requests, stating "we're on a traffic stop, you're going to be placed under arrest for obstructing." *Id.* at 3:58.  Yet Christie still refused to comply.   After three minutes of repeated non-compliance, the officer then stated that he would have to break Christie's window (which Christie had not rolled

---

[2]  The audio and video exhibits in support of the Government's opposition (Exhibits 7, 11, 13, and 14) have been submitted directly to the Court and defense counsel via USAfx.  These materials were also produced to defense counsel before defense counsel filed the instant motion.

down). *Id.* at 4:07.   With police officers standing on both sides of his vehicle, Christie then sped off. *Id.*

The CHP officers reasonably chose not to engage in a dangerous pursuit of Christie in their vehicle. *See* Tr. 40:11-18. The FBI had to find another way to execute the warrant.

### d. The Attempted SWAT Arrest of Christie and Ensuing Standoff

The FBI learned that Christie had returned to his residence but was not regularly leaving it.  This dictated that the arrest would take place in the residence.  The FBI determined that a Special Weapons and Tactics (SWAT) team would be the safest way to arrest Christie in light of, *inter alia*, his past behavior and ownership of firearms.  Tr. 43:22-45:13.

The Los Angeles Field Office (LAFO) SWAT Operations Log indicates that at approximately 8:59 a.m., the SWAT team breached Christie's door and the Crisis Negotiations Team (CNT) began negotiating with Christie.  Ex. 8 (LAFO Swat Operations Log).  Christie refused to exit the apartment and yield to arrest.  The FBI employed various tactics, in escalation, meant to bring about Christie's surrender, including deploying pepper spray at approximately 9:12 a.m., and shutting off the residence's water at 9:18 a.m.  Ex. 8; Tr. 47:18-48:21.

FBI agents used a robot equipped with a camera to gain visibility into Christie's residence.[3] Tr. 48:12-49:25.  At approximately 9:31 a.m., the agents determined that Christie had a gun in his right hand.  Ex. 8.  At approximately 9:37 a.m., Christie stated that he was "completely armed and willing to use 2nd amendment rights."  Ex. 8.   FBI Special Agent Eric Turner, who served as the Acting Supervisory Special Agent during the attempted arrest of Christie, testified in the detention

---

[3] The SWAT team's use of the drone involved breaking a skylight in the residence.  Tr. 70:2-8.

hearing that he specifically recalled Christie discussing using "his Second Amendment rights."[4] Tr. 25:3-26-2, 50:1-12.  Agent Turner also testified that one of the SWAT operators told him that he observed through the robot camera that Christie was pointing a weapon toward the "landing of the front door to his residence, where law enforcement officers would presumably make entrance." Tr. 75:17-24.  Further, Agent Turner testified that he heard Christie stating that the FBI had no legal authority to arrest him, as also noted in the log. Tr. 50:13-51:4.

George Newhouse, a private attorney that Christie had previously retained, arrived at approximately 9:59 a.m.  Ex. 8.  Mr. Newhouse has more than 30 years of experience practicing law and more than 20 years of experience representing criminal defendants.  Ex. 17 (biography of George Newhouse).  Christie had indicated that he trusted Mr. Newhouse.  Ex. 8 (9:47 a.m.: "Subject trust[s] attorney and says he is on his way.").  The SWAT Team facilitated Newhouse's communications with Christie, hoping that it would promptly end the standoff.  It did not.

Christie continued to refuse to be arrested.  He demanded to see the arrest warrant.  When he saw it, he insisted it was invalid.  At 10:55 a.m., Christie told the FBI—as clearly captured in contemporaneous audio recordings attached to the Government's submission— that "this is not going to end well," "this is not a legal warrant," "you have taken this too far," and "you better come in here shooting."  Ex. 8; Ex. 11 at 00:05-00:48 (FBI audio recording of communications with Christie); Tr. 55:5-9.   The FBI reasonably understood Christie's statement "you better come

---

[4] The Government, of course, does not agree that the Second Amendment guarantees citizens the right to shoot law enforcement officers while they are executing an arrest warrant.

in here shooting" to be a threat from Christie that he would "be engaging in shooting and violence" if the FBI tried to enter his residence and arrest him.  Tr. 55:10-15.

Mr. Newhouse urged Christie to put away his firearms and exit the residence peacefully. Ex. 13 ((FBI audio recording of communications with Christie; Christie tells Newhouse, "[T]hey don't have a legal warrant and I know they are trying to abduct me . . . I should be able to take my guns and go to the shooting range right now…"  Newhouse responds to Christie, "that's not going to happen . . . what's going to happen is that you're going to walk out of the apartment without the guns…").  Friends of Christie's arrived on the scene and tried to communicate with Christie as well.   Yvet Chambers, a friend of Christie's, told him, "I need you to take your guns right now. . . I'm not going to repeat this, you're going to do this. I need you to take your guns right now and put them back into their safety places. I need you to disembowel them from any cartridges and bullets."  Ex. 14 (FBI audio recording of communications with Christie).   According to Mr. Newhouse, he and Christie's friends made a half-dozen or more entreaties to Christie to put away his weapons and walk out the door.  Tr. 74:5-12.  Nevertheless, at approximately 11:14 a.m., Christie stated to one of his friends—*an hour after Christie's own attorney began pleading with him to put away his firearms*— "My guns are with me."  Ex. 8; Tr. 56:5-17.

Finally, at approximately 12:18, more than three hours after the SWAT team arrived at the residence, Christie emerged from the residence and was placed in custody.   The FBI considered Christie's conduct, effectively, a barricade situation.  Special Agent Turner testified: "The fact that [Christie] did not comply with law enforcement orders for over three hours, and refused to come out of his house, constitutes a barricade, in my opinion."  Tr. 71:22-25.

Following Christie's arrest, the FBI executed a search of the residence pursuant to a duly issued warrant.  Ex. 18 (Search and Seizure Warrant, 22-MJ-4923 (C.D. Cal. Dec. 15, 2022).  The

FBI found evidence of Christie's charged crimes, including the hammer that Christie carried during the Capitol riot and the distinctive clothing that he wore.  Tr. 58:3-59.25; Ex. 9, pp. 1-2. More importantly for the instant motion, the FBI also found two firearms.

The FBI found a loaded Glock handgun with the magazine inserted into the gun and a round in the chamber.  Tr. 60:1-61:15; Ex. 9 (search warrant photographs), pp. 4-5.  Simply put, Christie could have fired the Glock handgun during the standoff with a single pull of the trigger. Tr. 61:13-15 (testimony of Agent Turner that "there was a round in the chamber, and the significance of that is, if someone pulled the trigger, if the weapon is functioning properly, it would fire").  The FBI also found a 357 revolver in Christie's residence, which (unlike the Glock) was not loaded.  Tr. 61:16-62:5; Ex. 9, pp. 7-8.

### e.   The Central District of California Detention Hearing and Order

The Government moved for detention pursuant to 18 U.S.C. § 3142(f)(2).  Tr. 23:15-23. In support, the Government elicited the testimony of Agent Turner and introduced into evidence, *inter alia*, the dashcam video of the CHP stop and the photos of the firearms found during the search.  Defense counsel put on a witness, Asafeh Shirafkah, who has submitted a letter in support of the defendant's instant motion as well.  ECF 15-2.   The court ruled from the bench as follows:

> The Court does not find this to be a difficult case. This is a situation where the Defendant has a history of not complying with, not recognizing, you know, lawful authority, and has not only demonstrated that with his actions prior to the time that he was arrested yesterday, but certainly . . . the long, drawn-out proceedings with the SWAT team, the fact that, even after Mr. Christie's counsel told him that the agents had a lawful arrest warrant and a search warrant, and he needed to come out without his guns, the fact that he refused to do so, and made statements indicating that he was prepared to use violence against the agents, and then the fact that the subsequent search of his residence revealed that he did, in fact, have a loaded firearm with him, are all factors which the Court finds lead this Court to no other reasonable conclusion, other than this Defendant will not comply with any orders that the Court will set, and there are no conditions or combination of conditions

> that the Court could impose that would give the Court any assurance that he
> would comply with them.

Tr. 95:15-96:16.  Judge Sagar also relied on Christie's refusal to comply with the CHP officers in explaining his ruling.  Tr. 96:16-97:3.

The court issued a Detention Order holding that Christie would be detained because no condition or combination of conditions would reasonably assure the appearance of the defendant as required and the safety of the community.  ECF 15-9 at 2.  Consistent with its remarks on the record, the court's written order cited: (1) the defendant's history of failing to abide by orders from law enforcement, "including failure to abide by instructions to turn off his vehicle and step out of his car during a traffic stop even after being informed that he was not free to leave," *id.* at 3; (2) defendant's conduct during the arrest on December 22, 2022, in which he "refused to leave his residence without weapons, possessed a gun in his hand which was pointed at the entrance to his residence, and told law enforcement officers they 'better come in here shooting'"; and (3) "[e]ven after the arrival of Defendant's attorney, friends and family members, who asked Defendant to come out of his residence unarmed, Defendant refused to do so for a period of two hours, claiming that the FBI had no lawful authority and that the search warrant was not valid, despite his attorney's assurance that the search warrant was validly issued and that Defendant should surrender."  *Id.*

## **LEGAL STANDARD**

Pursuant to the Bail Reform Act, 18 U.S.C. § 3142 *et seq.*, the Court "shall order" that a defendant be detained pretrial if, after a hearing, the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e).  Detention must be supported by clear and convincing evidence when the justification is the safety of the community, 18 U.S.C. §

3142(f), and preponderance of the evidence when the determination is based on risk of flight, *United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

On a motion to revoke a detention order pursuant to 18 U.S.C. § 3145(b), this Court reviews the magistrate judge's detention order *de novo.  See United States v. Chrestman¸* 525 F. Supp. 3d 14, 23 n.5 (D.D.C. 2021) (adopting the uniform conclusion of every circuit to have addressed the issue that the standard of review is *de novo*).

## ARGUMENT

The Government submits that the court in the district of arrest, following an extensive detention hearing, correctly concluded that that no condition or combination of conditions would reasonably assure the defendant's appearance at trial and the safety of the community if Christie were released on bond.   In considering whether Christie should remain detained pretrial, this Court must consider: (1) the nature and circumstances of the offenses, (2) the weight of the evidence against the defendant, (3) the defendant's history and characteristics, including his past conduct, and (4) the danger to any person or the community if the defendant were to be released. 18 U.S.C. § 3142(g).  All four factors weigh in favor of pretrial detention here—and the third factor, taking account of the defendant's recent past conduct, would be dispositive on its own. Each factor is addressed in turn.

### a.  *Nature and Circumstances of the Charged Offenses*

The nature and circumstances of the defendant's January 6 conduct, which gives rise to the charged offenses, reflect a defendant who does not respect law enforcement whatsoever and thereby poses a risk of non-appearance.  Like all rioters on January 6, Christie was a member of a thousand-strong mob that attacked the Capitol and succeeded in halting the operation of the United

States Congress.  Moreover, Christie distinguished himself from the crowd by carrying an exposed hammer on his belt while using a bullhorn to exhort rioters to storm the Capitol.

Chief Judge Howell has outlined a number of factors that the Court may consider in assessing the comparative culpability of each January 6 defendant in relation to other rioters.  *See Chrestman*, 525 F. Supp. 3d at 26.  "[A] defendant's carrying or use during the riot of a dangerous weapon," is a factor that distinguishes more culpable defendants.  *Id.*  Here, Christie carried and flaunted a hammer while breaching the security barricades, mounting a police car, and egging on a violent riot.  This conduct manifested a distinct disrespect for law enforcement, and it reflects Christie's potential unwillingness to appear at trial.

Christie's offense conduct, while serious and troubling, likely would not merit pre-trial detention on its own.  The other factors discussed *infra*, however, are dispositive.

b.  *Weight of the Evidence Against the Defendant*

The weight of the evidence against the defendant is overwhelming.  Christie's conduct on January 6, 2021, as described in the Statement of Facts, was captured on videos in which Christie's face and distinctive clothing are frequently visible.  Law enforcement agents who have observed Christie in-person can provide identification.   Further, pursuant to a duly issued warrant, the Government seized from Christie's residence the distinctive clothing Christie wore while perpetrating the charged offenses and the hammer that he carried. The Government is also continuing to review information seized from Christie's cellular phone, which likely will provide further corroborating evidence.

c.  *Christie's History and Characteristics, including His Conduct*

Christie's recent conduct establishes that no condition or combination of conditions would assure Christie's appearance at trial.  The FBI initially attempted to arrest Christie in a safe and

minimally invasive manner by conducting a traffic stop, in daylight and in public.  Christie refused

at least seven requests from the CHP officers to step out of his vehicle.  Christie was told clearly

that he was not free to leave.  He ignored that instruction and drove away anyway.  Judge Sagar

described the significance of this conduct as follows:

> You know, if you can't even, you know, step out of your car when you're
> pulled over for a traffic ticket, what assurance does the Court have that
> you're going to show up in a court of law to answer to felony -- serious
> felony charges? And so, even putting aside the risk to danger of -- to the
> community, which I think is evident from the allegations in the complaint,
> the Court finds that there is a serious risk of nonappearance due to this
> Defendant's demonstrated disregard for law enforcement and his refusal to
> comply with law enforcement's directions. The Court does not believe he
> would submit to any authority, given his past conduct.

Tr. 96:16-97:3.

Christie's conduct a week later raises even louder alarms.  Christie refused to obey

instructions and submit to arrest for nearly three hours.  He maintained this refusal even when his

own attorney, and various friends, were on the scene desperately urging him to comply.  Christie

continued to insist that the FBI did not have any legal authority to arrest him even when his own

trusted attorney told him otherwise.

Not only did Christie refuse to leave the residence, but he also refused repeated requests to

put away his firearms.  Christie told a friend more than two hours into the standoff, "My guns are

with me."  The inability of Christie's attorney and friends to persuade him to comply with law

enforcement makes it abundantly clear that no surety would be able to ensure Christie's

recognition of this criminal proceeding, let alone his compliance with it.

Neither would location monitoring be sufficient here.  Criminal defendants have shown

their ability to disable such devices when determined to do so.  There is no reason to believe

Christie would have any scruples about that.  *See United States v. Gadson*, No. 3:14-CR-094 JD,

2015 WL 163553, at \*4 (N.D. Ind. Jan. 12, 2015) (denying defendant's request to be released

subject to location monitoring because "the Court regards location monitoring as merely a deterrence to escape—and an insufficient one for Gadson given his strong risk of flight and resources/know-how to do so quickly, before his escape could be detected and Gadson located.").

   d. *Danger to the Community Posed by the Christie's Release*

   The danger posed by Christie's release follows directly from the likelihood of his non-appearance.  If Christie were to be released, he would likely refuse to appear for proceedings in this case, as he has demonstrated through his refusal to accept service of a grand jury subpoena; his refusal to follow the commands of CHP officers; and his refusal, for more than three hours, to follow the instructions of the FBI SWAT team and his own lawyer to put away his guns and submit to arrest.  Law enforcement would then be required to arrest him again.  This scenario presents an unacceptably high risk of danger to the women and men who would be called upon to do so.

   Christie posted a threatening sign on his door to "Officers of the Law," warning them "KEEP OUT – DO NOT TRESPASS (including common areas)!! Survivors will be prosecuted." When the FBI SWAT team came to arrest Christie, he told them, "You better come in here shooting."  Christie's threats were made while he had a loaded firearm that he refused to disable and put away.  Based on this recent, well-documented, highly dangerous conduct, the Government respectfully submits that the Court should not put any law enforcement officers in danger by requiring them to re-arrest Christie. Nor should the Court put any pre-trial services officers in danger by requiring them to inspect Christie's home.

   Christie's revocation motion is replete with meritless allegations.  Christie defends fleeing the CHP officers on the ground that they "drove fear into his heart."  Def's Mot. at 8.  Christie accuses the FBI of "orchestrat[ing] theater on [the day of arrest] for a manufactured story of 'danger.'"  *Id.* at 5.  He invokes his friend's fear of the Iranian Revolutionary Guards to somehow

defend his own conduct.  *Id.* at 5.  He makes a meritless argument about the applicability of 18 U.S.C. § 3142(f) to challenge the legality of the Detention Order, *id.* at 20-21, and another meritless argument about the legality of the grand jury subpoena that he evaded, *id.* at 4. 13-14.

None of these allegations inspire confidence that Christie, if released, would respect and adhere to any orders of this Court.  Rather, these allegations make clear that Christie still refuses to take responsibility for the dangerous situations he created by resisting arrest—and he would disregard law enforcement commands and put people at risk again if given the chance.

### CONCLUSION

The defendant's detention is supported by a preponderance of the evidence that he presents a risk of flight, and no condition or combination of conditions can reasonably assure the safety of the community, or his appearance as required, if he is released.  Accordingly, the Government respectfully requests that the defendant's motion to revoke the detention order and for pretrial release be denied.

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052


By:  _____/s/_____
JASON M. MANNING
NY Bar No. 4578068
Trial Attorney, Detailee
1400 New York Ave NW, 11th Floor
Washington, D.C. 20005
(202) 514-6256
jason.manning@usdoj.gov