1              UNITED STATES DISTRICT COURT

2        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3

4  UNITED STATES OF AMERICA,     ) Case No. 2:22-MJ-05016-DUTY-1
                                 )
5            Plaintiff,          ) Los Angeles, California
                                 )
6  vs.                          ) Friday, December 23, 2022
                                 )
7  ERIC CHRISTIE,               ) (3:11 p.m. to 3:14 p.m.)
                                 ) (3:28 p.m. to 5:33 p.m.)
8            Defendant.          )
   _____)

9

10                 TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE ALKA SAGAR
11               UNITED STATES MAGISTRATE JUDGE

12

13  Appearances:                  See next page.

14  Court Reporter:               CourtSmart

15  Courtroom Deputy:             Alma Felix

16  Transcribed by:               Lorraine Caldwell
                                  Echo Reporting, Inc.
17                                9711 Cactus Street, Suite B
                                  Lakeside, California 92040
18                                (858) 453-7590

19

20

21

22

23

24
   Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

2

```
 1  APPEARANCES:

 2  For the Plaintiff:          HAVA A. L. MIRELL, ESQ.
                                Office of the United States
 3                                 Attorney
                                312 North Spring Street
 4                              Suite 1200
                                Los Angeles, California 90012
 5                              (213) 894-2434

 6  For the Defendant:          GEORGE B. NEWHOUSE, JR., ESQ.
                                Richards Carrington LLC
 7                              545 South Figueroa Street
                                Seventh Floor
 8                              Los Angeles, California 90071
                                (213) 348-9016
 9
    For Probation/Pretrial      YOEL HANOHOV, ESQ.
10      Services

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                            I N D E X

2  WITNESSES                DIRECT   CROSS   REDIRECT   RECROSS

3  Erick Turner               25      62        --         --

4  Asefeh Shirafkan           87      --        --         --

5

6  EXHIBITS                          IDENTIFIED      RECEIVED

7  Government's:

8  1    FBI communication re: service of   28            30
        federal grand jury subpoena on
9       Christie

10 2    Printout re: firearms registered   31            31
        to Christie
11
12 3    Police report                      10            --

13 4    CHP arrest-investigation report    38            40

   5    Document re: 11/28/22 spot check   32            --
14
   6    Depiction of signage on door       33            34
15
16 7    Video of CHP encounter with        37            37
        Christie
17 8    FBI SWAT operations log            15            46

18 9    Photographs taken during search    59            59

19

20 Defendant's:

21 (None.)

22

23

24

25

4

1  Los Angeles, California; Friday, December 23, 2022 3:11 p.m.

2                              --o0o--

3                        (Call to Order)

4           THE CLERK:  Calling Case Number MJ22-5016, United

5  States of America versus Eric Christie.

6           Beginning with Plaintiff's counsel, please state

7  your appearance for the record.

8           MS. MIRELL:  Good afternoon, your Honor.  Hava

9  Mirell on behalf of the United States.

10          THE COURT:  Good afternoon.

11          MR. NEWHOUSE:  Good afternoon, your Honor.  George

12  Newhouse, retained counsel on behalf of Eric Christie, who

13  is in custody before the Court.

14          THE COURT:  Okay.  Good afternoon.

15          Is Eric Christie your true name?

16          THE DEFENDANT:  Yes.

17          THE COURT:  All right.  Let me first proceed with

18  the Rule 5(f) warning.  Pursuant to the Due Process

19  Protections Act, the Government is ordered to comply with

20  their obligation to produce exculpatory evidence under

21  Brady v. Maryland and its progeny, and reminded of the

22  possible consequences of violating that law and this Court's

23  order, which includes the exclusion of evidence, adverse

24  jury instructions, dismissal of all or some charges with or

25  without prejudice, contempt, and sanctions.

1          Ms. Mirell, do you acknowledge the Government's

2  obligation to produce exculpatory evidence in a timely

3  manner in this case?

4          MS. MIRELL:  Yes, your Honor.

5          THE COURT:  All right.  Thank you.

6          Mr. Christie, did you see and sign a statement of

7  your constitutional and statutory rights?

8          THE DEFENDANT:  Yes, I did.

9          THE COURT:  Do you understand your rights?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Do you want me to read those rights to

12  you at this time?

13          THE DEFENDANT:  That's not necessary, your Honor.

14          THE COURT:  All right.  And Mr. Newhouse, are you

15  satisfied that Mr. Christie understands the constitutional

16  and statutory rights that apply to him in today's

17  proceeding?

18          MR. NEWHOUSE:  Yes, I am, your Honor.

19          THE COURT:  All right.  The Court has both Form

20  CR10 and signed by Mr. Christie and by Mr. Newhouse, and the

21  Court will order that form to be filed.

22          Mr. Christie, have you retained your own attorney,

23  Mr. Newhouse, to represent you in this matter?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Okay.  The Court has the Designation

6

1    on Appearance of Counsel form, and will also order that to

2    be filed.

3            Mr. Christie, you have been charged in a criminal

4    complaint which was filed in the District of Columbia.  Have

5    you received a copy of that document?

6            THE DEFENDANT:  Yes, we have a copy.

7            THE COURT:  All right.  I'm not going to ask you

8    to admit or deny the allegations in the complaint.  What I

9    want to know is, do you understand what it is you're being

10   charged with?

11           THE DEFENDANT:  Yes.

12           THE COURT:  All right.  The Court has received and

13   reviewed the pretrial services report, which is recommending

14   that Defendant be detained, and also -- and the Government

15   has also filed a request for detention.

16           How would you like to proceed, Mr. Newhouse?

17           MR. NEWHOUSE:  Your Honor, unfortunately, I still

18   have not seen a copy of that report.  I didn't get it on my

19   laptop.  So I would ask for a short postponement of the

20   detention hearing, which we're otherwise prepared to proceed

21   with.

22           THE COURT:  When you say a "postponement," you're

23   talking about a few minutes to read the report?

24           MR. NEWHOUSE:  Twenty or thirty minutes at most.

25           THE COURT:  All right.

1          MR. NEWHOUSE:  Begging the Court's indulgence.

2          THE COURT:  That's fine.  Can we provide Mr.

3  Newhouse with a printed copy?

4          MR. HANOHOV:  I can provide him a copy on an iPad.

5          THE COURT:  On the iPad?

6          MR. HANOHOV:  Yes.

7          MR. NEWHOUSE:  That should work, your Honor.

8          THE COURT:  All right.  Thank you.  All right.

9  We'll be in recess.

10          MR. NEWHOUSE:  Thank you.

11     (Proceedings recessed briefly.)

12          THE BAILIFF:  Please come to order.  This court is

13  once again in session, the Honorable Alka Sagar, United

14  States Magistrate Judge, presiding.

15          THE CLERK:  Recalling MJ22-5016, United States of

16  America versus Eric Christie.

17          Beginning with Plaintiff's counsel, please restate

18  your appearance for the record.

19          MS. MIRELL:  Good afternoon, your Honor.  Hava

20  Mirell on behalf of the United States.

21          MR. NEWHOUSE:  Good afternoon, your Honor.  George

22  Newhouse back on behalf of Art Christie, Defendant -- Eric,

23  sorry -- Eric Christie, who is in custody and present before

24  the Court.

25          THE COURT:  Mr. Newhouse, have you had an

8

1  opportunity -- sorry.  Mr. Newhouse, have you had an

2  opportunity to review the pretrial services report?

3           MR. NEWHOUSE:  I have, your Honor.  Thank you.

4           THE COURT:  Okay.  How would you like to proceed?

5           MR. NEWHOUSE:  We'd like to have the detention

6  hearing.

7           THE COURT:  All right.

8           MR. NEWHOUSE:  We're very much opposed to this

9  motion.

10          THE COURT:  Okay.  Let me hear from you.

11          MR. NEWHOUSE:  Your Honor, first let me start with

12  a number of significant deficiencies in the presentence

13  report -- presentence -- the pretrial services report, which

14  I understand is done very quickly and under, you know,

15  difficult circumstances, but, first of all, "Factors that

16  indicate risk of nonappearance," on page two, "History of

17  trying to avoid arrest."  Well, there is nothing in this

18  record about a history of trying to avoid arrest.

19          Now, there is -- and we concede that it occurred.

20  There was a traffic stop that occurred a few days ago, and

21  he was pulled over by CHP.  My client would testify that he

22  was aware of active FBI surveillance.  My client is not a

23  fan of the FBI, your Honor.  We're not going to get into

24  politics today, but he truly and well believed at that time

25  that they were about to abduct him, and he was concerned

9

1    about what was going to happen.

2            But the CHP officer who pulled him over did not

3    tell him he was under arrest.  He did not present him with

4    arrest papers or warrants.  He didn't say anything of the

5    kind.  He said, "I'd like to see your driver's license and

6    registration."  My client rolled down the rear window and

7    handed that to him, and he proceeded to have a conversation

8    with the officer, and what alarmed him was, at a certain

9    point, the officer demanded that he turn off his engine and

10   get out of the car.

11           Again, I'm not going to argue that the officer

12   couldn't make those requests, but what he should not have

13   done was to tell my client at that point, "If you don't

14   comply, I'm going to break the window and take you out

15   forcibly," and whether that was a lawful and legitimate

16   command or not is not really the point.

17           The point is, it scared him, particularly given

18   the fact that he was aware that the FBI was surveilling

19   him, and this goes back, by the way, to March of this year,

20   when he was provided -- served with what appeared to be a

21   grand jury subpoena, and my client didn't know what that

22   was, didn't know what his obligations were, but all along

23   there have been repeated instances where he has exercised

24   his constitutional rights to decline to assist law

25   enforcement.

1    Again, leaving aside whether that's the smart
2 thing to do, it's certainly his right, but when he fled the
3 CHP, which was a mistake -- we'll be the first to admit
4 it -- he shouldn't have done that, but he was not trying to
5 avoid an arrest, because, to make an arrest, you have to
6 tell the person, "You're under arrest.  Here's an arrest
7 warrant."  So that's a misstatement.
8    The other incident that's in the record is sealed,
9 and I'm not going to go into it, your Honor, because I'm
10 deeply offended by that document, to begin with.
11    THE COURT:  What are you referring to?
12    MR. NEWHOUSE:  Well, it's Exhibit -- hold on.
13    THE COURT:  You're referring to this binder of
14 exhibits (indicating)?
15    MR. NEWHOUSE:  It's in the Government's exhibit
16 binder.  It's sealed, which is good, and it's a more than
17 10-year-old incident that I don't know whether it happened
18 or not, but our point is --
19    THE COURT:  Is this Exhibit 3?
20    MR. NEWHOUSE:  Exhibit --
21    MS. MIRELL:  Your Honor, it's not yet formally
22 sealed.  I was going to do a courtesy of moving for the
23 Court to seal it, but it's not yet admitted into the record
24 at all.
25    MR. NEWHOUSE:  Well, it's certainly --

1         THE COURT:  Let me just make sure I'm looking at

2 the right thing.  Is it Exhibit 3?

3         MS. MIRELL:  It is Exhibit 3 in your binder, your

4 Honor.

5         THE COURT:  Okay.  So it's a police report.

6         MR. NEWHOUSE:  It's a police report.  It deals --

7 if this were a trial, we would have moved in limine to

8 exclude it on the basis that it's more than 10 years, and

9 absolutely evidences nothing, but there's no question, your

10 Honor.

11         My client -- and this, of course, goes to the

12 merits of this so-called "complaint" in D.C. -- he's an

13 avowed homosexual.  Okay?  He is.  He's gay.  But that is

14 not against the law, and having some incident with LAPD 11

15 years ago, for which he was not arrested or prosecuted, is

16 not -- it doesn't establish anything.  It certainly doesn't

17 establish that there's some or would be some proclivity to

18 avoid an arrest or other lawful process.

19         So we would ask that that be stricken, and, of

20 course --

21         THE COURT:  I think, if I understand it, the

22 reason that that's there is to show a pattern of not

23 complying with law enforcement, not complying with an

24 officer's demand that he, you know -- they were trying to

25 have him not, you know, resist what they were trying to do.

12

1  So it's not about why he was there or the circumstances that

2  led up to it.  I think the reason it's there is because it

3  just demonstrates a pattern.

4          MR. NEWHOUSE:  In addition to being offensive,

5  it's not probative of anything.

6          THE COURT:  Okay.

7          MR. NEWHOUSE:  Is it really a path --

8          THE COURT:  I --

9          MR. NEWHOUSE:  Let me just --

10         THE COURT:  I understand your argument.

11         MR. NEWHOUSE:  Let me just point out, is it really

12  a pattern?  Am I showing a pattern when I show that you did

13  something a decade ago?  I would actually --

14         THE COURT:  I think it becomes a pattern if what

15  you did a decade ago continues to your doing the same

16  conduct, you know, 10 years later.

17         MR. NEWHOUSE:  All right.  Well, I make a point.

18         THE COURT:  But, that aside, I'm not putting a

19  whole lot of weight on that, so I'll let you argue the rest

20  of your argument.

21         MR. NEWHOUSE:  Thank you.  So, if you look to the

22  traditional factors that impact a defendant's right to bail,

23  you look at a couple things, and, first of all, the

24  Government, in their boilerplate motion, says, "Well, risk

25  of flight," and their pretrial says, "History of trying to

13

1  avoid arrest."  We disagree.  Passport possession is not a

2  problem, because he is willing to surrender his passport,

3  assuming that it wasn't taken by the agents.  So possession

4  of the passport actually indicates that he follows the law,

5  and he'll surrender the passport.

6          So there is no serious risk of flight here.  The

7  Government's argument, which -- I'm preempting them.  They

8  haven't made it yet.  But I assume what they're going to say

9  is "Well, you know, he's part of the January 6 disturbances,

10 and, look.  He's charged with a misdemeanor."  Your Honor,

11 he's charged with a misdemeanor in which he is not looking

12 at a significant jail sentence, if any, but, even if you

13 assumed that he would get jail time, less than one year, is

14 it rational to really argue that anyone who is looking at a

15 single misdemeanor count, potential one year --

16          THE COURT:  I thought there were two counts.

17          MR. NEWHOUSE:  Sorry?

18          THE COURT:  I thought there were two counts.

19          MR. NEWHOUSE:  Well, I only saw one.

20          THE COURT:  Am I wrong about that?

21          MS. MIRELL:  There are two counts, and they're

22 both felonies, your Honor, given the (b)(1)(A).  So he's

23 looking at 10 years of imprisonment.

24          MR. NEWHOUSE:  Well, I was told it was a

25 misdemeanor complaint.

14

1          THE COURT:  All right.

2          MR. NEWHOUSE:  But, whatever.  He's looking at a

3  potential criminal charge in the District of Columbia.

4  Whether it's really a felony or a misdemeanor, we're going

5  to leave that for the good folks in D.C. to handle, but the

6  point is, here's a person who has no -- not minimal, no

7  criminal record.

8          He's got his whole life in front of him.  He has

9  family ties in Southern California, and a number of -- his

10 brother, who I would ask to stand up, is here, Michael, who

11 is willing to sign an affidavit of surety.  He has other

12 people in the courtroom, friends and supporters, a number of

13 whom are willing to sign affidavits of surety.  He owns a

14 condominium, which is where the FBI staged this.

15         I might point out, by the way, your Honor, that

16 yesterday was quite an episode.  They purportedly did a

17 search of his house, and an arrest, and they did it with the

18 FBI SWAT team, a vast overuse, abuse of power.  It wasn't

19 necessary.  But he has -- but I'll get to that in a moment.

20         He has every reason to stand up and answer these

21 charges and follow the Court's edict, which he will

22 understand, and now he's hired a lawyer who will assist him

23 in complying with this obligation.  Is he really going to

24 shirk that, and now he's looking at a five-year felony for

25 failure to appear?  I don't think so.

15

1          Anyway, the bottom line is, there is no risk of
2   flight.  You will find, I submit, very few cases where you
3   have better local ties to the community, and, of course, the
4   one local tie to the community which should be pointed out,
5   which did not appear in the pretrial report, is he has a
6   job, and, in fact, your Honor, I would ask the Court to take
7   into account that if he is detained any longer, he isn't at
8   work on Monday, he will lose his job.  He's worked for this
9   financial services firm -- what's the name of the firm? --
10  Connected, for five years.
11          So, if he flees, he opens himself up to a new
12  charge.  His family, who's willing to post affidavits of
13  surety, would lose their financial interests.  He could lose
14  his condominium.  He would lose his job, for a -- I believe
15  it's still a misdemeanor, but whatever the charge in D.C.
16  is, which he intends to defend, that's all washed away.  So
17  it's very hard to get a case where there is less in the
18  record to indicate a risk of flight, and there's nothing in
19  the record, your Honor, to indicate dangerousness to the
20  community.
21          Now, let me go to Exhibit -- take the Government's
22  exhibit, here.  I thank them for putting this in the record,
23  Exhibit 9 -- or, I'm sorry, 8 -- the FBI SWAT operations log
24  of yesterday.  Your Honor, I've been this gentleman's
25  attorney for about six months.  I did get a call from him

16

1  after the -- I'll just call it the "CHP problem," of which I

2  was aware, and I told him, "You're likely to get an

3  invitation from the local authorities to come down to court

4  to deal with this misdemeanor.  It's a misdemeanor, failure

5  to cooperate with the law enforcement."  But, on this date

6  in question, which is yesterday, let's go down the log.  It

7  says, "Water has been shut off."

8           By the way, the one thing I would ask the Court to

9  note, with the Court's vast experience and my somewhat more

10 limited experience, is FBI SWAT doesn't muster like that.

11 This was planned.  They determined that they were going to

12 send the SWAT team to his house in the morning, without any

13 reason or basis for concern over officer safety.

14          Now, the Court will also know that when the FBI

15 actually has a legitimate concern about safety, they ask the

16 Court for a midnight service.  They go in at 4:00 in the

17 morning, and they knock down the door, anyway, and they pull

18 the person out of his bed, and they use whatever force or

19 threat is necessary.  They didn't do that here.  They sent

20 the SWAT team.

21          Now, let's go to the log at 9:00 -- okay.  So I

22 think -- okay.  Here it is.  At 9:12 -- or 9:07 -- the SWAT

23 team basically breaks down his door, and I will say, your

24 Honor -- and I would proffer my testimony, to the extent

25 that it's relevant, but I'm a witness here because, at 9:05

17

1  yesterday, I got a call from this man.  He was terrified.  I

2  said, "What's going on there?"

3            THE COURT:  I'm sorry, Mr. Newhouse.

4            MR. NEWHOUSE:  Yes.

5            THE COURT:  I don't see anything about breaking

6  down the door.  Am I missing something?

7            MR. NEWHOUSE:  Well, I thought there was a

8  reference to -- well, maybe not, but I'm telling you, if I

9  am -- I appear, actually, at 9:47, "Subject trust asked to

10 speak with George Newhouse."  But yes, I got a call at 9:05

11 from my client, and I was expecting there would be some

12 follow-up from the CHP incident.  I mean, as it turns out,

13 clearly, as they admit now, that was a pretextual stop to

14 effect his arrest.  They didn't bother to tell him he was

15 under arrest.  But at 9:05, he tells me, "George, they just

16 broke down my door."  And I said, "Who?"  "I don't know, but

17 I'm -- they're here for me."

18            THE COURT:  I'm sorry, Mr. Newhouse.

19            MR. NEWHOUSE:  Yes.

20            THE COURT:  I'm trying to understand something.

21 The CHP incident, that was in November, right?

22            MR. NEWHOUSE:  No.  That was three or four days

23 ago.  When was it?  A week ago.

24            THE DEFENDANT:  It was no more than a --

25            MS. MIRELL:  It was on Thursday, your Honor.

18

1           THE COURT:  On Thursday?

2           MR. NEWHOUSE:  Thursday.

3           MS. MIRELL:  Last Thursday.  The 16th, I believe,

4    is the date.

5           THE COURT:  Okay.

6           MR. NEWHOUSE:  Okay.  Last week.

7           THE COURT:  All right.

8           MR. NEWHOUSE:  Okay.  And yesterday I get a call

9    at 9:05, "They've broken down my door," and then he tells me

10   something, and I was -- I would have assumed, "Maybe this is

11   a search warrant."  He then said, "And they have broken the

12   windows.  My skylights have been broken, and there is a

13   drone flying around in my apartment."  Okay?  This would be

14   terrifying to anyone, and it was terrifying to my client,

15   but here's what he didn't do.  Here's what you don't have on

16   the record about dangerousness.

17           He did -- he has two firearms.  The FBI has

18   admitted that those -- and we have a document -- were

19   registered to him, so they were lawful.  And, by the way,

20   two handguns are not necessarily indicative of a great

21   danger to begin with.  But he has one of them, and he does

22   tell me on the phone, "I have a gun.  I don't know what to

23   do.  I don't know -- I'm under attack."  So it was a

24   terrifying incident.  It was a use of force by the

25   Government that they did not need to.

1           Now, whether that relates to the fact that they're

2   mad at him because he won't cooperate, they're mad at him --

3   and you have, also, the affidavit, the statement of facts.

4   They've clearly been pressuring my client for the last six

5   months to cooperate with their investigation of the woman

6   who stole the baseball from Speaker Pelosi's office, and he

7   has refused to cooperate.  He didn't, and it's true, and he

8   should have responded to the grand jury subpoena, and he

9   didn't, and that was not right, but it's not a crime, and it

10  certainly doesn't indicate any --

11          THE COURT:  Wait.  I'm sorry.  Are you saying it's

12  not a crime to fail to response to a grand jury subpoena?

13          MR. NEWHOUSE:  I don't think it's a crime.  I

14  think it's a potential contempt of court.  It is a court

15  order.  And don't get me wrong, your Honor.  It's not a good

16  thing to do.  But it's not a crime.  He's not charged with a

17  crime.  Had they wanted to follow up with that, of course,

18  the Government had the power to go to court, show that he

19  didn't show up, and get an order to compel.  Now, if he

20  didn't comply with that, that would be a criminal contempt

21  of court.

22          But the bottom line is yes, he is

23  antiauthoritarian up to this day.  With his arrest and his

24  appearance in court, and hiring counsel, I would submit,

25  your Honor, that he now gets it.  He will comply with all

20

1 terms and conditions that the Court may choose to impose.

2 He understands the gravity of the situation.  He understands

3 how important it is to have his job and to keep his family

4 members who are willing to provide affidavits of surety, if

5 necessary -- keep them secure.  And, indeed, we could pledge

6 his equity interest in the condo, if necessary.

7          He's not offering that, but there are so many

8 terms and conditions that the Court can impose that will

9 solve, resolve, and address all of the Government's

10 so-called "interests," which, frankly, I think are somewhat

11 transparent, because I would submit, given the massive

12 overuse of authority to arrest this person who is accused of

13 being part of the January 6th riots, which, of course, no

14 one approves of and no one is happy with, and we understand

15 why the FBI is investigating this, but none of that explains

16 or excuses the massive overuse of force here, particularly

17 with someone who has such strong community ties and is

18 willing to submit to whatever.

19          I went over with him the Court's typical bond

20 conditions, and I said, "Can you" -- "We obviously will

21 agree to pretrial supervision, of course.  Will you agree to

22 have your travel restricted to the Central District and to

23 Washington, D.C.?"  "Of course."  He doesn't want to submit,

24 and we don't think it's necessary, for GPS monitoring, but

25 that's not a problem.  He doesn't have a drug problem.  He

1 has a job, an employment, so that's not a problem.  He has

2 every reason that one can think of to adhere to all the bail

3 conditions that your Honor might impose.  I went over the

4 standard ones.  He's agreeable to all of that.

5         He wants to get the January 6th issue behind him,

6 and we will let a better attorney than myself defend him in

7 that, and what will happen, will happen, but, your Honor, I

8 just -- I've been practicing law a long time.  I have never

9 seen a misdemeanor case where he is not -- the Defendant is

10 not even looking at serious time -- denied, detained

11 pretrial, and, respectfully, given what happened yesterday

12 with the FBI -- I was there for three hours.  They had

13 negotiators, your Honor.  They had these pros who deal with

14 situations where people are barricaded.

15         By the way, there was no barricade.  That's the

16 other misstatement -- make a note -- another misstatement in

17 the presentence report.  He wasn't barricaded in his

18 apartment.  That was his apartment.  In fact, ironically,

19 not only was he not barricaded, he didn't have a front door.

20 It had been knocked down.

21         So he's in his apartment.  The agents are

22 understandably being cautious or conservative, which I

23 understand, but "barricading" is the wrong word.  He was

24 terrified.  He was there.  He was dealing in good faith with

25 his counsel, me, and with the FBI negotiators, and at the

22

1  end of the day, he walked out, surrendered, and he appears

2  today, your Honor.  I'm asking the Court to do the right

3  thing.

4          THE COURT:  Well, what about the statement in the

5  presentence report that he told law enforcement that he was

6  willing to use his firearms if they entered his house?

7          MR. NEWHOUSE:  He did not say that.

8          THE COURT:  Okay.

9          MR. NEWHOUSE:  By the way, your Honor, not only

10  did he not say that, I was on the phone with him and the

11  negotiators, by the way, three amazing FBI agents.

12  They're -- it's really -- you know, had it not been my

13  client, I'm not even worried about what might happen.  It

14  was fascinating to hear the dialogue.  I could hear

15  everything he said.  I could hear what they said to him.  He

16  never once said, "I'm going to shoot myself" or "I'm going

17  to kill one of the agents."

18          He didn't want to give his guns up, that's true --

19  they were in his house -- because he was concerned, right or

20  wrong, that if he went out without the gun, that he would be

21  shot, and we did convince him, over time -- and one of the

22  individuals here to support the Defendant, Yvette

23  (phonetic), is here.  She was on the phone with the FBI

24  negotiators, and Yvette, I would proffer, would testify.

25  She -- you can sit down, thank you.  She would say not once

23

1  was there a threat of violence.  Did not happen.

2          There's nothing from the Government to counter

3  that, and I've heard every single word from about -- I would

4  say about 9:50 until he walked out of his apartment two and

5  a half hours later.  But it wasn't a barricade, no threats.

6  He never pointed the gun.  We told him, "If you do something

7  stupid with a firearm, you know, bad things can happen."  He

8  didn't want that.  So I hope that answers the question.

9          THE COURT:  All right.  Ms. Mirell, can I hear

10 from the Government?

11         MS. MIRELL:  Yes, your Honor.  The Government is

12 seeking detention in this case.

13         THE COURT:  You'll need to speak into the

14 microphone.

15         MS. MIRELL:  Government is seeking detention in

16 this case pursuant to 18 United States Code Section

17 3142(f)(2), and, in support thereof, would proffer the

18 complaint, the statement of facts, the arrest warrant,

19 pretrial services report and its recommendation of

20 detention, and the testimony of FBI Special Agent Erick

21 Turner, and I would like to proceed with his testimony in

22 order to rebut some of the unsupported allegations that

23 defense counsel made in his proffer.

24         THE COURT:  All right.  With respect to the

25 exhibit binder, are you --

24

1        MS. MIRELL:  I intend to introduce the exhibits

2 through the testimony of Special Agent Turner.

3        THE COURT:  All right.  We'll call --

4        MS. MIRELL:  May I have one moment to ask the

5 special agent one question before --

6        THE COURT:  Yes.

7        MS. MIRELL:  -- I call him to the stand?  Thank

8 you, your Honor.  And, your Honor, may I have permission to

9 use the podium, since I intend to show a video exhibit as

10 well?

11        THE COURT:  All right.

12        MS. MIRELL:  Thank you, your Honor.

13        MR. NEWHOUSE:  Your Honor, may we have a seat at

14 the defense table?

15        THE COURT:  Yes, he can sit at counsel table.

16        MR. NEWHOUSE:  Have a seat here (indicating).

17        THE COURT:  Okay.  Can I have Special Agent Erick

18 Turner approach the witness stand.

19        THE CLERK:  Please raise your right hand.

20        ERICK TURNER - PLAINTIFF'S WITNESS - SWORN

21        THE CLERK:  Please have a seat, and state your

22 first and last name for the record.

23        THE WITNESS:  Erick Turner.

24        THE CLERK:  You may be seated.

25 //

25

                          DIRECT EXAMINATION

1

2  BY MS. MIRELL:

3  Q     Good afternoon, Mr. Turner.  What do you do for a

4  living?

5  A     I'm a special agent with the Federal Bureau of

6  Investigation.

7  Q     How long have you been a special agent with the FBI?

8  A     Over 16 years.

9  Q     And are you assigned to a particular squad within the

10  FBI?

11  A     I am.

12  Q     Which squad is that?

13  A     Counterterrorism Three.

14  Q     And what are your assigned duties on that squad?

15  A     I investigate domestic terrorism incidents.

16  Q     What is your position within the squad?

17  A     I am normally a special agent.  I am currently the

18  acting supervisory special agent.

19  Q     And how are you familiar with Eric Christie?

20  A     I am familiar with Eric Christie due to an

21  investigation into his activities on the 6th of January at

22  the United States Capitol.

23  Q     And were you involved in his arrest yesterday?

24  A     I was.

25  Q     What was your role during the arrest?

26

1  A     I was the acting supervisory special agent for the

2  investigative squad yesterday.

3  Q     Did your squad take Mr. Christie into custody?

4  A     No.

5  Q     Who took Mr. Christie into custody?

6  A     Members of the Los Angeles FBI Special Weapons and

7  Tactics Team.

8  Q     Does that stand for "SWAT"?

9  A     Yes.

10 Q     Okay.  We'll get to that in a second.  Aside from the

11 SWAT arrest yesterday, have law enforcement had any other

12 contacts with Mr. Christie?

13 A     Yes.

14 Q     What were some of those first contacts between the FBI

15 and Mr. Christie?

16         MR. NEWHOUSE:  Objection, calls for a narrative,

17 not relevant.

18         THE COURT:  What's the relevance?

19         MS. MIRELL:  Your Honor, it demonstrates the

20 Defendant's pattern of failure to comply with FBI requests

21 and instructions and orders.

22         THE COURT:  All right.  Overruled.  You can answer

23 the question.

24         THE WITNESS:  Could you repeat the question,

25 please?

1  BY MS. MIRELL:

2  Q    Yes.  Aside from the SWAT arrest yesterday, what -- I'm

3  sorry.  What were among the first contacts the FBI had with

4  Mr. Christie?

5          MR. NEWHOUSE:  Objection, lack of foundation, your

6  Honor.

7          THE COURT:  Why don't you lay a foundation.

8  BY MS. MIRELL:

9  Q    Okay.  Aside from the arrest yesterday, Special Agent

10  Turner, did FBI have any other contacts with Mr. Christie

11  prior to his arrest?

12  A    Yes.

13  Q    And do you recall about when those contacts occurred?

14  A    I do not have the exact dates in front of me, but there

15  were several attempted contacts, and then there was a

16  service of a grand jury subpoena on Mr. Christie towards the

17  end of February of this year.  I believe it was February

18  21st.  I'm not sure of the exact date, but I believe it was

19  around that time.

20  Q    Okay.  When you said, "Several attempted contacts,"

21  what did you mean by that?

22  A    A colleague on my squad attempted to contact Mr.

23  Christie regarding the January 6th investigation.

24  Q    And what did they do, specifically, as far as you're

25  aware?

28

1  A     To my knowledge, a colleague on my squad left a

2  business card on Mr. Christie's door, asking that he contact

3  the FBI.

4  Q     To your knowledge, did Mr. Christie contact the FBI?

5  A     No, he did not.

6  Q     You mentioned a subpoena, or attempted service of a

7  subpoena, in February of 2022.  Is that correct?

8  A     Yes.

9  Q     Okay.  You do not --

10            MS. MIRELL:  Your Honor, permission to approach

11  the witness stand with an exhibit binder.

12            THE COURT:  All right.  Permission granted.

13  BY MS. MIRELL:

14  Q     Special Agent Turner, would you please turn to Exhibit

15  1 in your binder.

16  A     Okay.

17  Q     Do you recognize this?

18  A     I do.

19  Q     And what is this?

20  A     This is an FBI communication regarding the service of a

21  federal grand jury subpoena on Mr. Christie.

22  Q     And does this -- what date, according to this report,

23  did the FBI attempt to serve a subpoena on Mr. Christie?

24  A     On February 21st, 2022.

25  Q     Did Mr. Christie accept service of the subpoena?

29

1          MR. NEWHOUSE:  Objection, relevance, your Honor.
2  Is there a duty for someone to accept service of a subpoena?
3          THE COURT:  Well, I don't think we're -- you know,
4  it's -- that's not the issue.  The issue is whether there is
5  conduct here that would suggest that he would not comply
6  with any orders that a court would set, and I think that
7  prior -- the nature of his prior contacts with law
8  enforcement is relevant to that determination.  It's not
9  whether it's legal or not legal.  It's just what his prior
10  conduct was, and whether that could be used to support a
11  finding that he wouldn't comply with a court order that the
12  Court might issue.
13          All right.  You may answer the question.
14          THE WITNESS:  Mr. Christie refused to accept the
15  subpoena into his hand.
16  BY MS. MIRELL:
17  Q    So what did law enforcement do with the subpoena?
18  A    The FBI special agent informed him that he had been
19  served a subpoena, and that they were going to leave it on
20  his vehicle, and they placed a copy of the subpoena under
21  his windshield.
22  Q    To your knowledge, did Mr. Christie comply with the
23  order of the subpoena?
24          MR. NEWHOUSE:  Objection, lacks foundation, calls
25  for speculation.

30

1          THE COURT:  Well, it asks if he -- it's based on

2  his knowledge.

3          So do you know if he complied with the subpoena?

4          THE WITNESS:  To my knowledge, he did not.

5          THE COURT:  All right.

6          MR. NEWHOUSE:  Your Honor, may I offer -- this is

7  not an issue here.  He received a subpoena.  He did not

8  travel to Washington, D.C. and appear before the grand jury.

9          THE COURT:  All right.

10          MR. NEWHOUSE:  I think we talked about that.  It's

11  not an issue.

12          THE COURT:  All right.

13          MR. NEWHOUSE:  Thank you.

14          THE COURT:  Okay.  Are you moving Exhibit 1 into

15  evidence?

16          MS. MIRELL:  Yes.  I was about to do that, your

17  Honor.  Thank you.

18          THE COURT:  All right.  Any objection?

19          MR. NEWHOUSE:  No objection.

20          THE COURT:  Okay.  Exhibit 1 is admitted into

21  evidence.

22  BY MS. MIRELL:

23  Q    Special Agent Turner, are you aware if Mr. Christie has

24  any firearms?

25  A    Yes, I am.

31

1  Q    How many firearms?

2  A    I'm aware of two registered firearms to Mr. Christie.

3  Q    Okay.  I'd like to direct your attention now to Exhibit

4  2 in your binder.

5  A    I see it.

6  Q    What is this?

7  A    This is a printout regarding the firearms registered to

8  Mr. Christie.

9         MS. MIRELL:  Your Honor, at this time, the

10 Government moves to admit Exhibit 2.

11        MR. NEWHOUSE:  No objection, your Honor.

12        THE COURT:  Exhibit 2 in evidence.

13 BY MS. MIRELL:

14 Q    Now, Special Agent Turner, if I can direct your

15 attention to the middle of the page, according to this

16 report, when did Mr. Christie most recently acquire a

17 firearm?

18        MR. NEWHOUSE:  Objection, relevance.

19        THE COURT:  Overruled.

20        THE WITNESS:  March 1st of 2022.

21 BY MS. MIRELL:

22 Q    What kind of firearm did he purchase on March 1st of

23 2022?

24 A    A Smith and Wesson 357 revolver.

25 Q    So that's about eight days after FBI served a subpoena

32

1  on Mr. Christie.  Is that correct?

2  A     Yes, approximately eight days.

3  Q     Okay.  Now, prior to Mr. Christie's arrest yesterday,

4  did law enforcement conduct any spot checks at Mr.

5  Christie's residence, or surveillance?

6  A     Yes.

7  Q     And do you remember what month law enforcement last

8  conducted its spot check prior to planning for yesterday's

9  arrest?  And I can rephrase the question.

10 A     Yes, please.

11 Q     Do you recall when FBI last conducted a spot check of

12 Mr. Christie's residence?

13 A     There were spot checks conducted leading up to his

14 arrest, in the days leading up to his arrest.

15 Q     And where there spot checks conducted in the month of

16 November 2022?

17 A     I believe there were some in November.  I don't recall

18 the exact dates.

19 Q     Okay.  I'd like to direct your attention now to Exhibit

20 5 in your binder.

21 A     Okay.  I see Exhibit 5.

22 Q     And what is this, Special Agent Turner?

23 A     This is a document that memorializes a spot check

24 conducted on November 28th of 2022.

25 Q     According to this report, did Mr. Christie have any

33

1 signage posted to the door of his apartment during this spot

2 check?

3 A     Yes.

4           MS. MIRELL:  Okay.  The Government moves to admit

5 Exhibit 5.

6           MR. NEWHOUSE:  Objection, relevance.

7           THE COURT:  Yes.  I'm going to sustain that

8 objection.

9 BY MS. MIRELL:

10 Q    Okay.  All right.  At this time, I'd like to move to --

11 sorry -- direct your attention to Exhibit 6, then.

12 A     Okay.

13 Q    You previously mentioned some signage on Mr. Christie's

14 door.  Is this the signage from that report?

15 A     Yes.

16 Q    Okay.  And where it says, "Notice to all 'public

17 servants,'" and "public servants" is in quotation marks, do

18 you see a name to which all legal process should be served,

19 according to the signage?

20 A     I do.

21 Q    And what's that name?

22 A     Eric Christie.

23 Q    And just so I can read -- can I have you read for the

24 record what it says in the bottom paragraph of Exhibit 6?

25 A     The paragraph beginning with "To all"?

34

1  Q    Yes.  Yes.

2  A          "To all 'officers of the law,' if you

3             have come to protect me, you are

4             welcome.  If you've come to harass me,

5             keep out.  Do not trespass (including

6             common areas).  Survivors will be

7             prosecuted."

8             MS. MIRELL:  The Government moves to admit Exhibit

9  6.

10            THE COURT:  Any objection?

11            MR. NEWHOUSE:  No objection, your Honor.

12            THE COURT:  Exhibit 6 in evidence.

13            MS. MIRELL:  Okay.  Thank you, your Honor.

14 BY MS. MIRELL:

15 Q    So, prior, were there other attempts to arrest Mr.

16 Christie beyond the arrest that occurred yesterday?

17 A    Yes.

18 Q    And do you recall what that -- what date that attempt

19 was supposed to occur, or that arrest was supposed to occur?

20 A    I believe it was the 16th of December of this year.

21 Q    And what was the arrest plan for that day?

22 A    The arrest plan was to have CHP conduct a traffic stop,

23 detain Mr. Christie, and then transfer custody to the FBI.

24 Q    Was CHP successful in detaining Mr. Christie?

25 A    They were not successful in detaining Mr. Christie.

1 Q    Prior to your testimony here today, have you had an

2 opportunity to review a flash drive with serial number

3 0058121?

4 A    Yes.

5         MS. MIRELL:  All right.  If there's an objection,

6 I can have him inspect the flash drive.  If not, I can

7 proceed with playing it.

8         MR. NEWHOUSE:  There is an objection, your Honor.

9 It's not relevant.

10        THE COURT:  What's on the flash drive?

11        MS. MIRELL:  Dash cam footage from a December 16th

12 attempted arrest, your Honor, which shows the Defendant

13 fleeing.

14        THE COURT:  And Mr. Newhouse, are you conceding

15 that he fled from the CHP?  I think that you argued that

16 that did, in fact, take place, and you attempted to explain

17 why.

18        MR. NEWHOUSE:  Correct.  So, I mean, I would --

19        THE COURT:  So that's not an issue.  You're

20 conceding that, when the CHP attempted to conduct a traffic

21 stop, that he fled from the CHP?

22        MR. NEWHOUSE:  Well, again, I would object to the

23 use of the word "fled," but our position is, when the

24 officer told him, "If you don't get out of the car, I'm

25 going to break your window," he drove off without permission

36

1  from the officer.  Yes.  That's not at issue.  That

2  happened.

3          THE COURT:  All right.  And is that depicted on

4  the video cam?

5          MS. MIRELL:  The dash cam does show the Defendant

6  fleeing from CHP, but I think some of the audio on the dash

7  cam also undermines some of the representations and

8  narrative that defense counsel provided, and specifically

9  instructions to -- that the Defendant was not free to leave.

10          MR. NEWHOUSE:  Yes.  I would object.  It's

11  cumulative, your Honor, given because of the fact that we've

12  agreed with the Court's statement that he drove off, he

13  drove off without permission, and, you know, the exact

14  discourse between the two individuals is really not relevant

15  at this point.

16          THE COURT:  Well, are you agreeing that he was

17  told he was not free to leave, and he fled, or that he took

18  off?

19          MR. NEWHOUSE:  He was not told that.

20          THE COURT:  Okay.  But, according to Ms. Mirell,

21  the flash drive would depict that he was actually told he

22  wasn't free to leave, and that's a different circumstance

23  than the one you're arguing.

24          MR. NEWHOUSE:  And that's true, and if that's not

25  the conversation, then it would, I note, undermine the

37

1 Government's credibility, because that's not what my client

2 heard.

3          THE COURT:  All right.  So, then, you don't --

4 then I'm going to order the flash drive for the body cam to

5 be played, because you're not agreeing with what is on

6 there.

7          MR. NEWHOUSE:  Without objection.

8          THE COURT:  Okay.

9          MR. NEWHOUSE:  Thank you.

10          THE COURT:  Let's go ahead and -- are you going to

11 play that?

12          MS. MIRELL:  I'm going to attempt to do so, your

13 Honor.

14          THE COURT:  All right.

15          MS. MIRELL:  The Government moves --

16          THE COURT:  One moment.  All right.  You can

17 proceed, Ms. Mirell.

18          MS. MIRELL:  Your Honor, I just want to ensure for

19 the record that Exhibit 7 has been admitted.

20          THE COURT:  And there's no objection, so

21 Exhibit --

22          MR. NEWHOUSE:  No objection.

23          THE COURT:  -- Exhibit 7 is admitted.

24 BY MS. MIRELL:

25 Q    And I would like to start the video from 1:10, and

38

1 just -- Special Agent Turner, just to be clear, is this body

2 cam footage or dash cam footage?

3 A    This is dash cam footage, but the officers were wearing

4 audio devices, I believe.

5 Q    Okay.  I am starting the video from 1:10, and, Special

6 Agent Turner, were you nearby observing this stop?

7 A    I was nearby, observing the stop.  My view was

8 partially obscured.

9        (Video plays.)

10            MS. MIRELL:  I'm sorry.  Let me retry that.  I'm

11 sorry, your Honor.  Can I try it on your computer,

12 potentially?  I'm sorry, your Honor.  It was working one

13 second ago.  Is it working?  I'm sorry, your Honor.  I can

14 proceed, and return to it.  Okay.  We're going to proceed

15 and then return to the video, hopefully.

16            THE COURT:  All right.

17            MS. MIRELL:  I'd just ask my colleague to let me

18 know if you're able to pull it up.

19 BY MS. MIRELL:

20 Q    Okay.  Did CHP document its traffic stop with Mr.

21 Christie in a report?

22 A    Yes.

23 Q    And I'd now ask you to flip to Exhibit 4 in your

24 binder.

25            MS. MIRELL:  You got it?  Okay.  We're actually

39

1 going to try to get this to work.  Does that work?  Okay.

2 The record we're playing, starting at 1:10, from Exhibit 7.

3      (Video plays.)

4 BY MS. MIRELL:

5 Q    I just paused the video at the three-minute mark.  Did

6 you just hear the officer say, "You're not free to leave"?

7 A    I did.

8           MS. MIRELL:  Thank you.

9           We can continue from three minutes onward.

10      (Video plays.)

11 BY MS. MIRELL:

12 Q    Did you hear the officer instruct Mr. Christie, "You're

13 going to be arrested for obstruction"?

14 A    I did.

15      (Video plays.)

16           MS. MIRELL:  Okay.  I have stopped the video at

17 the 4:18 time stamp.  Thank you, your Honor, and I apologize

18 for the technical difficulties.

19 BY MS. MIRELL:

20 Q    I believe we were in the middle of looking at Exhibit 4

21 hereto, and I missed it if you described it.  Do you know

22 what this is?

23 A    Exhibit 4 is a Department of California Highway Patrol

24 Arrest-Investigation Report.

25           MS. MIRELL:  Okay.  And the Government moves to

40

1 admit Exhibit 5.

2          THE COURT:  Any objection?

3          MR. NEWHOUSE:  No objection.

4          THE COURT:  Okay.  Exhibit 4 in evidence.

5 BY MS. MIRELL:

6 Q    And according to this report in Exhibit 4, and

7 according to your conversations with CHP, does CHP still

8 have possession of Mr. Christie's license and registration

9 cards?

10 A    Yes.

11 Q    Okay.  Do you have an understanding of why CHP did not

12 pursue Mr. Christie once he took off?

13 A    I do.

14 Q    Why is that?

15 A    Because, when we had made arrangements with CHP to

16 conduct a traffic stop on Mr. Christie, one of the

17 conditions from CHP supervisors was that, if he fled, they

18 would not pursue.

19 Q    Thank you.  Are you aware of any other arrests or

20 attempted arrests involving Mr. Christie?

21 A    Yes.

22 Q    When did that attempted -- or arrest occur?

23 A    I believe it was in 2011.

24 Q    Do you remember --

25          MR. NEWHOUSE:  Excuse me, your Honor.  Objection

41

1  under 352 at this point.  This is dated, and it's all

2  hearsay at this point.

3          THE COURT:  Is the substance of the testimony

4  you're seeking to elicit in the police report that set forth

5  the circumstances of that arrest?

6          MS. MIRELL:  Yes.  It's on page three and spans to

7  page four.  We would also move to -- if this exhibit were

8  admitted, we would only move in that portion of the exhibit

9  under seal -- or we would -- I'm sorry.  We would admit the

10  entire report, but seal the entire report, and only discuss

11  the portions on the bottom of page three and top of page

12  four.

13          MR. NEWHOUSE:  Your Honor, our position is that,

14  if this were a trial, this document and this testimony would

15  never come in.

16          THE COURT:  Well, this isn't a trial, and the

17  rules that apply to trial proceedings don't apply to bail

18  hearings, but, I mean, Mr. Newhouse, you're not contesting

19  that what is reflected in this report actually happened,

20  right?  You're just reflecting (sic) that it was such a long

21  time ago, it's not relevant?

22          MR. NEWHOUSE:  The answer is I don't know, and

23  yes, I can't contest it because it's so long ago that

24  there's no way to know whether it's accurate or not.

25          THE COURT:  Okay.  Well, the Court does find that

42

1 it is dated, and so I'm not going to admit Exhibit 3 into

2 evidence.

3          MS. MIRELL:  Your Honor, may we still discuss its

4 contents, notwithstanding?

5          MR. NEWHOUSE:  Objection to that, your Honor.

6          THE COURT:  No.  That objection is sustained on

7 relevance grounds.

8          MS. MIRELL:  Okay.

9          THE COURT:  You can move on.

10          MS. MIRELL:  Well, may I ask the witness whether

11 he's aware if the Defendant has ever previously resisted

12 attempts by law enforcement to arrest?

13          THE COURT:  Yes.

14          MR. NEWHOUSE:  Object to hearsay.

15          THE COURT:  Well, he can answer based on his

16 knowledge.

17 BY MS. MIRELL:

18 Q    Okay.  Special Agent Turner, are you aware if, prior to

19 the December 16th CHP arrest and prior to yesterday's

20 arrest, Defendant has ever resisted attempts -- or resisted

21 arrest?

22          MR. NEWHOUSE:  Object to foundation, your Honor.

23 How could he possibly have personal knowledge of that?

24          THE COURT:  Well, if he -- if his knowledge is

25 based on a report that he's reviewed, I can accept the

43

1 testimony, but not the -- I'm not admitting the report into

2 evidence.

3        MR. NEWHOUSE:  Well, I would -- that's fair, your

4 Honor, except that my only point is, if this is based upon

5 what's in Exhibit 3, this is just a back-door way around the

6 Court's ruling indicating that this evidence is too old.

7        THE COURT:  Right.  I mean, if he -- if his -- if

8 the basis of his knowledge is his review of this report, I

9 take into account the fact that the report is not into

10 evidence, and this incident happened, you know, over 10

11 years ago.

12        MR. NEWHOUSE:  Thank you, your Honor.

13        THE COURT:  All right.  You may proceed with the

14 question.

15 BY MS. MIRELL:

16 Q    Are you aware if, prior to yesterday's arrest, and the

17 attempted arrest by CHP on December 16th, whether the

18 Defendant has ever resisted arrest?

19 A    Yes.

20 Q    And did that involve physical resistance of arrest?

21 A    Yes.  He physically resisted arresting officers.

22 Q    So you mentioned earlier that you ultimately dispatched

23 the SWAT team to effectuate the arrest.  Why did you use the

24 SWAT team?

25 A    I had concerns for agent safety.

44

1  Q    Did you have concern about the Defendant's potential

2  conduct?

3  A    Yes.

4  Q    What were your concerns?

5        MR. NEWHOUSE:  Object, your Honor, lack of

6  foundation, calls for speculation, improper opinion.

7        THE COURT:  Overruled.  You may answer.

8        THE WITNESS:  I had concerns that he would

9  potentially resist law enforcement, as he had in the past,

10 and I had concerns that he would barricade.

11 BY MS. MIRELL:

12 Q    Did you have any concerns based on his lawful

13 possession of firearms?

14 A    Yes.  I also had concerns based on his lawful

15 possession of a firearm, which he purchased approximately

16 eight days after we served him with a subpoena, and I also

17 had concerns with the last sentence on what was posted on

18 his door, saying that prosecutors -- or, excuse me, that

19 "Survivors will be prosecuted."  I took that as a threat to

20 use deadly force.

21 Q    Now, aside from his possession of his firearms, his

22 resistance to arrest previously, and his note on his door,

23 was there anything else that formed the basis of your

24 concern?

25 A    Could you list those factors again?

45

1  Q    Yes.  Aside -- the possession of the firearms, the note
2  on the door indicating that violators would be "Survivors
3  will be prosecuted" -- I'm sorry -- and his prior resistance
4  to arrest, was there anything else specific to FBI's
5  interactions with this individual that gave you concern?
6  A    I had concerns that he generally would not submit to
7  law enforcement authority.
8  Q    And did the grand jury subpoena affect -- or the
9  failure to accept service of the grand jury subpoena affect
10 your judgment with respect to the operation plan in this
11 case?
12 A    Yes, and also the fact that he then purchased a firearm
13 after the service of that subpoena.
14 Q    Okay.  So I want to direct your attention now to the
15 arrest that occurred yesterday.  Do you recall what time
16 SWAT arrived for the arrest?
17 A    Approximately 9:00 o'clock yesterday.
18 Q    And we're going to get into the details, but, generally
19 speaking, can you describe what happened during the arrest?
20 A    In a broad overview, the SWAT team attempted to place
21 Mr. Christie into custody.  He refused to comply.  He
22 barricaded, and after over three hours, he was taken into
23 custody.  At the end of a negotiation process, he was taken
24 into custody.
25 Q    Do you recall what time he was taken into custody?

46

1  A    He was taken into custody at approximately 12:18.

2  Q    Okay.  So that's over three years since -- after SWAT

3  arrived?

4  A    Yes.

5  Q    Okay.  Does SWAT keep a log of its activities during an

6  arrest operation?

7  A    Yes.

8  Q    I'd like to direct your attention now to Exhibit 8.

9  A    Okay.  I see it.

10  Q    And do you recognize what this is?

11  A    Yes.

12  Q    What is it?

13  A    It is the LAFO, which stands for "Los Angeles Field

14  Office," SWAT, which stands for "Special Weapons and

15  Tactics," operations log.

16  Q    Okay.  And this is the log from the arrest of Mr.

17  Christie?

18  A    Yes.

19           MS. MIRELL:  Government moves to admit Exhibit 8.

20           MR. NEWHOUSE:  No opposition.

21           MS. MIRELL:  Okay.

22           THE COURT:  Okay.  Exhibit 8 in evidence.

23  BY MS. MIRELL:

24  Q    Were you nearby -- are you a member of the SWAT team?

25  A    I am not.

47

1  Q    Okay.  But were you nearby listening in periodically to
2  the radio as this arrest was taking place?
3  A    Yes.
4  Q    And have you since had an opportunity to review some of
5  the radio recordings from this arrest?
6  A    I have had the opportunity to review some of the
7  communications from yesterday, but not all of them.
8  Q    Okay.  Now, I want to direct your attention to what's
9  now been admitted as Government's Exhibit 8.  According to
10 this log, what time did SWAT enter?
11 A    At 8:59.
12 Q    And if you're looking at the entry where it says,
13 "8:59, CNT started negotiations," what does "CNT" stand for?
14 A    Crisis Negotiation Team.
15 Q    When is a crisis negotiator used?
16 A    Generally when there are barricaded subjects or there
17 are hostages involved.
18 Q    Okay.  Directing your attention to the entry from 0912,
19 9:12, it says, "OC deployed through skylight and breached
20 second-floor balcony."  What does "OC" stand for?
21 A    I don't remember the exact language that "OC" stands
22 for.  Basically, colloquially, it is like a pepper spray.
23 Q    Do you have understanding of why pepper spray is
24 deployed in a situation like this?
25 A    Yes.

48

1  Q    Why?

2  A    If there is a noncompliant subject, it is a

3  less-than-lethal way to attempt to gain compliance.

4  Q    Is it your understanding based on this log that at

5  9:21, pepper spray was again deployed into the residence of

6  Mr. Christie?

7  A    Yes, at 9:21, a second OC deployment.

8  Q    Is it also your understanding based on this log that

9  there were ongoing negotiations and attempts to contact Mr.

10 Christie by the crisis negotiator?

11 A    Yes.

12 Q    Okay.  I want to direct your attention now to the entry

13 from 9:31 a.m., where it says, "Gun in right hand."  Who

14 held the "gun in right hand"?  Who is this entry referring

15 to?

16         MR. NEWHOUSE:  Objection, lack of foundation.

17         THE COURT:  Lay a foundation, please.

18 BY MS. MIRELL:

19 Q    Have you spoken to the SWAT agents who conducted this

20 operation?

21 A    I have spoken to several of the SWAT agents who

22 conducted the operation.

23 Q    And are you aware if there was a robot or drone used in

24 this operation?

25 A    Yes.

49

1  Q    And does the robot have a camera on it?

2  A    I am told that the robot has a camera on it, yes.

3  Q    So the robot can capture the actions and conduct of an

4  arrestee?

5  A    Yes.  That way, the SWAT operator does not have to put

6  himself or herself at risk.  They can put an inanimate

7  object in order to observe the subject.

8  Q    And based on your conversations and the existence of a

9  robot in this case, or in this SWAT operation, what is your

10 understanding of who the entry from 9:31, "Gun in right

11 hand," is referring to?

12          MR. NEWHOUSE:  Objection, lack of -- calls for

13 speculation, lack of foundation.

14          THE COURT:  You can lay a foundation.

15 BY MS. MIRELL:

16 Q    Did officers inform you that they were able to see

17 Mr. -- I'm sorry.  Did the SWAT operators inform you that

18 they were able to see Mr. Christie inside his apartment?

19 A    Yes.

20 Q    Were they able to see him through the robot?

21 A    Yes.

22 Q    And what did they tell you about what he was doing

23 inside the apartment?

24 A    They told me that, during the negotiations, he had a

25 gun.

50

1 Q    So the entry "9:31, gun in right hand," is a reference

2 to Mr. Christie?

3 A    Yes.

4 Q    Thank you.  Okay.  Directing your attention to the

5 entry from 9:37 a.m., where it says:

6            "Subject confirms to CNT" -- which I

7            understand to be "crisis negotiator --

8            "he is 'completely armed and willing to

9            use Second Amendment rights.'"

10    Did you overhear Mr. Christie say any of this?

11 A    I remember hearing him discussing his Second Amendment

12 rights.

13 Q    Okay.  Now directing your attention to the entry from

14 9:40 a.m., where it says:

15            "Subject believed CHP stop the week

16            prior was to abduct him, and believes

17            FBI has no legal authority in the

18            warrant."

19    Did you have an opportunity to listen to Mr. Christie's

20 statements during this three, almost three-and-a-half-hour,

21 arrest?

22 A    Yes.  I heard many of Mr. Christie's statements.

23 Q    And did Mr. Christie discuss FBI's legal authority

24 during the course of the arrest?

25 A    Yes.

1  Q    According to Mr. Christie's statements, what were his

2  beliefs about FBI's legal authority to arrest him?

3  A    That it basically did not exist, the FBI had no legal

4  authority.

5  Q    Okay.  And directing your attention now -- I'm sorry.

6  Are you aware if law enforcement ultimately provided Mr.

7  Christie with copies of the arrest warrant and search

8  warrant for his review?

9  A    I know that he received a copy of the search warrant,

10 because it was attached to a robot, and ultimately he was

11 able to take possession of that search warrant.

12 Q    And when officers arrived on scene, did they inform Mr.

13 Christie that he was under arrest?

14 A    That is standard FBI procedure.

15      MR. NEWHOUSE:  Objection, lack of foundation,

16 calls for speculation at this point.

17      THE COURT:  So do you have any knowledge that when

18 the FBI agents arrived, they informed him he was under

19 arrest?

20      THE WITNESS:  I personally did not hear that with

21 my ears.  In my 16 --

22      MR. NEWHOUSE:  Move to strike.  Excuse me, your

23 Honor.  I would move to strike the remainder of the answer

24 after he said he personally doesn't have a personal

25 knowledge of this.

1          THE COURT:  All right.  I move to -- that -- the
2  rest of the response is stricken.

3          You don't have any personal knowledge that they
4  told him he was under arrest.  Is that right?

5          THE WITNESS:  There were -- I do not.  When they
6  made the first knock-and-announce, I do not have personal
7  knowledge that they said that he was under arrest.  Based on
8  my 16 years of law enforcement experience, in every single
9  operation that I have been on --

10          MR. NEWHOUSE:  Objection, your Honor.  I'm sorry
11  to interrupt, but now he's just speculating.  We don't --
12  his 16 years of law enforcement is not relevant here.

13          THE COURT:  Well, I think the question is, is it
14  custom, habit, and practice for FBI agents to announce why
15  they're there to arrest somebody?

16          THE WITNESS:  Yes.  It is customary for the FBI to
17  announce their presence, who they are, and the reason that
18  they are there when they are executing search warrants and
19  arrest warrants.

20          THE COURT:  All right.  You can move on to the
21  next question.

22          MS. MIRELL:  Thank you, your Honor.
23  BY MS. MIRELL:
24  Q    Do you know if anyone was ultimately called to help the
25  Crisis Negotiation Team coax Mr. Christie out of his

53

1 residence?

2 A    Yes.

3 Q    Who was called?

4 A    Defense counsel was called, as well as several of Mr.

5 Christie's, I believe, friends, acquaintances were called.

6 Q    Were any of Mr. Christie's family members called?

7 A    Yes.

8 Q    Now, according to this report, Mr. Newhouse, or the

9 attorney, arrived at approximately 9:59 a.m.  Is that

10 correct?

11 A    Yes.  The entry says, "Subject's attorney is on scene."

12 Q    So discussion about "9:37 a.m., completely armed and

13 willing to use Second Amendment rights" preceded the

14 attorney's arrival on scene?

15 A    To my knowledge, yes.

16 Q    Okay.  And to your knowledge, did the attorney try to

17 persuade Mr. Christie to leave his residence?

18 A    Yes.

19        MR. NEWHOUSE:  We'll stipulate to that, your

20 Honor.

21 BY MS. MIRELL:

22 Q    Okay.  And did the attorney have to provide Mr.

23 Christie with instructions about what to do with his

24 firearms prior to leaving his residence?

25 A    Yes.  There were ongoing discussions and requests for

54

1 Mr. Christie to put his firearms down and exit his

2 residence.

3 Q    I want to direct your attention now to Exhibit -- I'm

4 sorry -- to page two of Exhibit 8, and at 10:54, where it

5 says, "Subject continues to talk to CNT and attorney.

6 Subject expresses that warrant is not legally binding."  Did

7 you hear the subject express, well, I should say, misgivings

8 or doubts about the authority of the warrant?

9 A    He expressed numerous times that he did not feel that

10 the search warrant was a valid search warrant.

11 Q    And did he provide any specifics of what he believed

12 was necessary for it to be valid?

13 A    Yes.

14 Q    What did he say?

15 A    He said that it needed a wet signature, and that it

16 needed an affidavit, and that there was no sheriff present

17 to execute the search warrant.

18 Q    All right.  I want to direct your attention to the

19 entry from 10:55, where it says the subject says, "You

20 better come in here shooting."  Did you personally hear the

21 subject say, "You better come in here shooting"?

22 A    When I reviewed some of the --

23         MR. NEWHOUSE:  Can I interrupt?  I'm sorry, your

24 Honor.  Can you give me the reference again, what page of --

25         MS. MIRELL:  From 10:55, page two of three of

1  Exhibit 8.

2          MR. NEWHOUSE:  Okay.  10:55.  Thank you.  Please

3  proceed.

4  BY MS. MIRELL:

5  Q    Did you personally hear, in your investigation or

6  review of recordings --

7  A    In the review, I heard, yes, that "You better" --

8  something to the effect of "You better come in here

9  shooting."

10 Q    What's your understanding of the significance of that

11 statement?

12 A    My understanding of the significance of that statement

13 is he is telling law enforcement that they had better come

14 in shooting, because he will be engaging in shooting and

15 violence.

16         MR. NEWHOUSE:  Your Honor, I'm going to move to

17 strike for lack of foundation.

18         THE COURT:  Well, he's testifying to his

19 understanding of the statement.

20         MR. NEWHOUSE:  Well, the statement -- we

21 sharply -- I was on the phone with them at that time.

22         THE COURT:  You'll have an opportunity to --

23         MR. NEWHOUSE:  We contest it.

24         THE COURT:  -- cross-examine --

25         MR. NEWHOUSE:  Thank you, your Honor.

1          THE COURT:  -- the agent afterwards, Mr. Newhouse.

2          You can proceed, Ms. Mirell.

3          MS. MIRELL:  Thank you, your Honor.

4 BY MS. MIRELL:

5 Q    Now, I want to direct your attention to 11:14, where it

6 says:

7          "The subject was" -- it's redacted --

8          "asked where guns are, to which subject

9          responds, 'My guns are with me.'"

10     Do you have an understanding of who is under the

11 redaction there, I mean, generally, the nature of the nature

12 of the relationship between that person and Mr. Christie?

13 A    Yes.  It was, I believe, a friend or acquaintance of

14 Mr. Christie.

15 Q    And Mr. Christie is informing that friend that he still

16 has his guns on him?

17 A    Yes.

18 Q    And approximately how many hours did this negotiation

19 span?

20 A    It was over three hours.

21 Q    And I'm sorry.  And defense counsel was on scene for

22 over two hours then, if he arrived at around 10:00 o'clock

23 a.m.?

24 A    That sounds correct.

25 Q    And Mr. Christie still would not emerge from his

57

1 apartment?

2          MR. NEWHOUSE:   Object to the argument, your Honor,

3 and leading.

4          THE COURT:   Yes.   That is argument now.

5 BY MS. MIRELL:

6 Q    Okay.   Did Mr. Christie emerge from his apartment

7 during the two hours that defense counsel was working with

8 the Crisis Negotiation Team to urge his client to leave the

9 apartment?

10 A    Not in the first two hours.

11 Q    Okay.   Are you -- have you spoken to the SWAT agents

12 who have -- who actually executed the arrest and actually

13 put cuffs on Mr. Christie?

14 A    I spoke to one of the SWAT operators who put cuffs on

15 Mr. Christie.

16 Q    Did they describe how they were ultimately able to cuff

17 Mr. Christie?

18 A    Yes.

19 Q    Can you describe what they said, in terms of how they

20 were able to cuff Mr. Christie?

21 A    They had to tackle him, and he had his hands underneath

22 his body, and they were concerned that he might be reaching

23 for a weapon, and several SWAT operators were required to

24 cuff him.

25 Q    Did you subsequently conduct a search of Mr. Christie's

58

1 residence?

2 A     Yes.

3 Q     And what did you find during that search?

4 A     We found several items enumerated in the search

5 warrant, including a hammer and two firearms, as well as

6 some business cards from the FBI.

7 Q     And did you find any other evidence -- or, I'm sorry,

8 other items of evidentiary value associated with Mr.

9 Christie and his presence at the Capitol on January 6th?

10 A     Yes.

11 Q     What were those items?

12 A     There were the items of clothing that he appeared to be

13 wearing in videos from January 6th, as well as travel

14 documentation such as -- I believe there was a boarding

15 pass, things like that, related to his travel around January

16 6th.

17 Q     When you said, "Items associated with Mr. Christie,"

18 can you specify which articles of clothing, for example,

19 that you were able to find, or items?

20 A     Yes, the shirt that he was wearing on January 6th, what

21 appeared to be the hat, a green bandanna, and, I believe, a

22 jacket that he had been wearing, as well as a flag that he

23 had worn under his hat.

24 Q     Okay.  And did law enforcement take photographs of some

25 of the items that they found during the search warrant?

59

1 A    Yes.

2 Q    Okay.  I'd like to direct your attention to Government

3 Exhibit 9.  Are these some of the photographs taken during

4 the search of items recovered or found or located at Mr.

5 Christie's residence?

6 A    Yes.

7         MS. MIRELL:  Okay.  Government moves to admit

8 Exhibit 9.

9         THE COURT:  Any objection?

10        MR. NEWHOUSE:  No objection, your Honor.

11        THE COURT:  Okay.  Exhibit 9 in evidence.

12 BY MS. MIRELL:

13 Q    Okay.  If you can look at page one of eight from

14 Exhibit 9, what is this photograph showing us?

15 A    It's showing us what appears to be a piece of luggage

16 with a hammer in it.

17 Q    And if you flip to page two of eight, is this the

18 hammer that you found inside the luggage, or that police

19 found inside the luggage?

20 A    Yes.  This is a picture of the hammer that the agents

21 found inside the luggage.

22 Q    Does this appear to be -- or does this resemble the

23 hammer that Mr. Christie was seen wearing on his belt at the

24 Capital on January 6, 2021?

25 A    Yes.

60

1 Q    Okay.  Directing your attention to page three of eight
2 from Exhibit 9, what does this photograph show?
3 A    Firearms that were observed at Mr. Christie's
4 residence.
5 Q    Did law enforcement seize these firearms?
6 A    No.  The firearms were not seized.
7 Q    Were they listed in the search warrant as items that
8 could be seized?
9 A    No.
10 Q    Okay.  And looking at page four of eight, what is this
11 photograph showing?
12 A    It shows a firearm.
13 Q    And what type of firearm?  Do you know?
14 A    I believe it is a Glock handgun.
15 Q    And is this -- are you aware if this is one of the
16 firearms that is registered to Mr. Christie?
17 A    Yes.
18 Q    And have you spoken to the agents who found this
19 firearm?
20 A    Yes.
21 Q    And are you aware if this firearm was loaded?
22 A    It was loaded, according to the agent that I spoke to.
23 Q    I'd like to direct your attention to page five of
24 the -- from Exhibit 9.
25 A    Okay.

61

1  Q    And what is this kind of black cartridge coming out

2  from the -- that we see kind of in the bottom third of the

3  photograph?

4  A    That is what's called a "magazine," where the actual

5  rounds or bullets are placed into, and then the magazine is

6  inserted into the weapon.

7  Q    So, when law -- are you aware, when law enforcement

8  found this weapon, the magazine was removed, or was it

9  already -- was it inserted inside the gun?

10 A    I believe it was inserted into the weapon.

11 Q    Okay.  And I'd like to direct your attention to page

12 six of eight, and what does this photograph show?

13 A    This shows that there was a round in the chamber, and

14 the significance of that is, if someone pulled the trigger,

15 if the weapon is functioning properly, it would fire.

16 Q    Turning now to page seven of eight.

17 A    Okay.

18 Q    And do you recognize what this is?

19 A    This appears to be a 357 revolver.

20 Q    And does this match the description of the revolver

21 that Mr. Christie purchased eight days after being served

22 with the subpoena?

23 A    Yes.

24 Q    And are you -- do you have any knowledge of whether

25 those bullets were inside the firearm or not?

62

1  A    To my knowledge, that weapon was not loaded.

2  Q    Okay.  And page -- finally, page eight of eight of

3  Exhibit 9.  This is just a closeup of that same firearm that

4  we saw on the previous page?

5  A    Yes, with the cylinder open, showing that there are not

6  rounds loaded into the weapon.

7           MS. MIRELL:  Okay.  Thank you very much, Special

8  Agent Turner.

9           No further questions at this time, your Honor.

10          THE COURT:  Mr. Newhouse?

11          MR. NEWHOUSE:  Yes, your Honor.  May I have one

12 moment to consult a witness in the back?

13          THE COURT:  Yes.

14          MR. NEWHOUSE:  Thank you.  We may have to call up

15 a rebuttal witness, but who would be short.  But let me

16 start with Agent Turner.

17                     CROSS EXAMINATION

18 BY MR. NEWHOUSE:

19 Q    Agent Turner, good afternoon.  My name is George

20 Newhouse, and I represent the Defendant.

21 A    Good afternoon.

22 Q    Now, you're correct.  I was at that scene, on the phone

23 with the negotiators for over two hours that day, wasn't I?

24 A    Yes.

25 Q    I never saw you.  When did you arrive?

63

1 A    I was at the talk from the beginning of the operation

2 until the scene was secured and turned over to me.

3 Q    Okay.  But you never spoke to me during the entire

4 two-plus hours that I was there, correct?

5 A    Correct.

6 Q    Okay.  And I was dealing with the -- and the others --

7 I was dealing with the lead agent for the SWAT team.  Is

8 that right?

9 A    I believe you were talking to the -- I think we would

10 refer to it, probably, as the "on-scene tactical commander."

11 Q    I sometimes get the parlance wrong, but I appreciate

12 that.  Thank you.

13 A    Sure.

14 Q    So let's -- a first question is, why did the FBI decide

15 to use -- to go in and have SWAT effect the arrest, as

16 opposed to the normal procedure, which would be ask a

17 magistrate judge an early-hours warrant, in which case you

18 could go in, the person is asleep?  You broke down the door

19 anyway.  Why did you elect, right off the bat, to bring the

20 SWAT team in?  Was that some form of punishment?

21 A    No.

22 Q    Why did you do it?

23         MS. MIRELL:  Your Honor, objection as to "some

24 form of punishment" as argumentative.

25         MR. NEWHOUSE:  Okay.

64

1          THE COURT:  Right.  That's sustained.

2          MR. NEWHOUSE:  And he said no.  So I withdraw that

3 question.

4 BY MR. NEWHOUSE:

5 Q    Why did you choose -- well, let me ask you a question.

6 How many SWAT -- I counted close to 25 SWAT team members

7 there that day.  Is that right?

8 A    I do not know the exact number of SWAT team members who

9 were there.

10 Q    Would you agree with me that it was a massive show of

11 force?  Correct?

12 A    I would not describe it as a "massive show of force."

13 Q    How would you describe it?

14 A    I would describe it as the Los Angeles field office

15 SWAT team executed an arrest and search warrant.

16 Q    And these people are all dressed in military garb,

17 helmets, flak jacks, flak suits, or whatever.  They are all

18 geared up.  Is that right?

19 A    They are geared up in -- we'd say, "Tactically geared

20 up," yes.

21 Q    Okay.  And the question is, why did you not elect to go

22 in, per normal policy, and ask the magistrate judge for an

23 early-hours warrant?  Why did you decide to go with the SWAT

24 team in this circumstance?

25          MS. MIRELL:  Objection, argumentative as to "per

65

1  normal policy," and I don't believe that defense counsel is

2  an --

3          MR. NEWHOUSE:  It's a fair point.  I'm going to

4  withdraw the question.

5          THE COURT:  Well, I don't think he -- you're not

6  the agent that sought the arrest warrant in this case, are

7  you?

8          THE WITNESS:  I was not the affiant for the arrest

9  warrant.

10          THE COURT:  All right.  So there's no foundation

11  for that.  Move on.

12  BY MR. NEWHOUSE:

13  Q    All right.  Were you in on the decision about how to go

14  in and effect the arrest, whether to use the SWAT team or to

15  have a band of agents go in and execute the arrest warrant?

16  A    I was involved in the discussion to elect to use the

17  SWAT team in this situation.

18  Q    Okay.  And would you agree with me that a normal human

19  being in their apartment at 9:00 o'clock in the morning

20  would find the SWAT team a little bit more frightening than

21  a knock on the door with FBI agents dressed, as you always

22  are, impeccably in suits?  Which of those two would be more

23  intimidating?

24          THE COURT:  Mr. Newhouse, you're arguing.

25          MR. NEWHOUSE:  Okay.  I'm sorry, your Honor.

66

1           THE COURT:  Yes.

2  BY MR. NEWHOUSE:

3  Q    Would you agree with me that the SWAT team --

4           THE COURT:  No, no, no.  That's not an appropriate

5  question.

6  BY MR. NEWHOUSE:

7  Q    Okay.  Is the SWAT team intimidating to general members

8  of the public?

9           MS. MIRELL:  Objection, calls for speculation.

10           THE COURT:  Well, you can answer that question.

11  Do you know if the SWAT team is intimidating to members of

12  the public?

13           THE WITNESS:  I have never polled members of the

14  public to see if they are intimidated by a SWAT team.

15  BY MR. NEWHOUSE:

16  Q    Okay.  But I'm right.  You didn't ask the magistrate

17  judge issuing the warrant or the search warrant --

18           THE COURT:  No.  Mr. Newhouse, he wasn't involved

19  in obtaining the warrant.

20           MR. NEWHOUSE:  I think he said -- maybe I

21  misunderstood -- that he was involved in discussions about

22  how to approach the service of the arrest warrant and the

23  search warrant.

24  BY MR. NEWHOUSE:

25  Q    Am I wrong?  You were involved in those discussions?

67

1  A    I was involved in the discussions to elect to use the

2  SWAT team, vice a normal squad-executed arrest and search

3  warrant.

4  Q    And I'd ask you to rely, in sum or in substance, those

5  discussions about why the SWAT team was decided.

6  A    Because we had concerns about agent safety based on Mr.

7  Christie's history and refusal to comply with law

8  enforcement.

9  Q    And was it your view that execution of a warrant at

10  5:00 in the morning, given permission from the magistrate

11  judge, that was -- would be insufficient to protect the

12  agents?

13         THE COURT:  Mr. Newhouse, the arrest warrant was

14  obtained from a magistrate judge in the District of

15  Columbia.

16         MR. NEWHOUSE:  I'm sorry.

17         THE COURT:  So --

18         MR. NEWHOUSE:  The service of the arrest warrant.

19  Right.

20         THE COURT:  Right.  So this witness was not

21  involved in that procurement.

22         MR. NEWHOUSE:  We'll move on.  We'll move on.

23  BY MR. NEWHOUSE:

24  Q    Was the protocol or the instructions to the team

25  issuing -- the SWAT team issuing the arrest warrant -- were

68

1    they told to knock on the door and announce, "FBI.  Open up.

2    We have some papers for you," something to that effect?

3    A    When SWAT executes an arrest and search warrant, the

4    tactical phase of the operation is turned over to the SWAT

5    team leadership.  The investigating squad does not tell SWAT

6    how to do their job.

7    Q    SWAT didn't knock and announce their presence, did

8    they, that morning?

9              THE COURT:  I think that's been asked and

10   answered.  You objected to the question, and I sustained

11   that objection.  He doesn't have any personal knowledge of

12   what was relayed.

13             MR. NEWHOUSE:  Well, I may have objected, but now

14   I want to ask the question, your Honor.

15             THE COURT:  All right.  You can ask the question.

16             MR. NEWHOUSE:  Thank you.

17             THE COURT:  Do you know if, when the SWAT team

18   arrived at the Defendant's residence, they announced that

19   they were there to effectuate a search warrant and/or an

20   arrest warrant?

21             THE WITNESS:  I do not have direct personal

22   knowledge.  I did not ask the SWAT team if they knocked and

23   announced, largely due to the effect that -- every other

24   search warrant and arrest warrant that I've been on, and FBI

25   policy, is that that is conducted, but, specifically, I did

69

1 not ask the members of the SWAT team if they knocked and

2 announced on this operation.

3 BY MR. NEWHOUSE:

4 Q    And, in fact, you know that the very first thing that

5 happened that morning at my client's door was that his --

6 the door was broken down, assaulted by some kind of

7 battering ram or something?  Was that what happened?

8             MS. MIRELL:  Objection, lack of foundation.  He

9 wasn't physically present.

10            THE COURT:  Do you have any personal knowledge of

11 the front door being broken down?

12            THE WITNESS:  I know that the door was breached,

13 based on the log, and when we conducted a search, there was

14 obvious signs that the front door had been breached.

15 BY MR. NEWHOUSE:

16 Q    Okay.  And let's go to Exhibit 8, in fact.  At 9:02, it

17 says -- well, strike that.

18     8:59, so one minute before 9:00 o'clock that morning,

19 it says, "Positive breach in the interior front door of

20 apartment, CNT starting negotiations."  Do you see that?

21 A    I do see that entry, yes.

22 Q    Okay.  And how was the door breached?  Do you know?  Do

23 you have knowledge, as the case agent?

24 A    I'm not the case agent.  I believe that a battering ram

25 was used, but I do not have -- I did not ask an agent how

70

1 the breach was conducted.

2 Q    Then the next thing that happened after the door was

3 broken down was drones broke the skylights, the windows in

4 the house.  Is that right?  Do you know?

5 A    I don't know if the drone itself broke the skylight,

6 but I do know that a skylight was broken.

7 Q    And how was it broken?

8 A    I do not know how SWAT operators broke the skylight.

9 Q    Okay.  And then it says, at 9:15, "Request to shut

10 off" -- so strike that.

11     I'm sorry.  It was 9:12, "OC deployed through skylight

12 and breached second-floor balcony."  What does "breached

13 second-floor balcony" mean?  What happened there?

14 A    The glass door on Mr. Christie's second-story balcony

15 was broken.

16 Q    And would you expect, as a seasoned, experienced FBI

17 agent, that the person inside the house at this point would

18 find these events terrifying?

19          MS. MIRELL:  Objection, argumentative, calls for

20 speculation.

21          THE COURT:  That's argumentative.

22 BY MR. NEWHOUSE:

23 Q    Okay.  And then, at -- well, let me ask you, the CNT,

24 these are the negotiators, right?

25 A    Correct.

1 Q    Okay.  They were in immediate contact with the occupant

2 of the house, in this case Mr. Christie.  Is that right?

3 A    I don't know if it was immediate.  I do know that it

4 was relatively soon after the operation started that they

5 were in contact with him.

6 Q    Okay.  Well, it says, "9:17, subject calling CNT, but

7 hung up."  What does that entry mean?  What is it depicting,

8 what event?

9 A    I believe it means "Subject calling CNT, but hung up."

10 Q    So CNT was on the scene immediately, because they

11 expected to have to negotiate with Mr. Christie with respect

12 to his surrender to the FBI.  Is that right?

13 A    When SWAT conducts operations, they always have CNT

14 with them.

15 Q    Okay.  And it's a fact, is it not, that there was no --

16 no one barricaded -- in some of the -- strike that.

17      The Defendant did not barricade himself in the

18 apartment at any point, did he?

19           MS. MIRELL:  Objection, argumentative.

20           THE COURT:  Do you know if the Defendant

21 barricaded himself in the apartment?

22           THE WITNESS:  The fact that he did not comply with

23 law enforcement orders for over three hours, and refused to

24 come out of his house, constitutes a barricade, in my

25 opinion.

72

1  BY MR. NEWHOUSE:

2  Q    That was my question.  So that's your definition of

3  "barricade," he doesn't comply with the instructions being

4  given to him by the CNT negotiator.  Is that right?

5  A    He's not complying with the instructions given to him

6  by the SWAT operators, and he refuses to leave and be placed

7  under law enforcement authority.

8  Q    Understood.  But nothing more, nothing like -- he

9  didn't put a table or some sort of furniture or other

10 objects in the way to prevent entry in the apartment.

11 You're not aware of that happening, right?

12           MS. MIRELL:  Objection, lack of foundation.

13           THE COURT:  Do you know if he did something to the

14 entryway that would prevent egress or ingress?

15           THE WITNESS:  I am not aware of Mr. Christie doing

16 something like that.

17 BY MR. NEWHOUSE:

18 Q    Okay.  Now, counsel for Mr. Christie, myself, arrived

19 around -- a few minutes before 10:00 o'clock.  Is that

20 right?  Is that what this log says?

21 A    I would need a second to find the entry.

22 Q    Well, look at 9:49.  There is a request for George

23 Newhouse, and phone number.  You see that?

24 A    I do see that entry, yes.

25 Q    That might explain why the FBI escorted me across the

73

1 street?

2 A    Yes.  I know that the crisis negotiator had asked for

3 your phone number in order to make coordination to get you

4 up to the CNT.

5 Q    Now, once counsel arrived, around 10:00 o'clock,

6 counsel and, a few minutes later, a woman named Yvette,

7 who's a good friend of the Defendant, they engaged with the

8 negotiators, with Mr. Christie.  Is that right?

9 A    Yes.  Yourself and Yvette, I believe it was, engaged

10 for a good amount of time with Mr. Christie and the CNT

11 negotiators in an attempt to get Mr. Christie to come out.

12 Q    You did not yourself overhear those conversations, did

13 you?

14 A    I overheard some of them, and I reviewed portions of

15 the recordings, but I have not had time to review all the

16 recordings.

17 Q    So my question is, you did not personally overhear

18 everything that was said between Mr. Christie's counsel and

19 Yvette and Mr. Christie, did you?

20 A    I cannot testify that I heard 100 percent of the

21 communications.  That is correct.

22 Q    Did you hear counsel -- and when I say "counsel," I'm

23 referring to myself in the third person, if that's okay.

24 Did you hear counsel tell Mr. Christie that "The search

25 warrant is valid, because it doesn't need to have a

74

1  signature.  The signature is in the court"?  Did you hear me

2  tell him that?

3  A    I did hear you tell Mr. Christie that it was a valid

4  search warrant.

5  Q    And did you hear myself and Yvette tell Mr. Christie

6  repeatedly, "Put the weapons away, and walk out the door,

7  and surrender to the agents who are out there"?  Did you

8  hear us tell him that?

9  A    Yes.

10 Q    How many times, a half-dozen or more?

11 A    I would think that's a fair estimate, yes.  There were

12 multiple times.

13 Q    And was Mr. Christie -- was he -- did he appear to you,

14 based upon your professional experience, to be upset at the

15 time, worried about his personal safety?

16         MS. MIRELL:  Objection, lack of foundation.  He

17 was not there.

18         THE COURT:  Sustained.

19 BY MR. NEWHOUSE:

20 Q    The portions of the conversations that you did

21 overhear, did you observe, perceive, Mr. Christie was

22 extremely upset about what was going on?

23         MS. MIRELL:  Objection as to phrasing --

24         THE COURT:  Right.

25         MS. MIRELL:  -- "overheard."

75

1        THE COURT:  I sustain the objection.  If you

2  overheard Mr. Christie say something, you can testify to

3  that.

4        THE WITNESS:  I heard Mr. Christie say repeatedly

5  that it was not a valid search warrant.

6  BY MR. NEWHOUSE:

7  Q    And you heard me tell Mr. Christie, "It is a valid

8  search warrant"?

9  A    Yes, I did.

10 Q    And you heard counsel tell Mr. Christie, "Put your

11 weapons down.  Relax.  Walk outside and surrender to SWAT."

12 You heard us tell him that, didn't you?

13 A    Yes.

14 Q    Okay.  And eventually, two hours later, that's exactly

15 what happened, correct?

16 A    He was taken into custody over two hours later.

17 Q    Okay.  And he didn't have -- by the way, did you

18 observe or do you have evidence that Mr. Christie ever

19 pointed his gun, his firearm, at any of the agents?

20 A    When I spoke to one of the SWAT operators, they

21 observed on the robot camera that he was pointing the weapon

22 in the direction of the landing of the front door to his

23 residence, where law enforcement officers presumably would

24 make entrance.

25        MR. NEWHOUSE:  Your Honor, I move to strike based

76

1  upon speculation and the use of the word "presumably."

2          THE COURT:  Okay.  Can you repeat your answer?

3  What is your understanding about how the weapon was -- where

4  it was directed based on?

5          THE WITNESS:  It was basically pointed right -- if

6  you walked through the door to Mr. Christie's residence, a

7  SWAT operator told me they observed him pointing the weapon

8  in that direction.

9  BY MR. NEWHOUSE:

10 Q    But that -- I'm sorry.  That observation was over the

11 drone footage.  Is that right?

12 A    No.  It was over the robot.

13 Q    Okay.  Strike that.

14      The robot.  Okay.

15 A    Correct.  Mr. --

16 Q    Go ahead.  I'm sorry.

17 A    No, go ahead, please.

18 Q    So, when the -- Mr. Christie also asked to see a copy

19 of the warrant, did he not?

20 A    He requested to see a copy of the search warrant, yes.

21 Q    Okay.  And counsel made arrangements with the

22 negotiators and the SWAT team to have that copy of the

23 warrant delivered to them, didn't we?

24 A    Yes.

25 Q    Okay.  And that's when your testimony was Mr. Christie

77

1  objected because he didn't think the warrant was valid.  Is

2  that right?

3  A    He objected at numerous points to the FBI's authority

4  and the validity of the search warrant.

5  Q    So the -- let's look at the firearms, which is Exhibit

6  9.  So we have Exhibit 9, pages four of eight.  We have --

7  you've testified that's the Glock semiautomatic and a Smith

8  and Wesson.  These were the two firearms that the search

9  team found in the house?

10 A    Yes.  The pictures are of the firearms that were found

11 in the house, yes.

12 Q    Okay.  And the firearms were validly, legally purchased

13 by Mr. Christie, and, in fact, registered to him, right?

14 A    That's my understanding, yes.

15 Q    So Mr. Christie's possession of these weapons in his

16 condo did not violate any law you're aware of?

17 A    Not that -- no law that I am aware of was violated by

18 his possession of the weapons.

19 Q    And you're aware -- based upon your surveilling or

20 participating in the search, you're aware that Mr. Christie

21 never fired any of the firearms at any point?

22 A    During the arrest?

23 Q    During the whole arrest, the entire period.

24 A    No.  Mr. Christie, to my knowledge, did not fire a

25 weapon during his arrest.

78

1 Q    So Mr. Christie's use or handling of the firearms, as

2 far as you can see as a federal law enforcement officer, did

3 not violate any federal law.  Is that right?  He never left

4 his house, right?

5           THE COURT:  No, that's argumentative, Mr.

6 Newhouse.

7           MR. NEWHOUSE:  I'm just asking if there was a --

8           THE COURT:  You can make that argument, but I

9 don't think that he is qualified to say whether, you know,

10 he violated federal law --

11           MR. NEWHOUSE:  That's fair.

12           THE COURT:  -- when he had a loaded firearm when

13 agents were trying to arrest him.

14 BY MR. NEWHOUSE:

15 Q    Let's go to Exhibit 5 -- Exhibit 6.  You testified that

16 that's a notice that Mr. Christie had posted on his door.

17 Is that right?

18 A    Presumably Mr. Christie posted it, because it was on

19 the door of his condo.

20 Q    And that was observed by the FBI during some -- what

21 did you call it, a "checkup" on his apartment?

22 A    No.  I called it a "spot check."

23 Q    I stand corrected.  A spot check.  How many spot checks

24 would you say the FBI did on Mr. Christie's condominium

25 between March of this year, when the grand jury subpoena was

79

1  served, and the execution of the arrest warrant?  How many

2  times did you have agents go by to spot-check the premises?

3  A    I don't know an exact number.  I know that there were

4  times that we had to do spot checks in order to serve him

5  with the subpoena.

6  Q    Okay.  Well, would you estimate six times?

7  A    I suspect it was probably more than six, but I don't

8  know how many.

9  Q    Now, was there anything about this notice -- it says:

10            "Notice to public servants.  You are

11            hereby put on notice that this is a

12            private property and, as such, all

13            rights are guaranteed by the

14            Constitution of the United States, which

15            you have taken an oath to uphold and

16            defend, are hereby claimed."

17       Did you see that on the notice?

18  A    Which --

19  Q    The very first paragraph.

20  A    Yes.  "You are hereby put on notice that this is

21  private property."  Yes, I see that.

22  Q    Okay.  And when you noticed -- when you observed that,

23  when the agents came back with this photograph, did that

24  statement alarm you in any way?

25  A    That statement did not alarm me.

80

1 Q    Okay.  In fact, there is no -- there was no express

2 threat anywhere on this document, was there, about any FBI

3 agent or police officer or any other public servant, was

4 there?

5           MS. MIRELL:  Objection, argumentative.

6           THE COURT:  That is argumentative.  Sustained.

7 BY MR. NEWHOUSE:

8 Q    Okay.  Was there any threat made that you could see in

9 this notice?

10 A    I perceive a threat in the last sentence of the notice.

11 Q    Let's look at that.  It says:

12           "Keep out.  Do not trespass, including

13           common areas.  Survivors will be

14           prosecuted."

15      Do you see that?

16 A    Yes.

17 Q    Okay.  And you took that to be a threat?

18 A    I took "Survivors will be prosecuted" as a threat.

19 Q    Okay.  And how so?  Explain that.  Explain your

20 conclusion.

21 A    Because a "survivor" seems to imply that someone might

22 not survive.

23 Q    Meaning some violent or unlawful action might be taken

24 against them.  Is that your point?

25 A    I would classify it as deadly, because it implies that

81

1  someone would not survive.

2  Q    And when did you first see that exhortation?

3  A    I believe it was -- based on the other exhibit, I

4  believe it was November 28th.

5  Q    Okay.  First time, November 28th?

6  A    I believe that that is the first time that the FBI was

7  aware of that.

8  Q    Okay.  And did you contact Mr. Christie?  Did you

9  mail -- send a mail to him at the address listed, or

10 otherwise endeavor to tell him that that is unlawful, it's a

11 threat against a federal officer?  You didn't respond in any

12 way.  Strike that.

13      Did you respond in any way to Mr. Christie when you

14 read that exhortation that we just looked at?

15 A    No.  I had no communication with Mr. Christie.

16          MR. NEWHOUSE:  Your Honor, I have no further

17 questions at this time.

18          THE COURT:  All right.  Is there any redirect?

19          MS. MIRELL:  No, your Honor.

20          THE COURT:  All right.  You may step down.  Thank

21 you, Agent Turner.

22          THE WITNESS:  Should I take this with me?

23          THE COURT:  You can provide that binder to

24 Government counsel.

25          All right.  Is there anything further from the

82

1  Government in terms of presenting witnesses or evidence?

2       (The witness was excused.)

3            MS. MIRELL:  No further witnesses or evidence,

4  your Honor.

5            THE COURT:  All right.  Mr. Newhouse, would you --

6  let me just state that I have the following exhibits that

7  have been admitted into evidence:  Exhibit 1, 2, 4, 6, 7, 8,

8  and 9.  Is that consistent with your understanding?

9            MR. NEWHOUSE:  It is, your Honor.

10           MS. MIRELL:  Yes, your Honor.

11           THE COURT:  All right.  Mr. Newhouse?

12           MR. NEWHOUSE:  May I -- with leave of court, I

13  would like to call one brief rebuttal witness.

14           THE COURT:  And this witness would be rebuttal to

15  Agent --

16           MR. NEWHOUSE:  Well, there was testimony by Agent

17  Turner about -- well, specifically about a threat being made

18  by Mr. Christie, about the use of improper force, which we

19  believe is untrue, and I'd like to call a witness who was on

20  the phone with the negotiators and Mr. Christie for almost

21  two hours.  She never heard that statement.

22           THE COURT:  I'm not clear as to the threat that

23  you're referring to.

24           MR. NEWHOUSE:  May I have a moment, your Honor?

25           THE COURT:  Yes.

1        MR. NEWHOUSE:  Well, it's a -- I'm sorry, your

2  Honor.  I'm having a senior moment.  But the threat was

3  specifically that Mr. Christie was going to shoot an agent,

4  or might shoot an agent.  It was a threat of the use of

5  force or violence, which we don't believe was made, and this

6  witness would testify to that effect.

7        THE COURT:  Okay.  Are you referring to Exhibit 8,

8  page two, the entry at 10:55, where it says, "The subject

9  says, 'You better come in here shooting'"?

10        MR. NEWHOUSE:  Yes, that's it.  That's exactly

11  right.

12        THE COURT:  All right.  And so you are going to

13  call a witness to say that the Defendant did not make that

14  statement?

15        MR. NEWHOUSE:  That's correct.

16        THE COURT:  All right.  And so -- but this

17  exhibit, which is a log of the SWAT operations on the date

18  in question, indicates that the Defendant made the

19  statement --

20        MR. NEWHOUSE:  Right, the --

21        THE COURT:  -- or statement to this effect.

22        MR. NEWHOUSE:  Specifically at 10:55, the entry

23  says, "Subject says, 'You better come in'" -- sorry -- "'You

24  better come in'" -- something -- "'here shooting.'"  And

25  that's what she's prepared to testify to.

84

1          THE COURT:  All right.

2          MS. MIRELL:  Your Honor, I believe, just based on

3  the log alone, this witness' testimony would not be

4  relevant, because she did not arrive on scene until after

5  the statement was made.

6          THE COURT:  And where does it indicate on the

7  log --

8          MS. MIRELL:  I believe -- I tried to redact the

9  names for privacy, the names of the friends, but where

10 11:06, "Subject wants," I believe that would have been the

11 witness that defense counsel intends to call, as well as

12 another friend to talk to him, and this witness doesn't

13 start conversation with the subject until 11:07, but the

14 statement in question occurred at 10:55.

15         MR. NEWHOUSE:  Your Honor, I object to the

16 Assistant U.S. Attorney's testimony.  That's not correct.

17         THE COURT:  She's not testifying.  She's just

18 arguing.

19         MR. NEWHOUSE:  Well, she just did.

20         THE COURT:  No, she's not.  She's arguing that the

21 witness that you propose to put on the witness stand to

22 indicate that the Defendant did not make the statement at

23 10:55 is not qualified to testify to that fact because she

24 wasn't on the scene at 10:55.  At most, she could testify as

25 to what the Defendant did or did not say after she arrived.

85

1 So do you have any reason, any evidence, any proof --

2           MR. NEWHOUSE:  Yes.

3           THE COURT:  -- that this witness was on the scene

4 before 10:55?

5           MR. NEWHOUSE:  May I have a moment, your Honor?

6           THE COURT:  Yes.

7           MR. NEWHOUSE:  Your Honor, we have a different

8 witness who was there and on the phone earlier.

9           THE COURT:  I'm sorry, Mr. Newhouse.  What did you

10 just say?

11           MR. NEWHOUSE:  So I have a different witness who

12 was present at or before 10:55.  She was actually there most

13 of the time when I was there on the phone.

14           THE COURT:  All right.

15           MR. NEWHOUSE:  So --

16           THE COURT:  And where on this log does it indicate

17 that this person was present?

18           MR. NEWHOUSE:  Well, I'm not sure it does, your

19 Honor, because I don't know who compiled this log, but it's

20 not a comprehensive listing of everything that was said.  I

21 can assure you I was there, and there was a lot of

22 discussion that's not reflected in the log.  So Asefeh is

23 a -- will be a short witness who will, I think, rebut this

24 contention --

25           THE COURT:  All right.

86

1        MR. NEWHOUSE:  -- and I'd like to lay the

2 foundation for her.  Okay.  May she approach?

3        MS. MIRELL:  Your Honor?

4        THE COURT:  One moment.

5        MS. MIRELL:  Your Honor, her mere presence at the

6 scene does not mean that she privy to the conversations with

7 the crisis negotiator and that she was on the phone with the

8 crisis negotiator, therefore, may not have any relevant

9 testimony as to whether these statements were uttered or

10 not.

11        THE COURT:  All right.  You know what?  I'll allow

12 you to attempt to lay a foundation, and if you're not able

13 to, I'm not going to permit any further testimony from the

14 witness.

15        MR. NEWHOUSE:  And that won't be the first time in

16 my career, your Honor.  Understood.

17        THE COURT:  All right.

18        MR. NEWHOUSE:  Thank you.

19        Go ahead and approach the witness stand.

20        THE CLERK:  Please raise your right hand.

21     ASEFEH SHIRAFKAN - DEFENDANT'S WITNESS - SWORN

22        THE CLERK:  Please have a seat and state your name

23 for the record.

24 //

25 //

87

                      DIRECT EXAMINATION

1

2  BY MR. NEWHOUSE:

3  Q    And I should say state and spell, please, your full

4  name.

5  A    Asefeh Shirafkan.

6  Q    Can you spell that for us, please.

7  A    A-S-E-F-E-H, last name S-H-I-R-A-F-K-A-N.

8  Q    May I refer to you as "Asefeh"?

9  A    Yes.

10 Q    Okay.  Asefeh, there has been testimony about a

11 discussion in which I participated in these FBI CNTs

12 negotiators had with the Defendant on this date in question.

13 You've heard that testimony, correct?

14 A    Yes.

15 Q    Okay.  Were you also present on the scene that day?

16 A    Yes.

17 Q    What time did you arrive?

18 A    I think about 10:00-something.  I was the first person

19 who arrived there.

20 Q    Okay.  And were you present --

21        THE COURT:  You arrived before Mr. Newhouse?

22        THE WITNESS:  Yes.

23        MR. NEWHOUSE:  She did, your Honor.

24 BY MR. NEWHOUSE:

25 Q    Were you present at around 10:55:

88

1 A     I believe so.

2 Q     And were you present overhearing a conversation that we

3 were having with the Defendant about guns or other

4 approaches to him to enable him to surrender?  Did you --

5 A     No.

6 Q     Did you hear those discussions?

7 A     No.  He was terrified.

8           THE COURT:  All right.

9           THE WITNESS:  No.

10           THE COURT:  Ms. Shirafkan, where were you?  Were

11 you with Mr. Newhouse?

12           THE WITNESS:  When I arrived, they basically --

13 they said I am detained, and I explained that I am very

14 nervous about him.  He was terrified.  He called me.

15           THE COURT:  Okay.  My question is, where were you

16 physically located?  Were you standing next to Mr. Newhouse?

17           THE WITNESS:  I was with the FBI.  Like, they took

18 me inside with them.

19           THE COURT:  Okay.

20           THE WITNESS:  Yes.

21           THE COURT:  You were not next to Mr. Newhouse?

22           THE WITNESS:  Who is -- no, no.

23           THE COURT:  The lawyer.

24           THE WITNESS:  He arrived after me.

25           THE COURT:  Okay.

89

1            THE WITNESS:  Yes.

2            THE COURT:  All right.  He arrived after you?

3            THE WITNESS:  Yes.

4            THE COURT:  Were you -- the place that you were,

5  were you in communication with the Defendant?

6            THE WITNESS:  Yes.

7            THE COURT:  How were you communicating?

8            THE WITNESS:  He called me, and he was terrified.

9            THE COURT:  He called you on a cell phone?

10            THE WITNESS:  Yes.

11            THE COURT:  All right.  And did you have that cell

12  phone on speaker mode?

13            THE WITNESS:  I don't believe so.

14            THE COURT:  Okay.  So he called you?

15            THE WITNESS:  Yes.

16            THE COURT:  All right.  Did you also hear

17  conversations that the Defendant had with the members of the

18  SWAT team?

19            THE WITNESS:  I didn't, no.

20            THE COURT:  Okay.  All right.  Go ahead, Mr.

21  Newhouse.

22            MR. NEWHOUSE:  No further questions, your Honor.

23            THE COURT:  All right.

24            MR. NEWHOUSE:  I don't think this is the right

25  witness.

1          THE COURT:  All right.  Any cross-examination?

2          MS. MIRELL:  No, your Honor.

3          THE COURT:  All right.  Thank you.  You may step

4 down.

5      (The witness was excused.)

6          MR. NEWHOUSE:  Nothing further, your Honor.

7          THE COURT:  All right.  I'm ready to hear

8 argument.  Let me hear from the Government first.

9          CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

10          MS. MIRELL:  Your Honor, I think, as the record

11 demonstrates, and specifically the testimony and exhibits

12 from this afternoon, Government has established that

13 Defendant --

14          THE COURT:  Can you speak up, please?

15          MS. MIRELL:  I'm sorry, your Honor.

16          Government has established that the Defendant

17 poses a serious risk of flight, as well as a danger to the

18 community.

19          Starting with just evaluating the 3142(g) factors

20 in this case, and just starting with the nature and the

21 circumstances of the offense, this is a man who entered

22 restricted grounds with a clawhammer and a bullhorn.  He

23 riled up an angry mob of armed rioters, and then he mounted

24 a Government vehicle and encouraged those rioters to storm

25 the United States Capitol.

 1          THE COURT:  Okay.  Ms. Mirell, you're arguing the

 2  charge in the complaint.  What I want to hear argument about

 3  is whether there are any conditions -- whether there is any

 4  condition or combination of conditions that the Court can

 5  set that would assure against risk of nonappearance and risk

 6  of danger.

 7          MS. MIRELL:  Sure.  I think, then, I'll shift to

 8  the history of the characteristics of the Defendant, but

 9  speak to those characteristics that your Honor wants

10  addressed.

11          Your Honor, this Defendant has demonstrated time

12  and again that he has no respect for the rule of law.  Aside

13  from the offense with which he is charged, his interactions

14  with law enforcement demonstrate that he does not recognize

15  the sovereignty, the authority, and the legality of the

16  federal government.

17          He has threatened law enforcement with violence,

18  and actually engaged in physical force against law

19  enforcement, as was the testimony of Special Agent Turner.

20  He came to the door with a firearm, a loaded firearm,

21  yesterday.

22          He told FBI repeatedly that they do not have

23  authority or jurisdiction.  He refused to recognize the

24  legality of the arrest warrant and the search warrant in

25  this case.  He refused to comply with a court order.  He

92

1  refused -- defense counsel has conceded that he refused to

2  comply with a federal grand jury subpoena in February of

3  2022.

4          This is someone who does not believe in, much less

5  respect, the authority of this Federal Government, and based

6  on his conduct, the past two weeks, he has shown that he

7  will not submit to law enforcement or to a court's authority

8  if required to do so in the future.

9          Obviously, we are actually extremely grateful for

10 the assistance of Mr. Newhouse and some of the friends and

11 family members who are here in the audience, because, but

12 for their assistance, who can say what would have happened

13 yesterday?  But, if you look at the log, it's clear that not

14 even Mr. Newhouse's presence, not even his friends'

15 presence, not even his siblings' presence, was enough to

16 convince Mr. Christie to surrender his firearms and to come

17 out peacefully.

18         So that goes to the inadequacy of a surety or a

19 friend serving as a guardian in this case, because he didn't

20 even respond to his lawyer's repeated efforts, two hours'

21 worth, by counsel's own concession, over two hours' worth of

22 pleading with Mr. Christie to come out and to surrender his

23 firearms.  We are lucky that no one died yesterday.

24         He engaged -- and, you know, I think there were a

25 lot of questions about "Why was the SWAT team called in the

93

1 first place?"  I think, in retrospect, thank God the SWAT
2 team was called to effectuate this arrest, your Honor.  He
3 engaged officers in a three-hour standoff that required LAPD
4 to shut down traffic on his -- down his street, and that
5 attracted the attention of at least one news chopper that
6 disrupted with SWAT's ability to overhear what was happening
7 and actually control the situation.

8         Location monitoring is inadequate for a person
9 like this.  This is someone who has already fled from law
10 enforcement, as demonstrated in a video where law
11 enforcement very clearly instructed the Defendant that he
12 was not allowed to leave, that he was going to be placed
13 under arrest.  If he wants to flee, he will find a way, as
14 he has done in the past.

15         There is genuine concern among law enforcement and
16 within the Government that if there are any further -- if
17 there have to be any further encounters with the Defendant
18 and law enforcement in the future, that they will go south.

19         I think those are my arguments with respect to the
20 flight risk, and the danger to the community -- I think the
21 danger to the community also comes from the Defendant's
22 willingness to come armed with a deadly or dangerous weapon
23 to the Capitol, as well as his threatening of a firearm and
24 brandishing of a firearm during an arrest, but had -- you
25 know, had Mr. Christie complied with law enforcement's

94

1  commands and orders on December 16th, we wouldn't be here

2  today, probably, but he created the situation, and

3  aggravated by threatening law enforcement's lives.

4          He has demonstrated that he does not respect this

5  Court's authority.  He does not respect the authority of the

6  Court in the District of Columbia.  He does not believe in

7  the jurisdiction of the FBI, as he said repeatedly, and as

8  Agent Turner testified, and this is not a man who can be

9  trusted to abide by any conditions of release.

10          Unless the Court has any further questions, we

11  would submit.

12          THE COURT:  Thank you.

13          Mr. Newhouse.

14      CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

15          MR. NEWHOUSE:  Your Honor, first I'd like to thank

16  the Government for the compliment.  I do feel that my

17  arrival on the scene helped calm Mr. Christie down, and

18  ultimately got him to do the right thing, the safe route,

19  which minimized any harm.  So I'm pleased to accept those

20  thanks and those kudos, but let me --

21          THE COURT:  And I can take judicial notice of the

22  fact that you are a very calm person, Mr. Newhouse.

23          MR. NEWHOUSE:  Thank you, your Honor.

24          But I'd like to segue in that and say he has done

25  something since, or about that time, that is significant

95

1  and, I think, should allay this Court's concerns and allow

2  it to issue a release order with terms and conditions, and

3  that is, he hired a lawyer.  I like to think he hired a

4  pretty good lawyer, but he hired a lawyer who went out of

5  his way to tell him, "It's a valid warrant.  Don't be

6  stupid.  Put your firearms down."

7         We did work with the FBI negotiators.  It was an

8  amazing experience.  But he is here.  He has submitted and

9  will submit, I can tell you personally, to the Court's

10  authority and instructions, and with the appropriate terms

11  and conditions that the Court is well familiar with, he will

12  get to Washington, and then a better lawyer will come in,

13  and they will deal with this charge, and on that, your

14  Honor, I submit.  Thank you.

15         THE COURT:  All right.  The Court does not find

16  this to be a difficult case.  This is a situation where the

17  Defendant has a history of not complying with, not

18  recognizing, you know, lawful authority, and has not only

19  demonstrated that with his actions prior to the time that he

20  was arrested yesterday, but certainly -- even not taking

21  into account the failure to, you know, abide by something

22  like a very routine traffic stop, failure to comply with a

23  grand jury subpoena, even if the Court didn't consider that

24  prior history, and even if the Court didn't consider the

25  nature of the allegations in the criminal complaint, the

96

conduct that took place during the attempt to arrest the
Defendant yesterday, the long, drawn-out proceedings with
the SWAT team, the fact that, even after Mr. Christie's
counsel told him that the agents had a lawful arrest warrant
and a search warrant, and he needed to come out without his
guns, the fact that he refused to do so, and made statements
indicating that he was prepared to use violence against the
agents, and then the fact that the subsequent search of his
residence revealed that he did, in fact, have a loaded
firearm with him, are all factors which the Court finds lead
this Court to no other reasonable conclusion, other than
this Defendant will not comply with any orders that the
Court will set, and there are no conditions or combination
of conditions that the Court could impose that would give
the Court any assurance that he would comply with them.

You know, if you can't even, you know, step out of
your car when you're pulled over for a traffic ticket, what
assurance does the Court have that you're going to show up
in a court of law to answer to felony -- serious felony
charges?

And so, even putting aside the risk to danger
of -- to the community, which I think is evident from the
allegations in the complaint, the Court finds that there is
a serious risk of nonappearance due to this Defendant's
demonstrated disregard for law enforcement and his refusal

1 to comply with law enforcement's directions.  The Court does

2 not believe he would submit to any authority, given his past

3 conduct.

4         The Court appreciates the fact that he has ties to

5 the community, and that he has family support, and

6 appreciates their presence here today in the courtroom.  It

7 does not go unnoticed.  But there are factors here that the

8 Court needs to weigh, and at this moment in time, what's

9 before the Court leads the Court to no other conclusion that

10 release on bond must be denied.

11         So this Defendant is remanded to the custody of

12 the U.S. Marshal pending further proceedings, and ordered

13 removed to the District of Columbia for further proceedings.

14         Let me ask Government counsel, do you have a date

15 for the Defendant's next appearance?

16         MS. MIRELL:  I believe I do, your Honor, although

17 it is subject to change.  One moment.  I believe the initial

18 appearance is scheduled on December 29th at 1:00 o'clock

19 Eastern Standard Time.  That was the Zoom appearance, in

20 case there was not a detention order today, and I can

21 confirm with the AUSA in the District of Columbia about what

22 the reporting instructions will be for Mr. Christie now.

23         THE COURT:  All right.  So I want to make sure

24 this doesn't fall through the cracks, so I'm going to ask

25 you, Ms. Mirell, to confer with your counterpart in the

98

1 District of Columbia, obtain a date for Mr. Christie to

2 appear in the District of Columbia for further proceedings,

3 communicate that to Mr. Newhouse so that you can both, you

4 know, be sure that he is going to be transported there in a

5 timely manner, and, if there's any delay in transport,

6 ensure that that date gets continued to a date when he can,

7 in fact, be there, so we don't have a situation where, you

8 know, he's transported to the District of Columbia, and

9 nobody knows, and it doesn't get on calendar.  Okay?

10          MS. MIRELL:  Understood, your Honor.

11          THE COURT:  All right.  Mr. Christie, I have here

12 a waiver of rights form indicating that you are agreeing to

13 give up your right to an identity hearing, to arrival of

14 process, and you do have a right to a preliminary hearing.

15 Have you discussed these rights with Mr. Newhouse, and are

16 you willing to give them up at this time?

17          MR. NEWHOUSE:  Your Honor, the only caveat to that

18 is, Mr. Christie's waiver of his right to a preliminary

19 hearing was based upon our information that this was a

20 misdemeanor complaint.  If I'm wrong on that, then he would

21 like to reserve his right to a preliminary hearing, at least

22 at this point, before he consults with counsel in D.C.

23          THE COURT:  Okay.  So what I'm going to do, then,

24 is I'm going to give this form back to you.  You can cross

25 out the intention of the waiver to the preliminary hearing.

99

1   Have him initial it and sign it, and do you -- and also let

2   me know if you want that preliminary hearing in the District

3   of Columbia or in this district.

4            MR. NEWHOUSE:  It would be the District of

5   Columbia for the --

6            THE COURT:  All right.  So you just need to

7   indicate that you have the preliminary hearing in the

8   charging district.

9            MR. NEWHOUSE:  May I have a moment, your Honor?

10           THE COURT:  Yes, yes.

11           MR. NEWHOUSE:  Your Honor, to the extent that Mr.

12  Christie has a right to have a preliminary hearing in this

13  district, he would like to have -- exercise that right.

14           THE COURT:  All right.  Does the Government -- I

15  think he does a right to a preliminary hearing in this

16  district.

17           MS. MIRELL:  I believe so, your Honor.

18           THE COURT:  Okay.  So, then, we will schedule a

19  preliminary hearing.  Can I get a date?

20           All right.  Mr. Christie, I have here a waiver of

21  rights form indicating that you are giving up your right to

22  an identity hearing and to arrival of process.  Have you

23  discussed these waivers with Mr. Newhouse?

24           THE DEFENDANT:  Yes.

25           THE COURT:  And it's your intention to give up

100

1  your right to an identity hearing and to arrival of process?

2            THE DEFENDANT:  Right.  Yes.

3            THE COURT:  All right.  The Court will accept that

4  waiver, finding that the Defendant has knowingly waived his

5  right to an identity hearing and to arrival of process after

6  consulting with counsel.  The Court will order this waiver

7  to be filed.  I'll ask the courtroom deputy to give us a

8  date for the preliminary hearing.

9            THE CLERK:  January 10th, 2023, at 10:00 a.m., in

10 Courtroom 540 of the Roybal Courthouse.

11           THE COURT:  All right.  So Government counsel must

12 have witnesses that are prepared to testify to matters

13 pertaining to the probable cause determination on the

14 criminal complaint.  All right?

15           MS. MIRELL:  Just to confirm, your Honor, if the

16 grand jury returns an indictment prior to that date, then

17 the prelim will be taken off calendar?

18           THE COURT:  Right.

19           MS. MIRELL:  Thank you, your Honor.

20           THE COURT:  All right.  Is there anything further

21 that we need to take up at this time?

22           MR. NEWHOUSE:  No, your Honor.

23           THE COURT:  All right.  Thank you.  This matter is

24 adjourned.

25           MS. MIRELL:  Thank you, your Honor.

101

1          THE CLERK:   Court is adjourned.

2      (Proceedings concluded.)

102

1          I certify that the foregoing is a correct

2     transcript from the electronic sound recording of the

3     proceedings in the above-entitled matter.

4

5     /s/Lorraine Caldwell              1/16/2023
      Transcriber                       Date

6
      FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:
7

8
      /s/L.L. Francisco
9     L.L. Francisco, President
      Echo Reporting, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25