UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | |
| v. : | Case No. 23-Cr-005 (APM) |
| : | |
| ERIC CHRISTIE, : | |
| : | |
| : | |
| Defendant. | |

**GOVERNMENT'S OPPOSITION TO DEFENDANT ERIC CHRISTIE'S RULE 33 MOTION FOR A NEW TRIAL**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to Defendant Eric Christie's motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. ECF 67, 68. The Court convicted Christie following a fair trial during which the parties presented extensive argument on the interpretation of the statute at issue, 18 U.S.C. § 1752; Christie confronted the Government's witnesses and presented his own summary witness; and the Court excluded Christie's proposed expert witness only after Christie failed to show that the proffered opinions would be relevant to any disputed fact. Contrary to Christie's bald allegations, his convictions were not based on facts "created" by the Court; rather, they resulted from the overwhelming evidence properly admitted at trial. Furthermore, the Court's interpretation of Section 1752 was not a "novel construction" invented at trial, as Christie contends; rather, the Court's interpretation accords with the previous holdings of other courts in this District, and the Court had put the parties on notice of its interpretation in a pre-trial ruling. In sum, Christie's convictions are far from "miscarriages of justice" warranting a new trial. Christie's motion therefore should be denied.

I.   **Background**

   a. **The Charges**

Christie was charged with two offenses: entering and remaining in a restricted area and carrying a deadly or dangerous weapon during and in relation to the offense, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A) (Count One); and engaging in disorderly or disruptive conduct in a restricted area and carrying a deadly or dangerous weapon during and in relation to the offense, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A) (Count Two).

The term "restricted area" is statutorily defined to include "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service [including the Vice President] is or will be temporarily visiting."  18 U.S.C. § 1752(c).  In denying Christie's pre-trial motion to dismiss the indictment, the Court rejected the argument—which is belied by the statute's broad, plain language—that the statute requires that the U.S. Secret Service, or any particular agency, must have been responsible for creating or maintaining the posted, cordoned off, or otherwise restricted area.[1]  *See* ECF 33 at 25-26; ECF 34 at 9-10; Minute Entry (05/08/23).

The alleged weapon giving rise to the Section 1752(b)(1)(A) enhancement was a metal hammer.  The Government did not allege that Christie used the hammer, nor did the Government contend that the hammer constituted an "inherently dangerous weapon."  ECF 58 at 1.

---

[1] The Court's ruling on this issue was consistent with the many decisions in this District that have rejected this same argument.  *See, e.g., United States v. Puma,* 596 F. Supp. 3d 90 (D.D.C. 2022); *United States v. Griffin,* 549 F. Supp. 3d 49 (D.D.C. 2021); *United States v. McHugh*, 583 F. Supp. 3d 1 (D.D.C. 2022); *United States v. Bingert,* 605 F. Supp. 3d 111 (D.D.C. 2022); *United States v. Grider*, 617 F. Supp. 3d 42 (D.D.C. 2022).

### b. Pre-Trial Litigation Addressing the Meaning of "Deadly or Dangerous Weapon" in 18 U.S.C. § 1752(b)(1)(A)

The Court permitted the parties to submit pre-trial memoranda on the interpretation of the phrase "deadly or dangerous weapon" in Section 1752(b)(1)(A) in circumstances where the defendant carried but did not use the weapon. The Government and defense submitted their memoranda on July 25 and 26, 2023, respectively. ECF 58, 61. On July 28, 2023, the Court held a pre-trial conference that included oral argument on the issue. Minute Entry (07/28/23). On August 3, 2023, the Court issued an order resolving the question. ECF 64.

The Court's order utilized methods of statutory interpretation adopted by the U.S. Supreme Court. *Id.* at 1 (citing *Abramski v. United States,* 573 U.S. 169, 179 (2014)). Based on its analysis of the statute's language, context, and purpose, the Court held that "an object carried on restricted grounds is 'deadly or dangerous' if it is capable of causing serious bodily injury or death to another person, and the defendant carried it with the intent that it be used in a manner capable of causing serious bodily injury or death." *Id.* at 2.

The Court specifically stated that it was adopting the definition proposed by the Government. In its memorandum, the Government cited two cases arising from the Capitol Riot, *United States v. Thomas Robertson* and *United States v. Joshua Black*, in which courts in this district had adopted the same definition. ECF 58 at 3-7.

On the eve of trial, the defense filed a motion for reconsideration, urging the Court to adopt a different definition of "deadly or dangerous weapon" than that which the defense had previously proposed. ECF 65. In Christie's revised proposal, Section 1752(b)(1)(A) would require proof that the defendant intended to use the weapon against a Secret Service protectee. *Id.* The Court permitted the Government to address the reconsideration motion orally during trial. The

3

Government asserted, among other things, that Christie's new proposed definition was inconsistent with the plain language of Section 1752(a)(4), which proscribes "knowingly engag[ing] in any act of physical violence *against any person or property* in any restricted building or grounds." 18 U.S.C. § 1752(a)(4) (emphasis added). Section 1752(a)(4) thus reflects Congress's intent to further the Secret Service's ability to maintain control of restricted areas by prohibiting any act of violence therein. The Court denied the reconsideration motion and applied at trial the definition set forth in its August 3 Order.

### c. The Government's Case-In-Chief

Five witnesses testified during the Government's case-in-chief: U.S. Capitol Police Captain Carneysha Mendoza; U.S. Secret Service Agent Elizabeth Glavey; U.S. Capitol Police Sergeant David Van Benschoten; U.S. Capitol Police Officer Morgan Wischstadt; and FBI Special Agent Kyle Hicks. As relevant to the instant motion, the witness testimony included the following regarding the security perimeter on Capitol Grounds on January 6, 2021:

- Captain Mendoza testified, in sum and substance, that she had observed the establishment of the security perimeter (including the bicycle racks used as temporary fencing) the night before January 6, 2021; that the restricted perimeter is established in part for the protection of visiting dignitaries, including the Vice President; that the Capitol Police are responsible for protecting everyone who comes into the Capitol Building; that the East Plaza was within the security perimeter on January 6, and it remained so after the Vice President's motorcade relocated; that the Capitol Police put in place specific security measures to account for the Vice President's presence; and that in Captain Mendoza's experience, the Capitol Police and Secret Service generally coordinate with each other on security arrangements when a Secret Service protectee plans to visit the Capitol.

- Special Agent Glavey testified, in sum and substance, that she served on the Vice President's Secret Service detail on January 6; that she understood that the Capitol Police would establish a security perimeter for January 6 and Capitol Police personnel would maintain the perimeter; that the Secret Service has a liaison who is specifically dedicated to coordinating security issues between the Secret Service and the Capitol Police, and Special Agent Glavey met with that liaison on the morning of January 6;

- and that it was important to the Secret Service that the security perimeter prevent the public from gaining access to the Vice President's motorcade (which was scheduled to wait for the Vice President on the East Plaza throughout the official proceeding) and that the security perimeter prevent the public from gaining access to the Capitol Building.

- Sergeant Van Benschoten testified, in sum and substance and as corroborated by extensive video evidence, that he and his fellow officers, including Civil Disturbance Unit personnel wearing riot gear, tried to prevent rioters from breaching the security perimeter and gaining access to the East Plaza; and that he and his fellow officers were overrun by the rioters because the rioters greatly outnumbered them and used force.

- Officer Wischstadt testified, in sum and substance, that the Capitol Police who were manning the security perimeter on the East Front tried to prevent rioters from coming through the police line, but they were outnumbered and overrun.

- Special Agent Kyle Hicks testified in sum and substance and as corroborated by video evidence that Christie entered the East Plaza within approximately 30 seconds of the initial breach of the security perimeter by rioters; that Christie, on multiple occasions, was in close proximity to physical confrontations between rioters and police officers trying to maintain the security perimeter; and that Christie sent a text message on the evening on January 6 in which he boasted "we literally broke into the Capitol" (Government's Exhibit 222.02).

The witness testimony and evidence also included the following, as relevant to the instant motion, regarding the metal hammer carried by Christie:

- Numerous videos showed Christie carrying an exposed metal hammer on his belt on January 6, including as he approached a line of police on the Capitol steps (Government's Exhibit 503A) and as he exhorted rioters with his bullhorn while standing atop a police vehicle (Government's Exhibit 504A).

- Special Agent Glavey, when presented with the specific hammer seized from Christie's residence (which the defense stipulated was indeed the hammer carried by Christie on January 6), testified in sum and substance that she would not allow any unauthorized person carrying that hammer to come near the Vice President because the hammer could be used as a weapon.[2]

---

[2] Notably, defense counsel did not ask Special Agent Glavey a single question about this aspect of the testimony on cross-examination. Refraining from doing so was a defensible strategic choice: there was no reasonable prospect that the witness could be impeached on such a commonsensical and indisputable point.

5

- Sergeant Van Benschoten, on cross-examination, when presented with both the hammer and the bullhorn seized from the defendant, testified in sum and substance that he would view the hammer as a more threatening object than the bullhorn because a hammer is designed to pound a nail into a wall, whereas a bullhorn is designed to project sound.

- Special Agent Kyle Hicks testified to an exchange of text messages between Christie and his brother, in which Christie's brother (identified as "Bro" on Christie's phone) specifically asked him why he carried a hammer on January 6, and Christie responded, "Protection. A gun or knife would have been illegal" (Government's Exhibit 305.01); SA Hicks also introduced into evidence a recorded telephone call in which a journalist specifically asked Christie why he carried a hammer on January 6, and Christie replied, "because Antifa has been known to show up wherever the Trumpers are so I figured I needed some form of protection . . . trying to call it a deadly or dangerous weapon, please." (Government's Exhibit 905.01).

In addition, the witness testimony and admitted evidence included the following, as relevant to the instant motion, regarding Christie's disorderly and disruptive conduct, and its impact on Government business:

- Video evidence showed that Christie, among other things, used a bullhorn to exhort rioters to storm the Capitol before the rioters succeeded in breaking through the security perimeter; once the rioters broke through the perimeter, Christie raced onto the East Plaza, used a bullhorn to encourage rioters from the base of the Capitol steps, and then mounted a police vehicle and continued to use his bullhorn to exhort rioters, and in particular, Christie did so as rioters first broke through the police line at the bottom of the Capitol steps and advanced to the East Rotunda door.

- Sergeant Van Benschoten testified in sum and substance that rioters who used bullhorns undermined the police's ability to command the crowd's attention and control the crowd; and that rioters who openly carried dangerous objects also undermined the police's ability to control the crowd because police had to devote extra attention to the threat posed by the presence of the weapons.

- Special Agent Glavey testified in sum and substance that the Vice President had to be relocated for security reasons because of the threat posed by the rioters collectively, and that the official proceeding could not continue in Congress while the Vice President was sheltering in the secure location.

The Court cited to many specific portions of the witness testimony and admitted exhibits, including some of those cited above, in providing the reasons for its verdict from the bench.

### d. The Court's Exclusion of the Defense's Proposed Expert Witness

The defense presented the testimony of Steven Hill, a defense investigator. The defense also sought to present the expert testimony of J. Lawrence Cunningham, a private sector security professional who retired from the U.S. Secret Service in 1994—more than 25 years before January 6, 2021. When the Court asked defense counsel for a proffer of the expert opinion to which Mr. Cunningham would testify, defense counsel stated that he would opine, in sum and substance, as to whether Christie constituted a threat on January 6. The Government objected that the proffered opinion was not included in the disclosure that defense counsel had provided to the Government before trial, as required by Federal Rule of Criminal Procedure 16(a)(1)(G). Defense counsel then pivoted to defending the expert opinion that it had disclosed in its notice. That opinion was summarized in the written pre-trial notice as follows:

> [B]ased on his experience and training, and after review of videos and documents from cases and as submitted for this specific case, that the entire U.S. Capitol grounds would not have been requested or coordinated for restriction by the U.S. Secret Service (USSS) under 18 USC Section 1752(a) for protection of Vice President Pence on January 6, 2021. He will testify that standard practice is that the USSS requests that the jurisdiction owner restrict a specific area for a specific time in support of its mission for USSS protectees and no other agency or entity has the training, skills or authority to bypass what the U.S. Secret Service requests be implemented.

Ex. A, Letter from Stewart Country Law PA to U.S. Department of Justice (July 14, 2023) ("Defendant's Rule 16 Notice").[3]

The Court asked for a copy of the Defendant's Rule 16 Notice, which the Court subsequently read in full. The Court and defense counsel then engaged in an extensive colloquy in which defense counsel was provided ample opportunity to identify how the expert's proffered

---

[3] At trial, the Court entered the Defendant's Rule 16 Notice into the record.

opinions, as set forth in the Defendant's Rule 16 Notice, would be relevant to any fact at issue in the case. Because the defense could not identify any relevance of the proposed testimony to the elements that the Government was required to prove at trial, or to any affirmative defense, the Court excluded the proposed testimony.

## II.     Legal Standard

Under Rule 33 of the Federal Rules of Criminal Procedure, "[u]pon [a] defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts in this district have held that "'[t]rial courts enjoy broad discretion in ruling on a motion for a new trial.'" *United States v. Moore*, No. CR 18-198 (JEB), 2023 WL 1070562, at *2 (D.D.C. Jan. 27, 2023) (alteration in original) (quoting *United States v. Wheeler*, 753 F.3d 200, 208 (D.C. Cir. 2014)). The breadth of trial courts' discretion regarding such motions arises from the fact that "'[t]he rules do not define 'interests of justice' and courts have had little success in trying to generalize its meaning.'" *Moore*, 2023 WL 1070562 at *2 (quoting *Wheeler*, 753 F.3d at 208). However, "[a]t bottom, the D.C. Circuit counsels that granting a new trial motion is warranted only in those limited circumstances where a serious miscarriage of justice may have occurred," *Moore*, 2023 WL 1070562, at *2 (quoting *Wheeler*, 753 F.3d at 208), such as, when "an innocent person has been convicted," *United States v. Borda*, 786 F. Supp. 2d 25, 32 (D.D.C. 2011) (internal quotation marks and citations omitted).

Further, Rule 33 motions "are viewed with great caution and only granted in extraordinary circumstances where the evidence preponderates heavily against the verdict and when any error affects a defendant's substantial rights." *United States v. Benton*, No. 1:21-CR-00569 (TNM), 2023 WL 1070563, at *5 (D.D.C. Jan. 27, 2023) (internal quotation marks and citation omitted).

8

Indeed, "[u]nless an error . . . affects a defendant's substantial rights, it shall be disregarded." *Borda*, 786 F. Supp. 2d at 32 (citing *United States v. Lawson*, 494 F.3d 1046, 1053 (D.C. Cir. 2007)); *see also* Fed. R. Crim P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). Even when such rights are adversely affected, "the error must have a 'substantial and injurious effect or influence in determining the . . . verdict' in order to warrant a new trial." *Borda*, 786 F. Supp. 2d at 32 (alteration in original) (citing *United States v. Dominguez Benitez*, 542 U.S. 74 (2004)). Thus, under Rule 33(a), the "interest of justice" requires a court to grant a new trial only when an error has affected a defendant's substantial rights and substantially impacted the verdict. The burden of demonstrating that a new trial would be in the interest of justice rests with the defendant. *United States v. Machado-Erazo*, 986 F. Supp. 39, 44 (D.D.C. 2013) (citing *United States v. Mangieri*, 694 F.2d 1270, 1285 (D.C. Cir. 1982)).

III.    **Argument**

Christie offers a disconnected array of arguments in seeking a new trial. He variously challenges the Court's legal interpretations of Section 1752 and its application of fact to law; the due process he was afforded; and the exclusion of his proposed expert testimony. For the reasons set forth below, none of these contentions disturb the conclusion that Christie was convicted following a fair trial in which the Court properly construed the applicable law. The motion should be denied.

a. **The Court Provided the Defense with Ample Opportunity to Advocate for Its Interpretation of Section 1752**

Christie contends that the Court did not afford him "due process" in connection with its interpretation of Section 1752(b)(1)(A) because the Court queried the Government about how the

9

evidence satisfied the nexus requirement in the statute, which provides that the weapon must be used or carried "during and in relation to the offense." ECF 68 ("Def's Mot.") at 4. In its questioning, the Court referenced *Smith v. United States*, 508 U.S. 223, 225 (1993), which involves a statute, 18 U.S.C. § 924(c), which is similar to Section 1752 insofar as it provides an enhanced penalty for any defendant who uses or carries a firearm "during and in relation to" a crime of violence or a drug trafficking crime. Christie contends, "[a]s a matter of injustice due to lack of due process, the Court did not allow any defense opinion about the new standard it intended to apply from the *Smith* case." Def's Mot. at 4. Christie's due process argument hinges entirely on the fact that the Court asked a question of the Government without simultaneously directing the question to the defense. When viewed in context, the argument fails.

As described *supra*, the Court provided defense ample opportunity to advocate for its preferred interpretation of Section 1752(b)(1)(A): the Court accepted pre-trial briefing on the issue; the Court held a pre-trial conference in which both parties were given the opportunity to orally advocate for their positions; the Court issued a written order following the pre-trial conference setting forth the Court's interpretation of Section 1752(b)(1)(A); and during trial the Court considered Christie's motion for reconsideration on the issue. Moreover, the Court's colloquy with the Government regarding the "during and in relation to" nexus element of Section 1752(b)(1)(A) and the *Smith* decision occurred before the defense's closing statement, during which the defense was free to address any issues raised by the Court previously. Simply put, the Court provided Christie with more than sufficient due process before and during trial regarding the interpretation of Section 1752(b)(1)(A). Moreover, as set forth *infra*, Christie has failed to show that the Court's interpretation of Section 1752(b)(1)(A) was erroneous.

### b. The Court's Interpretation of "Deadly or Dangerous Weapon" Was Correct

Christie takes issue with the Court's substantive interpretation of Section 1752(b)(1)(a), contending that it was a "novel construction just for this trial" that "departed from the usual standard." Def's Mot. at 1-2. Christie rehashes arguments that the Court has previously rejected while conveniently ignoring that the Court's interpretation of Section 1752(b)(1)(A) aligns with the decisions of two district courts that have specifically interpreted the statute in cases where the defendant carried, but did not use, an object that is not "inherently dangerous": *United States v. Thomas Robertson* and *United States v. Joshua Black*. *See* ECF 58 at 3-7. Further, in *Robertson,* Judge Cooper held that this interpretation of Section 1752(b)(1)(A) is in accord with the D.C. Circuit's interpretation of an analogous D.C. statute that proscribes carrying deadly or dangerous weapons. *United States v. Robertson,* 610 F. Supp. 3d 229, 237 (2022) (citing *United States v. Vinton,* 594 F.3d 14, 22 (D.C. Cir. 2010)). Christie's motion thus fails to show that the Court's interpretation of Section 1752(b)(1)(A) is contrary to any binding or persuasive authority, let alone that the Court's interpretation adversely affected Christie' substantial rights.[4]

### c. The Court Properly Applied Section 1752(b)(1)(A) to the Admitted Evidence

Christie contends that the Court not only misinterpreted Section 1752(b)(1)(A) but that it also misapplied the factual record to its legal standard. He accuses the Court of having "created

---

[4] Christie takes out of its context a factual finding from a detention order in *United States v. Geiswin*. Def's Mot. at 5. There, the Court was evaluating the weight of the evidence against the defendant largely in the context of the charged assault crimes. The Court noted that there was evidence that the defendant had used pepper spray to assault officers but had not used his baseball bat to assault or to threaten to assault anyone. *United States v. Geiswin,* 21-Cr.-24, 2021 WL 3168148, *14 (July 27, 2021). In making this factual observation, the Court did not hold that the Government must prove that a defendant used or threatened to use a weapon to prove a violation of Section 1752(b)(1)(A)—a statute that provides a penalty enhancement where a defendant uses *or carries* a deadly or dangerous weapon during and in relation to the offense.

facts" in the "complete absence of any words that evidenced intent to cause serious bodily injury or harm." Def's Mot. at 6. Christie's own words, however, were admitted at trial to show that on two separate occasions he specifically stated that he carried the hammer on January 6 for "protection." Christie even explained to his brother, in a written communication, that he carried the hammer as a substitute for a gun or a knife—further evidencing his intent to use the hammer as a weapon. GX 305.01 (Bro: "What was the hammer for? . ." Christie: "Protection. A gun or knife would have haven illegal."). This evidence, combined with the absence of any credible evidence indicating that Christie carried the hammer for any other purpose, provided a sufficient basis for the Court to conclude that the Government proved beyond a reasonable doubt that Christie carried the hammer with the intent to use it to cause serious bodily injury.[5]

Christie further takes issue with the Court's application of the nexus element requiring that the hammer be used "during and in relation to the offense," contending that "the Court created thought crime was not supported by any evidence." Def's Mot. at 9. Again, Christie's motion simply ignores the inconvenient evidence admitted against him at trial. This included the following evidence showing that Christie carried the hammer during his commission of the offenses, and that Christie's carrying of the hammer furthered his ability to carry out the offenses:

- Christie travelled to Washington D.C. from California by plane the day before January 6, and the FBI found the hammer nearly two years later in his suitcase. The Court could reasonably infer from this evidence that Christie specifically packed the hammer for the purpose of participating at the protest on January 6.

- During January 6, Christie wore the hammer on his belt buckle on his right side, in a manner easily accessible to him. Multiple videos showed Christie's exposed hammer while he was in the restricted area on January 6. Again, the Court could reasonably

---

[5] Christie also contends in his motion that the Court did not hold the Government to its burden, asserting that "[t]he bench trial was treated as it was a motion rather than requiring a standard of beyond a reasonable doubt." Def's Mot. at 9. Christie offers no support for this bald claim.

- infer from this evidence that Christie deliberately wore the hammer in a manner that would allow him to use it.

- Further, Christie wore the hammer in a manner that made it clearly visible to any police officers, counter-protestors, or others who might try to stop Christie from his intended actions on January 6. Christie's exposed hammer served to intimidate and deter, and it thereby facilitated his illegal conduct that day, including his illegal entry into the restricted area, his illegal continued presence in the restricted area, and his disruptive conduct—such as mounting a police vehicle—in the restricted area. Similarly, the Court could naturally infer that by allowing Christie to feel he had "protection"—as Christie said himself—the hammer facilitated Christie's commission of his crimes.

- Sergeant Van Benschoten also testified, in sum and substance, that protestors who carried weapons and objects that they could use as weapons commanded the police officers' attention, to the detriment of their ability to focus on the crowd writ large. Sergeant Van Benschoten did not recall Christie specifically, but the Court could naturally conclude from this testimony that Christie's carrying of an exposed hammer on January 6 in and of itself was disruptive to the police.

The evidence thus overwhelmingly showed that Christie carried the hammer "during and in relation to" both offenses, as that phrase is commonly used. The Court's verdict is also in accordance with the Supreme Court's holding in *Smith v. United States*. There, the Court described the phrase "in relation to" as "expansive," and the Court held that, to satisfy the nexus requirement, the firearm "must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence."[6] *Smith,* 508 U.S. at 237. The evidence described *supra* proved at trial that Christie's hammer was carried for the purpose to further his crimes, had an effect in the commission of his crimes, and its presence was no mere coincidence.

---

[6] Because Section 924(c) relates only to firearms, not to all deadly or dangerous weapons, the Court's analysis in *Smith* focuses only on firearms. Yet the Supreme Court's interpretation of the phrase "during and relation to" in *Smith* nevertheless is germane to this Court's interpretation of the same phrase in Section 1752, and the defense has not provided any rationale as to why the phrase should be construed differently here.

In sum, Christie has not made any showing that any aspect of the Court's verdict in relation to the Section 1752(b)(1)(A) enhancements was erroneous, let alone that any error affected his substantial rights. His motion in this regard should be denied.

### d. The Court Properly Found that the East Plaza Was Restricted within the Meaning of Section 1752

Throughout trial, the Court repeatedly explained to defense counsel that for an area to be restricted within the meaning of Section 1752, the statute merely requires that the area be "any posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service [including the Vice President] is or will be temporarily visiting." Nevertheless, the defense continues to assert arguments as if the statute required something else, contending that "there was no evidence entered by any witness testimony or document that the USCP had closed the east plaza as a restricted area extension for protecting the Vice President while he was inside the building." Def.'s Mot. at 3. The statute, of course, does not require that the East Plaza was closed "for protecting the Vice President while he was inside the building," and this argument is therefore beside the point.

Regardless, as described *supra*, Captain Mendoza and Special Agent Glavey both provided testimony that showed that the East Plaza was indeed closed, at least in part, to further the protection of the Vice President. As these witnesses explained, the Vice President's motorcade was staged on the East Plaza, and the Vice President's security depended upon the prevention of unscreened individuals from breaking into the building, which they could do from the East Plaza. Defense counsel does not credit any of this testimony: she pronounced at trial that she believes all the sworn testimony from Capitol Police and Secret Service personnel about the security arrangements on January 6, which has been given in trial after trial related to the Capitol Riot,

amounts to a "big lie." But the Court, not defense counsel, was the finder of fact at trial, and the Court's decision to credit sworn, unimpeached testimony about the restricted area was certainly not a miscarriage of justice.

### e. The Court Properly Applied Section 1752(a)(2) to the Admitted Evidence

Christie contends that there was insufficient evidence for the Court to find that Christie's conduct disrupted Government business, which the Government was required to prove in Count Two. Def's Mot. at 9. Pointing to the fact that none of the Government witnesses recalled Christie specifically, Christie asserts that his participation in the mob must not have disrupted Government business. *Id.* Judge Kollar-Kotelly, however, has aptly articulated how each member of the mob contributed to the disruption of Government business on January 6 and satisfied this element of Section 1752(a)(2):

> The following metaphor is helpful in expressing what the statute [18 U.S.C. § 1752(a)(2)] does require. Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the Court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business and official functions.

*United States v. Jesus D. Rivera*, 607 F. Supp. 3d 1, 9 (D.D.C. 2022).

Moreover, Christie's conduct far exceeded that of a rioter who merely disrupted the Congressional proceedings through his illegal presence on Capitol Grounds. Christie repeatedly exhorted the mob through his bullhorn to storm the Capitol Building; Christie mounted a police car on the East Plaza, showing himself off as a symbol to the mob that they, not the police, were in control; Christie specifically urged the mob to view the Capitol as "our house" as the mob overran a police line desperately trying to keep rioters from accessing the East Rotunda door; and

Christie engaged in all this misconduct while wearing an exposed, menacing metal hammer. In the face of this evidence, Christie's motion does not provide any countervailing reason to question the Court's finding that Christie disrupted Government business.

>    f.  **The Defense Failed to Show that the Proposed Expert's Opinion Was Admissible under Rules 401, 402 and 702**

Christie contends that he was denied a fair trail by the Court's exclusion of his proposed expert witness, Mr. Cunningham. His motion, however, does not explain how the proposed expert opinion would have shown that Christie did not commit the charged crimes, and that the testimony's exclusion thus led to a miscarriage of justice. Christie's motion even fails to meet a much lower standard: it does not show that any of the expert's opinions were admissible.

"Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401. "Irrelevant evidence is not admissible." Fed. R. Evid. 402. Similarly, Rule 702 provides that expert testimony is only permissible where the expert's opinion "will help the trier of fact to understand the evidence or to determine a fact *in issue*." Fed. R. Evid. 702 (emphasis added). The proposed expert opinions, when considered alongside the actual facts in issue at trial, did not meet these standards.

Mr. Cunningham could not offer any opinion as to whether the East Plaza was a "posted, cordoned off, or otherwise restricted area . . . of a building or grounds where the President or other person protected by the Secret Service [including the Vice President] is or will be temporarily visiting." His opinions, based on his experience as a Secret Service agent more than 25 years ago, would not have any bearing on whether the East Plaza was, as a matter of fact, cordoned off on January 6. And this fact could not reasonably be disputed, as shown by the video evidence

and testimony of persons present at the Capitol on January 6, and as captured by the following screenshot from a video admitted at trial:



Screenshot from GX 402 (colored circles and lines added by the Government as a demonstrative). Similarly, at trial the defense could not articulate how Mr. Cunningham's opinions would have any bearing on whether the Vice President was visiting the Capitol on January 6; whether Christie's conduct was disorderly and disruptive; whether Christie knew he was not permitted in the East Plaza; whether Christie carried the hammer for the purpose of using it to cause bodily injury; whether the hammer was capable of causing bodily injury; or on any other issue in the case.

Before precluding the testimony, the Court read the entirety of defense counsel's Rule 16 notice regarding the proposed expert testimony. The Court also provided defense counsel with an extensive opportunity to identify any relevance of the proposed opinions. Defense counsel failed to do so. The Court properly excluded the testimony accordingly. *See, e.g., Robertson v. McCloskey*, 676 F. Supp. 351, 355 (D.D.C. 1988) (excluding proposed expert testimony because, among other things, it "suffer[ed] from problems of relevancy"); *United States v. Girod*, No. CR

17

5: 15-87-DCR, 2016 WL 3962935, at *3 (E.D. Ky. July 21, 2016) ("Because Girod's proposed opinion testimony is both irrelevant and unreliable, it will be excluded under Rule 702.").

Christie's Rule 33 motion does not show the relevance of any of the proposed expert opinions either. Instead, Christie complains that "Judge Mehta refused to allow the Defense to examine its expert witness about the United States Secret Service (USSS), the sixty-plus years' procedures for establishing Section 1752 restricted building and grounds, the authorities of the USSS versus the USCP, and what each agency receives a budget for – indicating Congressional intent for the Section 1752 law." Def's Mot. at 2. None of these subjects were of consequence at trial.[7] Christie's second effort to justify his proposed expert testimony thus fares no better than his first, and the Court's exclusion of Mr. Cunningham does not provide a basis for a new trial.

## IV.     CONCLUSION

For the foregoing reasons, Defendant Eric Christie's motion for a new trial should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar Number 481052

By:            /s/
JASON M. MANNING
NY Bar No. 4578068

---

[7] Defense's reference to Congressional intent here is particularly puzzling. To the extent Mr. Cunningham had any expertise in Congress's intent in passing and amending Section 1752—and there is no reason to believe that he did—Congressional intent in enacting a law is a matter for the Court to consider during litigation, not a matter for the finder of fact to consider at trial.

Trial Attorney, Detailee
RAYMOND WOO
AZ Bar No. 023050
Assistant U.S. Attorney, Detailee
U.S. Attorney's Office
601 D Street, NW
Washington, DC 20530
(202) 514-6256 / (602) 514-7736
jason.manning@usdoj.gov /
raymond.woo@usdoj.gov
