### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| *v.* | ) | **Case No. 1:23-cr-00005 (APM)** |
| | ) | |
| **ERIC CHRISTIE,** | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Comes now the Defendant, ERIC CHRISTIE, by and through undersigned counsel, and respectfully submits this Memorandum in aid of sentencing. For all the reasons below, Mr. Christie asks this Court to impose a sentence pursuant to the U.S.S.G. guidelines for time served, with an order for release from incarceration on December 1, 2023, and under one year of supervised release.

Eric Christie expresses his deep remorse here for laws that he violated. He never intended to violate any laws. He did not commit any violent act and does not condone the violence that occurred at the U.S. Capitol on January 6, 2021. While ignorance of a law is not acceptable as an excuse, he did not know the east plaza of the Capitol was closed the entire day and would not be opened for protest. He did not know the east plaza of the Capitol was restricted for protection of the Vice President, and did not even know where the Vice President was located that day. All he heard was that President Trump said he hoped Mr. Pence would do the right thing. He never knew at the time that Mr. Pence was inside the building or that any breaches of doors, with protestors entering the building, had caused an evacuation.

Mr. Christie apologizes for stepping on the government vehicle to make his megaphone declarations about "MAGA party" and to say the building was "our house." Whether it was a

private or government vehicle, Eric knows that it was unacceptable behavior to climb on top. Although he touched no police, stayed below the steps on the east side, and caused no damage, he apologizes if his megaphone speech was hearable by police. He has no recollection of ever telling anyone to go up the steps and knows he never told anyone to go inside the building. He apologizes for creating a noise racket that was part of the louder crowd roar. He asks this Court to consider that he never intended for his voice to encourage anyone to go into the building.

Even if the police had allowed people to go in the building, Mr. Christie never wanted to go inside. His text messages to his brother made it very clear that he did not want to go inside and did not. He apologizes for his behavior outside the bike racks before the police retreated to the steps.  He got caught up in crowd bad speech behavior and is sorry he did not just keep the megaphone away from his mouth unless he was singing or praying. Mr. Christie does not believe all the speech attributed to him by the government was actually his speech, but he apologizes for being part of the noisy chaos outside the bike racks. He knows the words that should have come from his mouth when he saw people pushing against the racks were "stop it" rather than wandering away as he was seen doing on video.

Eric is not a physically confrontational person by nature.  He will verbally argue at times but otherwise is often the "mediator" making peace among parties in conflict. He knows in retrospect, given facts of what was happening on the west side that he did not know about on January 6th, that he should not have said any words about entering the plaza before and unless offered entry. He knew earlier that the police had stopped entry attempts, and he should not have said anything encouraging entry by those near the bike racks.

He asks the Court to forgive his misunderstanding that at around 2:00 p.m. the police had allowed entry onto the plaza. He had heard the announcement that police were trying to get

approval to go to the steps. Eric knows he should have asked if entry was allowed when he saw people from the northeast and then in front of him running toward the center steps. His running toward the steps was misplaced energy where he did not look around to use his best judgment.

Mr. Christie asks the Court to forgive him for his lack of knowledge in believing he could wear the hammer on his pants belt loop. He asks the Court to accept that he never had any intent to attack anyone at the U.S. Capitol. The hammer was always meant to be a messaging deterrent to ANTIFA violence when he was alone away from the rally crowd. He asks the Court to recall that he did not use the hammer to enter the grounds or to place anyone in fear of danger from him while he was on the Capitol grounds. Mr. Christie sincerely regrets that anyone drew the conclusion solely based on his clothing and wear of a hammer on January 6, 2021 that he could or would ever initiate any violence. He apologizes for anything that indicated that he is anything but a peaceable person, and asks the Court to recognize his lifelong history as a law abiding citizen.

Mr. Christie lost his job because he has been incarcerated since December 22, 2022. The Presentence Investigation Report shows his negative monthly cash flow. Because he is convicted of felonies for wearing a hammer on the U.S. Capitol grounds and was never intended for offensive use, he cannot return to his employment in the financial industry. He needs to enter into a completely new livelihood. Losing his home should not become the punishment for Eric's unknowing, non-violent violation of the law after conviction by the Court.

## I.    BACKGROUND

Mr. Christie will not repeat his background as captured in the Presentence Investigation Report. In summary, he grew up in a home where Christian values were an innate part of his upbringing.  He was devasted by the death of his father in the early 1990s. His family was in Texas when he moved to California to make it on his own. He worked hard to acquire some properties

for rental management. He eventually landed in finance and banking. He bought his condominium and soon thereafter the other condominium owners in the building have trusted and relied on him to take the lead in association management. For example, Eric is the one who budgets and coordinates for repairs. The roof is due to be replaced and everyone is waiting on Eric's return to get that done.

As to family, Eric grew estranged from his mother and brother because they disagreed with his political beliefs. His brother has not been easy for Eric to deal with since his brother had injuries from an accident. Eric loves his family, but they view anything not covered and approved by the anchors on broadcast television news as a conspiracy. Eric is not even sure that his brother, who witnessed part of the FBI SWAT operation against him on December 22, 2022, understood that Eric was falsely said to have had a standoff from arrest when he knows that Eric was told over and over he was not under arrest.

Eric liked his work. He was a valued employee who could have continued in his job had he not been incarcerated since December 22, 2022. He cannot continue in his job after his felony convictions.

### January 6, 2021

Mr. Christie traveled on a redeye flight from California and arrived in Washington D.C. on the morning of January 6, 2021. He went to Washington D.C. to attend the "Save America" rally, also known as "Stop the Steal." Mr. Christie wanted to hear what President Trump had to say. Like millions of Americans, Mr. Christie was aware of irregularities and some publications about illegal conduct of the 2020 election in some states. While the arguments may continue since there was no true investigation in many counties or states, there is no doubt that Georgia's executive consent agreement with Stacey Abrams regarding mail-in ballots, and Wisconsin's violations of mail-in

ballot rules did not follow election laws by those states' legislatures. Mr. Christie thought he would hear some new facts, but overall wanted to show support for President Trump's policies that had helped all Americans, whether he had won or lost the 2020 election.

Having been politically active in trying to solve local community problems in his Los Angeles district, and being a regular rally goer, Mr. Christie wore his usual Beverly Hills rally "costume." It consisted of his politically incorrect "Fags for Trump" shirt, MAGA hat, and LGBTQ flag draped as a cape. He expected to attend a peaceful rally event in D.C., and had no plan or intent to go to the U.S. Capitol. All he knew after arrival was that there was a rally, people seemed to be gathering near the Washington monument, and in the approach to the Ellipse area the lines to enter the secure area were too long for waiting in the cold weather.  There were large screens and speakers that went out to a larger distance since the crowd was too large anyway to all fit in the secured area.

Mr. Christie was pulled away from the rally by a Beverly Hills rally goer who did not feel well. She asked if she could go to his hotel with him to watch the speeches on her phone or a hotel TV. With no intent to go to the U.S. Capitol, Mr. Christie escorted the ailing woman to his hotel lobby. It was still too early for him to check-in. Nobody at the hotel expressed concern or questioned his hammer or rally costume. He listened as he was able to a phone stream of the rally. It was not until he heard the speeches that said people would be protesting at the U.S. Capitol that a trip to the U.S. Capitol became part of his agenda for the day.

There is further background as to why Mr. Christie and many other rally goers felt the need to protect themselves when outside of the crowd. From January 2-3, 2023, social media airwaves became inundated with the story that as they had done in November and December 2020, ANTIFA (for "Anti-Fascist") members were planning to attack Trump supporters in town. ANTIFA

members had previously attacked or threatened assault on isolated and vulnerable rally goers when they departed the larger group, such as when heading to transportation and lodging. ANTIFA previously accosted the elderly, and threw acid at and beat a journalist. The attacks are difficult to consolidate because broadcast and print news media largely ignored the violent instances. But the beatings, stabbing, and acts of violence were known enough so that when social media was flooded with reports that ANTIFA planned to disguise themselves around town as Trump supporters, those who would not be scared off by more ANTIFA terrorism wore tactical vests.

Mr. Christie's message to ANTIFA to "stay away" was to attach a household hammer to his pants' belt loop.  In addition to the hammer seeming a manly object when next to his "fags for Trump" shirt, he wanted to deter any violent encounter. He knew he could not carry a deadly weapon such as a gun or knife around D.C. or at the rally. He also knew he did not want to be placed in a position of pointing a gun at anyone or getting into a knife fight when he was not of the heart (or skill) to ever stab anyone. His own words conveyed that he had no intent to break the law. But he wanted to message that he was not vulnerable and should not be attacked. It was part of his costume in that while his shirt said "Fags for Trump" he messaged that could protect himself if attacked after leaving the rally grounds, heading to his hotel, or stopping to pick up food. The hammer was never intended as an offensive object, and was never inherently dangerous. He never used it against anyone. No police even noticed it despite it being openly displayed. Not a single person in the crowd anywhere made mention of the hammer. When he entered the east plaza of the Capitol, he did not know he was violating any law by wearing a hammer that was never intended for use at that location or offensively. He did not know Vice President Pence was inside the building. Mr. Christie believed he was legally wearing the hammer.

Mr. Christie has been subject to threats as an openly gay person. He never attempted to harm any person. He once joked with his brother about bringing a baseball bat to ward off a vocalized threat to his brother as a baseball team coach. But it was truly a joke because Eric never owned a baseball bat as an adult. Eric told his brother to call the police and gave him the local station's phone number. He has never been in fisticuffs or bar fights. He is not trained in martial arts and knew that if alone and threatened, his best bet for personal safety would be to flee the threat. The hammer was a deterrent message against violent ANTIFA members. Eric never considered that it would be realistic to become involved in hand (Antifa with knife or acid) to hand (hammer) conflict. Eric never once said or inferred he would strike anyone with the hammer.

Mr. Christie has no criminal history, although he once violated a local ordinance by being in a park after hours over twelve years ago. Mr. Christie has never acted violently toward any person. This held true on January 6, 2021. Mr. Christie never intentionally acted to violate any law. This also held true on January 6, 2021. He left a pretextual traffic stop in California in December 2022 after the police said all his paperwork was cleared but then illegally ordered him to exit his vehicle (after the alleged traffic stop was over California law prohibits any order to exit the vehicle). When Mr. Christie argued, the officer, holding a baton, threatened to break the car window right next to his head. Given a threat of illegal violence against him under California law, Mr. Christie fled. He did just what the DOJ and agencies recommend: flee a credible threat of violence. His nature is to not engage in violence. He did not violate the law when without a knock the SWAT broke his doors and glass on December 22, 2022, and immediately threw in pepper gas, a flash bang, and instead of entering to arrest him - which is the only protocol when a forced entry operation is used - *immediately* put a crisis negotiation team that was prepositioned outside the building on the phone rather than order him outside for arrest. They stated over and over they were

there to search, and he was not under arrest, while their abnormal actions led Mr. Christie to believe they intended to murder him. This is all on audio recordings. Yet, there was no search warrant on site. It took over an hour for the search warrant to be brought to the site. And rather than let his brother, lawyer, or associate bring him the search warrant, the SWAT messed around for almost another hour trying to get a robot to go up a set of stairs to hand it to Mr. Christie.  Mr. Christie did not "resist arrest" or a lawful order when the SWAT operation was completely illegitimate as conducted, there was no search warrant present for his lawyer to look at, and the FBI constantly lied to Mr. Christie. He asked repeatedly to see the warrant and was denied. After reviewing the warrant with his attorney, Mr. Christie peacefully exited and was immediately tackled and manhandled.

In retrospect for January 6, 2021, video clips can be shown with the government's narrative interpretation that Mr. Christie knowingly entered grounds restricted for the protection of Vice President Pence. But Mr. Christie had no idea where Vice president Pence was located. Nor did he know the area was closed after the police left the outer bike rack line from north to south. Mr. Christie entered the east plaza simultaneous with when the police received a pull-back order, and where he saw the police line all to his northeast fall back as a group headed toward and walked along with police to the building's center steps. He saw a large group of protestors arriving from the northeast having been allowed entry to the plaza, and accompanied by cheers. Seconds later he saw the police line in front of him fall back, after previously hearing the announcement that the police were trying to get permission for protestors to go to the steps. He did not see people push across the bike racks. He was not initially looking there, and body density prevented his line of sight. Mr. Christie saw multiple things nearly at once and they all looked like protestors were being

allowed to enter. If he had it to do over, Mr. Christie would have walked up to one of the retreating officers and asked if and why they were being let in the plaza.

The movement and cues that Mr. Christie saw and heard were different than what the government presented as what it thought he saw and heard. Mr. Christie never anticipated being on the U.S. Capitol grounds. People outside the bike racks appeared to have an expectation that they were supposed to be allowed in for rallies. In hindsight, there were permitted rallies. Nor did Mr. Christie ever expect that there would be fighting between Trump supporters and police. He did not see any fighting through the crowd to the top of the steps by the Columbus doors, and did not know until much later that anyone had forced their way past police to go inside. He was unaware of the west side incidents, or that police were shooting at protestors.

Mr. Christie implores the Court to believe that had he once heard any dispersal order to leave the plaza, either directly by police on the ground or through the outdoor loudspeakers that were never used until around 6:00 p.m., he would have departed the area below the steps on the east plaza. By all reporting, neither the police nor protestors who thought they could be on the grounds know why the United States Capitol Police command center did not use the outdoor loudspeaker system to order protestors off the grounds. When he ran to the bottom of the steps, had any officer yelled that everyone had to leave, Mr. Christie swears he would have done so. All he heard was "stop" - meaning he should not go up the steps. Mr. Christie obeyed that order, and the videos show that.

Mr. Christie is sorry he ever went to the U.S. Capitol on January 6, 2021 because he never wanted to be part of or near any illegal activity. Mr. Christie does not like getting in large crowds and wishes he had followed his natural instincts to stay well away from the crowd. He pleads with the Court to consider that while he was on the vehicle, he did not tell anyone to violate the law.

He did not say "storm it" or "go in" while using his megaphone on the vehicle. He is sorry he did not follow his gut and leave when the crowd packed the steps when the police were only a third of the way up, and he saw thousands more people approaching the plaza. Mr. Christie is a smart man and is sorry that he made the bad assumption that he was being allowed in and did not use his better judgment to stay off the east plaza and leave the area. He is sorry he did not respectfully ask an officer if he was allowed to go to the steps.

## II.    APPLICATION OF SECTION 3553 FACTORS

Under the majority opinion in *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing. See 18 U.S.C. § 3553(a)(4)." *United States v. Booker*, 125 S.Ct. 738 (2005). The Court in *Booker* held that courts must consider all the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Pursuant to 18 U.S.C. §§ 3562 and 3553(a) as endorsed by *Booker*, sentencing courts should consider the need for the sentence imposed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. Section 3553(a)(2)

Specifically, courts should "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" set forth above. Section 3553(a) further directs sentencing courts to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the range of sentences available, the need to avoid unwanted sentencing disparities

among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offenses charged.

Section 3582 of Title 18 states that:

> [t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

18 U.S.C. Section 3582

## III.   DISCUSSION.

Mr. Christie's life has been completely changed since his arrest and detention. He is a single gay man without a partner or spouse. He has friends but his being in jail has placed a burden on them to keep his home front ready for his return. The damage caused by the building's burst pipe still requires Eric to be there for decisions and repairs.  He did not complete college and worked his way up in the banking and financial world based on his merits and acquired skills. His mother is elderly, and his brother disapproves of Mr. Christie. For almost a year he has had to rely on one-two people in California to help him from afar for home maintenance, repair of FBI SWAT damage, and bills. His home had water damage from broken pipes that serve the entire building, and flooring and walls still need to be repaired. As a 56 year old man who was always a responsible citizen, he is at risk of losing everything he worked for all his life. He lost his job. He has a "former friend" who tampered with his finances where the extent of the damage is unknown. He has to reinvent himself, where his savings have been drained to keep him from losing his home. He lives modestly but nonetheless, he may need to leave the high taxation and other expenses of living in California if he cannot find employment there. He has never physically hurt anyone or been violent. Prior to this conviction he had no criminal history. Now he is a felon for life for wearing

a hammer that he never used or threatened anyone with. Any more time incarcerated is not reasonable within the purposes for prison.

A. **Using Section 3353(a)'s Sentencing Factor: Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense, Mr. Christie Should be released on Dec 1, 2023 for Time Served.**

The "overarching instruction" of 18 U.S.C. § 3553(a) is to "'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). Mr. Christie's sentence of time served meets *Kimbrough*. The convicted crimes of 18 U.S.C. Sections 1752(a)(1) and (2) are serious. Mr. Christie fully understands that. But for those not convicted of a felony for carrying a non-inherently dangerous object that was never used, and where there was no assault or violence by the defendant, the sentences are generally less than four months in prison, if any prison is assigned at all. In this case, Mr. Christie did not know that the Vice President was being protected. He now fully understands the law and there is no chance at all of recidivism. He has already spent almost a year incarcerated because the government said he would not comply with release conditions. His life shows he respects the law. That he fled from a direct threat of injury to his head, face, and body after a traffic stop had ended does not indicate disrespect for the law. He fled from serious bodily harm. He has been punished more than others convicted of Section 1752(a), which carries a base offense level of 10. (Exhibit 1)

**To avoid sentence disparities**, the Court should consider that in many cases the DOJ dropped charges of a dangerous weapon either in plea deals or in the charging document. The government would not offer that here, despite requests. In George Tanios' case (1:21-cr-0222) he bought and carried pepper spray which he gave to someone else to use. And it was used against police. He pled to Sections 1752(a)(1) and (2) and received 5 months imprisonment and 12 months

supervised release. The DOJ currently has two defendants whose cases remain under seal where they carried firearms onto the grounds and their sentencing guidelines range is only 0-6 months in their plea deals. David Blair, (1:21-cr-186) whose lacrosse stick made some incidental contact with police and was held defensively in front of him pled to 18 USC Section 231(a)(3) Civil Disorder and received 5 months imprisonment plus supervised release of 18 months. Eric Cramer (1:22-cr-339) carried a baseball bat and entered the capitol building. His guideline range with the plea was 11, where he received 8 months imprisonment and 12 months supervised release. Aaron Mostofsky (1:21-cr-138) pushed against police, went inside the building, took a police vest and riot shield, and carried a large walking stick but was not charged with a dangerous weapon; and after pleading guilty to multiple felonies was assessed as having 13 points (range of 12-18 months) and received 8 months prison and 12 months of supervised release. Hunter Ehmke (1:21-cr-029) who broke a window on the east side received 4 months in prison. Several defendants who were charged with assault ended up pleading to 18 U.S.C. Section 231(a) Civil Disorder and received under a year in prison.

### B. Adequate Deterrence has Already Been Enacted

With Mr. Christie having committed no violence, nor aided anyone else, his sentence already accomplished this goal of deterrence. He will commit no other crimes. And those who see his sentence should be deterred from carrying anything onto U.S. Capitol grounds.

### C. There is No Element of the Public that Needs Protection From Mr. Christie.

He has never threatened a member of the public. He did not threaten anyone on January 6, 2021.

**D. Prison is Not Going to provide Education or Vocational Training, Nor Medical Care**.

If the guidelines range to the maximum level were selected in this non-violent case, there would still be no time for any training. The bad food is causing digestive and skin rash issues where medical care is ineffective.

Because the Section 3553 factors combined with Mr. Christie's characteristics and background indicate that no further prison time would be reasonable or serve a valid purpose as described above, he should be released on December 1, 2023 for time served with only six months of supervised release.

**E.  The Court Should Consider Applying § 2B2.3 for "Trespass" Rather Than § 2A2.4 "Obstructing or Impeding Officers" as the USSG Chapter for the Offense**

For 18 U.S.C. § 1752(a)(2), the PSR applies USSG § 2A2.4 for a base offense level of 10 rather than using § 2B2.3 for "Trespass." Chapter 2A is titled "crimes against the person" and here there was no crime against any person. Further, § 2A2.4 is titled, "Obstructing or Impeding Officers." The trial transcripts show that no police witness recognized or remembered Mr. Christie. He did not obstruct or impede any officer. The base level of 10, with 0 criminal history points leads to a guidelines table sentencing range for prison of 6 - 12 months.  Mr. Christie is almost at 12 months in prison now.

If the Court were to apply § 2B2.3 for "Trespass" as is more fitting since Mr. Christie made noise on his megaphone, and appeared unruly on top of a vehicle, the base level is 4. Two points would be added because of the federal facility. Two points would be added for the conviction of possessing a dangerous weapon. The total count would be 8 with the guidelines range for prison set at 0-6 months. His mere presence on the east plaza, with no direct contact that obstructed or impeded any officer from doing their job, which as stated by trial witnesses was "to protect the Capitol building and members of Congress" does not warrant use of § 2A2.4. The USSG refers to the above two sections, without reference to which § 1752 paragraphs go with either Trespass or Obstructing or Impeding. Other §1752 parts more aptly fit with § 2A2.4:

> (3) knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstructs or impedes ingress or egress to or from any restricted building or grounds; or
> (4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds; . . . .

18 U.S.C. § 1752

Because mere presence does not confer guilt for obstructing or impeding as may have been enacted by others, and Mr. Christie committed no crime against any person, and he did not aid or abet any person, the Court should use USSG § 2B2.3 for an offense level of 8 rather than 10.

### F.  The Court Should Deny the Presentence Investigation Report's (PSR) Enhancement for +2 for "Reckless Endangerment."

The thorough investigating officer read through the bond hearing transcript and related filings. She took the government's position. She wrote:

> The defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer [to wit: the defendant, while armed with a firearm, barricaded himself inside his apartment for approximately three hours when law enforcement officers attempted to arrest him]; therefore, two levels are added. USSG §3C1.2.

ECF No. 73 at 9; item 43.

First, Mr. Christie respectfully asserts that this Court has no personal or subject matter jurisdiction over him for any issue related to the search of his home. The search warrant was signed by a magistrate in a U.S. District Court in California. The search was executed in California.

Importantly, the government refused and outright declined to honor Mr. Christie's written discovery request for documents and specific items related to the search. It only provided a partial audio recording where the first 15 minutes not provided would show that the crisis negotiation team was right there outside his building, and was part of a plan to create a crisis.

There was no evidentiary hearing for what the AUSA, FBI SA, and others enacted for the SWAT attack on Mr. Christie on December 22, 2022. As described *supra*, the SWAT executed a forced entry operation but never planned to enter, in violation of FBI protocols. They *immediately* (within a minute of door and glass breakage, and pepper spray), put a crisis negotiation team that was prepositioned outside the building on the phone. They did not order him outside for arrest.

They planned to and did immediately shut off the water and electricity to the building. The FBI did not evacuate neighboring condominiums. Those residents were forced to suffer the pepper gas that spread everywhere since Mr. Christie's door was broken open. The FBI did not seriously consider that Mr. Christie was going to shoot anyone. There is no hard evidence that he held a gun in his hand. The drone operator witness misrepresented that there was a knock and announcement. Mr. Christie did not have the chance to bring in any witnesses who would discredit the misrepresentations since the government did not afford professional courtesy that this witness would appear and what he would testify about. The star witness, unannounced beforehand, was a not so practiced drone operator who crashed his drone, and then claimed without ever having taken a picture that every drone allows, that Mr. Christie held a gun. There is no evidence he pointed a firearm at anyone ever.

The FBI negotiators stated over and over they were there to search, and that Mr. Christie was not under arrest. There is audio and there are witnesses to this. No comprehensive hearing was ever held on the matter. The SWAT team's abnormal actions led Mr. Christie to believe they intended to murder him. This is all on audio recordings. Yet, there was no search warrant on site. It took over an hour for the search warrant to be brought to the site. And rather than let his brother, lawyer, or associate bring Mr. Christie the search warrant, the SWAT consumed almost another hour trying to get a robot to go up a set of stairs to hand it to Mr. Christie.  Mr. Christie did not "flee or resist arrest."

There was no lawful order to exit for "a search" when the SWAT operation was completely illegitimate as conducted; there was no search warrant present for searchers to use; and the FBI constantly told Mr. Christie that he was not under arrest. He asked repeatedly to see the search

warrant and was denied. After finally reviewing the warrant with his attorney, Mr. Christie peacefully exited and was immediately tackled and manhandled for arrest.

The government wants the Court to use USSG § 2A2.4 with its note that mentions §3C1.2 Reckless Endangerment.  Application Note 2 refers to fleeing from a law enforcement official. Mr. Christie did not flee from his home or a law enforcement official. The untrue accusation was that he barricaded himself. The USSG is not a word salad that the government can just mix up and toss around to add criminal points. The USSG specifically refers to 18 U.S.C. § 758 for fleeing or evading a law enforcement checkpoint at high speed as an example of creating the risk of death or serious bodily injury. There was never a single action by Mr. Christie that had any potential to cause a substantial risk of serious bodily injury or death to anyone. The description for "reckless Endangerment" requires an act. The only possible danger might have been from a government team member accidentally shooting himself by mishandling any of the massive amount of weaponry being paraded outside.

There was no hearing, and no use of any federal rules to show with due process that Mr. Christie created any substantial risk of injury or death. He did not point a weapon at anyone, he did not shoot through walls, and there was no act at all. Just because the drone operator said he was scared does not meet the standard that Mr. Christie created a substantial risk of bodily injury or death to anyone. If the drone operator were sincere, he would have ensured neighboring condo units were evacuated. Nor would there have been SWAT team members walking all over the roof and Mr. Christie's balcony. Most importantly, there was no act that caused any threat. Mr. Christie stood in a hallway littered with glass shards that could have killed him. He was choking from multiple rounds of pepper gas. The reckless endangerment was against Mr. Christie.

Using the government's version of the search, without any due process, or discovery, or any evidentiary hearing under the Federal Rules of Evidence having been held on the matter, the Presentence Investigation Report asks this Court to violate Mr. Christie's Constitutional rights starting with the Fifth and Sixth Amendments by adding a +2 points enhancement under USSG Section 3C1.2 for "Reckless Endangerment During Flight." Even if it had the jurisdiction, this Court never afforded Mr. Christie a hearing under the Federal Rules Evidence, or the Federal Rules of Criminal Procedure that require discovery.  Mr. Christie did not flee. He did not barricade himself inside a home where all the doors and glass had been broken. And in the English language, a barricade remains the opposite of flight. Flight and creation of substantial risk of serious bodily injury or death require an act.

The California Highway Patrol pretextual stop was addressed above. There was no risk to anyone except to Mr. Christie, had he stayed to have the driver's door glass broken into his head. It is noteworthy that the City Attorney for Los Angeles will not prosecute on the false police report submitted over that event. The video showing the entire event seems to have been enough to result in dismissal. Regardless, Mr. Christie's California bond hearing transcript confirms it was never a real traffic stop. It was always illegal then under California law to order Mr. Christie out of his vehicle without telling him there was a warrant for his arrest.

Because Mr. Christie created no substantial risk of bodily injury or harm to anyone ever, and his Constitutional rights would be violated by adding the two points under USSG Section 3C1.2, the Court should not accept the +2 points, and instead should use its decision from Paragraph E. above regarding 2A2.4 or 2B2.3 for the offense level. The maximum offense level should be either 10 or 8, with respective prison ranges of  6 - 12 months or 0 - 6 months. His offense level should not be set at 12, with its prison sentence range of 10 - 16 months.

**G.  The Court Should Take First Step Act Times into Account and Release Mr. Christie at Sentencing.**

Mr. Christie will be at 12 months of physical imprisonment on December 21, 2021.

Varying downward was taken out of the question when the government refused to disclose the truth to this Court about the supposed 'facts' it presented to continuously oppose bond. Its claim was that the home siege had to happen because Mr. Christie did not comply with a December 16, 2022 pretextual traffic stop when ordered to exit his vehicle after the officer announced that all of Mr. Christie's paperwork was good - and it cleared. The government allegation was that without any dangerousness shown, with no criminal history, and without Mr. Christie being as flight risk, Mr. Christie would not comply with this Court's release conditions.

In sensitive discovery there is email correspondence that always redacts anything written by AUSA Manning to SA Hicks regarding the planned home search and Mr. Christie. The government refused requests for unredacted versions. <u>But in one email dated December 15, 2022, Mr. Hicks disclosed that the "search operation" was being planned for nighttime and they needed a special warrant for the operation.</u> This shows the misrepresentation made to the Court where the claim was made that the SWAT operation was because Mr. Christie left the California Highway Patrol pretextual stop. The <u>Hicks email was on December 15, 2022 - a full day before the Highway Patrol pretextual stop on December 16, 2022</u>. The SWAT attack was always being planned before the California Highway Patrol non-traffic stop. This Court relied on the false claim that the home <u>search/attack was because Mr. Christie left the non-traffic stop</u>. The government never corrected the misrepresentation. The SWAT operation was kabuki theater planned that way all along.

Despite other defendants similarly situated either for having an unused, non-inherently dangerous object where that was never even charged, or was dropped from their charges, or offers

for plea deals omitted reference to use of dangerous objects (including assault charges being dropped) where defendants received well under a year in prison, the government still seeks to single Mr. Christie out. In multiple phone calls it refused to object to the +2 for Reckless Endangerment, even though it knew the search "operation" was theater where all the actors showed up without any search warrant, they never tried to arrest Mr. Christie after a forced entry where the SWAT team did not enter, and the government subsequently claimed open doors and broken glass equaled a barricade.

Mr. Christie is likely to have some level of PTSD after his home was so assaulted.

The above is important because Mr. Christie has been in jail, where his release pending sentencing was opposed without just reason. He was never a flight risk, and he was never a danger. Now the issue is to consider time under the First Step Act. If Mr. Christie is sentenced to one year and one day, then he automatically receives 54 days of good time credit. That time for release has passed. The PSR report at ECF No. 74 uses the offense level of 12 and relays that 14 months is what Mr. Christie will be at when applying the 54 days for good conduct - and this is a mid-range sentence.

Actually, since Mr. Christie has done productive work from August until present, he should have 50 days (ten per month) credit for time served under the First Step Act. As of sentencing, he will then have been constructively sentenced to over one year, until January 19, 2024 with the 50 days added. He is already at a sentence just 2 days short of thirteen months by December 1, 2023 when considering 50 days of time credits. Then there are 54 days for good conduct for year one plus 4.5 days per month after that. His good conduct time is equal to 63 days under the constructive sentencing that already occurred - which means that already he has constructively been sentenced to March 22, which is 15 months.

Because 14 and 15 months are well beyond any sentence for any similarly situated nonviolent person (who never used a non-inherently dangerous object) on the U.S. Capitol grounds on January 6, 2021, and the time approaches the top end of the USSG range for offense level 12, while exceeding the other offense level ranges, the Court should release Mr. Christie on December 1, 2023 at sentencing.

**H.  Mr. Christie Requests that No Fine be Assessed.**

The PSR shows that he cannot afford a fine. He has no income. He has no medical health insurance. He has no vision or dental insurance. Those costs are not fairly factored into his already negative monthly cash flow.  He is sincere in saying that he is remorseful for laws he violated and will be fully engrossed in finding employment and returning to all the positive things he did in his community and for his condominium association.

**I.  Mr. Christie Requests No Restitution Be Required**.

Mr. Christie was not charged with damaging property because he did not cause property damage. Mr. Christie did not harm any human and there was no human victim as a result of his ruckus megaphone speaking outside the building and below the steps. The PSR states that the government will seek restitution but provides no statutory authority under 18 U.S.C.

The basis for American jurisprudence includes that people are charged and tried for crimes they commit, not for being near strangers who may commit a crime. There is no statute that allows Mr. Christie to be charged restitution for property damage caused by others. 18 U.S.C. § 3663(a)(2) requires a human victim directly and proximately harmed by the defendant's crime. The government is demanding restitution as part of plea agreements under § 3663(a)(3) that states the

parties can agree. Because the crimes Mr. Christie was convicted for have no human victim, a restitution order should not be issued.

**J.  The Court Should Limit Supervised Release to Six Months, and at Most One Year**.

The purposes of supervised release will be exhausted by one year. Mr. Christie is not going to trespass on governmental or any property. He  will not possess any firearms and will not go to any restricted area carrying any hard objects larger than a pen. He is at the lowest end of possible recidivism where no supervision is necessary. He may need to travel for the equivalent of "gig work" as he can find it, where work periods need to be very flexible. Limiting him to a district in California and requiring set travel dates will be counterproductive to his finding gainful employment whenever it becomes available.

Supervised release and conditions align closely with sentencing. Pursuant to § 3583(d), the applicable, relevant conditions of supervised release must:

> [1] be reasonably related to at least one of the following: the nature and circumstances of the offense, the defendant's history and characteristics, the deterrence of criminal conduct, the protection of the public from further crimes of the defendant, and the defendant's educational, vocational, medical, or other correctional needs.
> [2] ... involve no greater deprivation of liberty than is reasonably necessary to achieve the purpose of deterring criminal activity, protecting the public, and promoting the defendant's rehabilitation.
> [3] ... be consistent with any pertinent policy statements issued by the Sentencing Commission.

Mr. Christie presents no threat of further crimes and needs no lengthy supervision for "deterrence." He already spent almost a year incarcerated for nonviolent activity where he caused no direct or proximate harm to anyone or anything. Almost every defendant convicted of a misdemeanor Section 1752 charge appears to have received at most a year of supervised release. Adding more supervised release time because he wore a hammer that he believed was legal  would involve a greater deprivation of liberty, to include lost work opportunities than is reasonably

23

necessary to deter criminal activity. Except for an ordinance violation, for over 50 years Mr. Christie abided by all laws until his convictions for January 6, 2021. He has to reinvent his career and save for retirement. He wants to be able to keep his home and live in California. He faces many challenges, but nothing includes future criminal activity. Because of the lack of potential recidivism, and a lifelong history of being law abiding, the Court should not order any supervised release in excess of one year, with six months being the most reasonable.

IV.     **CONCLUSION**

Wherefore, Mr. Christie prays that the Court will release him on December 1, 2023 given that both he and the PSA calculate his constructive incarceration to already be between 14 - 15 months for the highest sentencing range of 10 - 16 months, and where he committed no violence and harmed no person or object. He is remorseful for the events of January 6, 2021 and for his behavior in being where he was not allowed, and for wearing an object that he judged to be legal at the time. He will commit no future crime. He requests that the Court limit supervised release to under a year because while his convictions are serious, his actions did not involve a drug crime, trafficking, firearms, explosives, child pornography, violence, or any potential continuing activity that requires long term supervision.

Dated November 28, 2023                    Respectfully submitted,

                                           /s/ *Carolyn A. Stewart*
                                           Carolyn A. Stewart, Bar No. FL-0098
                                           Defense Attorney
                                           Stewart Country Law PA
                                           1204 Swilley Rd.
                                           Plant City, FL 33567
                                           Tel: (813) 659-5178
                                           Email: Carolstewart_esq@protonmail.com


## CERTIFICATE OF SERVICE

I hereby certify on the 28th day of November 2023, a copy of the foregoing was served

upon all parties as forwarded through the Electronic Case Filing (ECF) System.

                    /s/ Carolyn Stewart
                    Carolyn Stewart, Esq.