**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23 CR. 005 (APM)** |
| **ERIC CHRISTIE,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence Eric Christie to 13 months' incarceration, 36 months' supervised release, $2,000 in restitution, and the mandatory special assessment of $200.   The government's recommended sentence falls at the midpoint of the 10- to 16-month guidelines range calculated by the government and the United States Probation Office.

The Court's deadline for the filing of this submission was November 27, 2023.   Minute Entry (08/11/23).   The government regrets missing the deadline, and respectfully requests that the Court accept the submission despite it having been filed a day late.[1]

---

[1]    The government also notes that defense filed its sentencing memorandum earlier in the day on November 28, 2023.   ECF 75.   The government has not considered the defense submission in preparing the instant submission.

1

## I.    INTRODUCTION

The defendant, Eric Christie, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that interrupted of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power, injured more than one hundred police officers, and resulted in more than $2.9 million in losses.[2]

Christie used a bullhorn to exhort rioters to breach the security perimeter on the East Front of the Capitol, and he did so even as he observed rioters fighting with police.   When the rioters forcefully pushed through the bike rack fencing and overran the police officers, Christie raced across the East Plaza within a minute of that initial breach.   Christie then mounted a police vehicle at the base of the East Rotunda steps.   From there, Christie continued to use his bullhorn to urge rioters to storm the Capitol, leading the crowd in chanting "Whose house? Our house" as rioters overran a makeshift police line at the base of the East Rotunda steps.   Christie engaged in all this conduct while wearing on his belt buckle an exposed metal hammer, which he subsequently admitted to his brother and to a journalist that he carried as a weapon.

The government recommends that the Court sentence Christie to 13 months of incarceration, a sentence that reflects the gravity of Christie's conduct on January 6 and the

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

additional danger Christie posed to law enforcement in recklessly resisting arrest.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the trial testimony of United States Capitol Police Captain Carneysha Mendoza for a summary of the January 6, 2021 attack on the United States Capitol, which members of this Court have described as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our democracy itself."   *United States v. Cua*, No. 21-cr-107, 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Judge Moss); *see also United States v. Foy*, No. 21-cr-108 (D.D.C. June 30, 2021) (Doc. 41, Hrg. Tr. at 14) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system.") (Judge Chutkan); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Judge Howell).

### B.    Christie's Role in the January 6, 2021 Attack on the Capitol

The Court's factual findings in its trial verdict established Christie's significant participation in the Capitol riot; his carrying of a dangerous weapon, a metal hammer, throughout his time at the Capitol; and his boasts about his misconduct thereafter.   *See* Ex. A., Verdict Transcript (Aug. 11, 2023) ("Verdict").

### a.  Christie's Conduct Breaching the Security Perimeter and Inciting His Fellow Rioters

Christie traveled to Washington D.C., from his home in Los Angeles, on January 5, 2021. *Id. at* 5.   On January 6, 2021, Christie arrived at the Capitol grounds sometime before 1:44 p.m., wearing a rainbow flag tucked under his hat, and carrying a white megaphone.   *Id.* at 7.   Around this time, Christie stood "within feet of a skirmish between officers and the crowd that [had] gathered along the East plaza barrier."   *Id.*   at 7.   While there, Christie stated, "Do it, do it, do it, do it, do it."   *Id.*   At 1:46 p.m., Christie appeared to have moved onto a short wall behind a lamp post, and yelled, "Y'all bitches need to get out of the way, we're coming in."   *Id.*

At 1:47 p.m., there was another "skirmish between officers and individuals at the front of the line along the police barrier."   *Id.* at 8.   Christie stated, "That's our fucking building.   Storm it, storm it, storm it."   *Id.*   Christie "would have had the ability to see the police line" while standing on the wall behind the lamp post.   *Id.*

At 1:49 p.m., Christie engaged with a female protestor who was wearing a pink jacket.   *Id.* at 9.   The female stated, "You're all fucking talk, but you're not down here with us.   We need everybody.   We can't do this by ourselves.   Get your asses down here and let's fucking do this. You want to make some fucking noise.   You just want to sit there and talk.   Come on."   *Id.* Christie responded to the protester with "Storm it, girl, storm it."   *Id.*

At 1:51 p.m., "a tug-of-war [broke] out over the bike racks, and the crowd succeed[ed] in pulling at least one bike rack off the line and into the crowd."   *Id.*   Christie then approached the police line from behind the lamp post.   *Id.* at 9-10.   Christie "would have been able to see another tug-of-war break out between the protestors and officers over the bike racks."   *Id.* at 10.

At 1:58 p.m., a "fight [broke] out along the police line." *Id.* at 12.   Christie then put the megaphone to his mouth and urged the crowd, "Do it, go in, that's your capitol." *Id.*   Six seconds later, Christie stated, "Go on in, go on in, go on in, go on in, go on in, go on in, go on in." *Id.* The police line broke at approximately 1:59 p.m. *Id.*   Christie raced across the East Plaza within the first minute of the rioters overrunning the police. *Id.*   The police fell back from their initial line at the East Plaza "to form a new police line at the base of the East front steps." *Id.* at 13.   At approximately 2:00 p.m., Christie, again using his bullhorn, proclaimed, "This is our Capitol," right in front of the new police line, as shown in Image 1. *Id.*



***Image 1***

Christie then mounted "a black SUV government vehicle or a truck," and chanted into his megaphone. [3]  *Id.*   At approximately 2:06 p.m., Christie repeatedly chanted through his megaphone, "Whose house?", in the direction of the crowd below the East Rotunda steps, as shown

---

[3] The Court noted that the defense's own witness, Mr. Hill, effectively recognized that Christie's conduct was disorderly and disruptive when the witness agreed that when he was a law enforcement officer, if he had had the opportunity to prevent somebody from trying to climb atop his police car, he would have arrested the person. *Id.* at 29.

in Image 2.   *Id.*   The crowd responded, "Our house."   *Id.*   The "police then [fell] back again as

the crowd advance[d] up the east Rotunda steps."   *Id.*



***Image 2***

At approximately 2:25 p.m., a flash bang was heard outside of the East Rotunda doors.

*Id.* at 14.   Christie responded by turning, picking up his megaphone, and speaking to the crowd

for eight seconds.   *Id.*   The East Rotunda doors were breached at around 2:26 p.m.   *Id.*

At approximately 2:27 p.m., Christie stated, "They're totally taking it over."   *Id.*   At

approximately 2:28 p.m. the crowd chanted, "U.S.A., U.S.A, U.S.A.".   While standing on a police

vehicle, Christie responded by gesturing "his hand in a circular motion" and "egging the crowd on

as they chant."   *Id.*

### b.  Christie's Carrying of a Metal Hammer, a Dangerous Weapon

Christie wore an exposed metal hammer affixed to his waistband throughout his

participation in the Capitol riot, as shown in Image 3.   *Id.* at 15.



*Image 3*

The FBI seized the hammer, shown in image 4, contemporaneous with Christie's arrest, and it was introduced at trial.



*Image 4*

The Court found that Christie's metal hammer, "if used to strike a person, particularly in the head, easily could cause at least serious bodily injury."   *Id.* at 32.   The Court further found Christie carried the hammer with the intent to use it in such a manner.   Christie placed the hammer on his belt loop, so it was easily visible to the public and within his reach.   The Court found Christie admitted carrying the hammer in place of a gun or a knife, which are "objects that are commonly thought of as a dangerous or deadly weapon."   *Id.* at 33.   In addition, the Court found

that Christie stated he was carrying the hammer for protection against Antifa, meaning Christie "intended to use the hammer in a way that could cause serious bodily injury if the circumstances called for it." *Id.* at 33-34.

Christie's communications after January 6 also demonstrate that he carried the hammer as a weapon.  On July 24, 2021, Christie exchanged messages with his brother, who asked, "What was the hammer for?  Are you happy with these videos?  Would you show them to your employer, dad, or mom?" *Id.*  at 17.  Christie answered, "Protection.  A gun or knife would have been illegal." *Id.*  at 18.  Similarly, in March 2023, Christie gave a jail call interview to a reporter. *Id.* at 18.  The reporter asked, "I understand you were carrying a hammer.  What I mean was, what was -- what was that about?  I mean, they keep referring to that in some of the articles about you.  Tell me about that." *Id.*  Christie responded, "Um, it was -- um, here's the thing.   Because Antifa, you know, has been known to show up at these -- at these, um, whenever the Trumpers are, so, um, I figured, like, you know, some form of protection, yeah." *Id.*  The reporter then stated, "And they used that against -- I would imagine that the used that against you." *Id.*  Christie responded, "Right, right, trying to call it a deadly or dangerous weapon.  Please, I thought that's what a knife and a gun was, okay?  Not a hammer." *Id.*  at 18-19.

### c.  Christie's Boasts about Storming the Capitol

Trial evidence showed that Christie boasted about his participation in the Capitol riot on January 6 and he continued to defend his criminal conduct thereafter.   On January 6, Christie was part of a group chat that included Gina Bisignano.[4]  *Id.* at 15.   At 2:40 p.m., a person in the group

---

[4]   Bisignano was indicted separately as a result of her participation in the riot, and the case is pending trial.  *United States v. Bisignano,* 21-cr-36 (CJN).

chat messaged, "Well, they just announced that the mayor of D.C. appointed a 6:00 p.m. curfew."
*Id.* at 15-16.   Christie bragged, "Um, Jen, we literally broke into the Capitol.   Do you think that
we are going to have a curfew tonight?   Not going to happen."   *Id.* at 16.

Christie also justified his actions in the weeks following January 6.   On January 14, 2021,
Christie sent several text messages to Bisignano.   *Id.* at 16.   In those messages, Christie wrote,
"Whenever any form of government becomes destructive, it is the right of the people to alter or
abolish it and to institute a new government."; "Congress was destroying your Constitution."; and
"Congress if full of criminals who are destructive to your [ ] unalienable rights."   *Id.*[5]

### III.   THE CHARGES AND CONVICTION

A federal grand jury returned an indictment charging Christie with two counts: Count One,
entering and remaining in a restricted building or grounds with a deadly or dangerous weapon, and
Count Two, disorderly and disruptive conduct in a restricted building or grounds with a deadly or
dangerous weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A) and 18 U.S.C. §§
1752(a)(2) and (b)(1)(A), respectively.   On August 11, 2023, the Court convicted Christie of both
offenses following a bench trial.

### IV.   STATUTORY PENALTIES

Christie now faces sentencing on both counts.   As noted by the Presentence Report issued
by the U.S. Probation Office, for each count, Christie faces up to 10 years of imprisonment, a term
of supervised release of not more than three years, a fine up to $250,000, restitution, and a

---

[5] These communications to Bisignano "were not found on Christie's phone when it was seized
and searched a year and half later in December of 2022."   *Id.*   at 16-17.

mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### a.   The Guidelines Calculation

The government agrees that the Total Offense Level is 12, as calculated by the Probation Office in the PSR.[6]   PSR ¶¶ 37-47.   The U.S. Probation Office calculated Christie's criminal

---

[6]    The U.S. Probation Office began its calculation of the offense level for Counts One and Two, which charge violations of 18 U.S.C. §§ 1751 and 1752, respectively, by finding that these offenses grouped.   *See* PSR at ¶ 35.   The Probation Office also found that the offense level which applied to the group was the offense level that produced the highest group, USSG § 2A2.4, the guideline applicable to the offense charged in Count Two.   PSR ¶ 34. The PSR then calculated a single offense level for both counts, using that guideline, as follows:

| | |
|---|---|
| Base offense level: | 10 (USSG   § 2A2.4) |
| Reckless endangerment during flight: | +2 (USSG   § 3C1.2) |
| Total Offense Level | 12 |

*See* PSR ¶¶ 37-47.

The Probation Office's calculation of the Total Offense Level is erroneous in that it groups Counts One and Two before calculating the offense level for each of these counts of conviction individually. The Application Instructions in the Guidelines set out the specific order in which the calculation of the offense level is to be made: first, determine the offense guideline; second, determine the base offense level and apply any appropriate specific offense characteristics, cross references, and special instructions; third, apply any adjustments in Parts A, B, and C of Chapter 3. U.S.S.G. § 1B1.1(a)(1)-(3). Then, repeat each step for each count ("If there are multiple counts of conviction, repeat steps (1) through (3) for each count."). U.S.S.G. § 1B1.1(a)(4). Finally, perform the grouping analysis in Part D of Chapter 3.   *Id.*   Nonetheless, in this instance, use of the incorrect methodology does not result in a different Total Offense Level or guideline range. Using the methodology in USSG § 1B1.1, the calculation is as follows:

history as category I, which is not disputed.   PSR ¶ 50.   Accordingly, based on the government and Probation's calculation of Christie's total adjusted offense level, Christie's Guidelines imprisonment range is 10 to 16 months' imprisonment.   PSR ¶ 90.

### b.  USSG § 3C1.2 Applies to Christie's Reckless, Armed Endangerment of the FBI in December 2022

Section 3C1.2 provides for a two-point enhancement "[i]f the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer."   USSG § 3C1.2.   Application Note 3 specifically states that "this adjustment also is applicable where the conduct occurs in the course of resisting arrest." Commentary, USSG § 3C1.2, n. 3.   The Sentencing Commission promulgated § 3C1.2 to "adopt the view that mere flight from arrest was not sufficient for an adjustment, but that flight plus endangerment was enough."   *United States v. Brown*, 31 F.4th 39, 46 (1st Cir. 2022).

---

Count One: 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A)

| | |
|---|---|
| Base offense level | 4  (USSG § 2B2.3(a) |
| Trespass occurred at "any restricted building or grounds" | +2 (USSG § 2B2.3(b)(10(A)(vii) |
| A dangerous weapon was possessed | +2 (USSG § 2B2.3(b)(2) |
| Reckless endangerment during flight: | +2 (USSG § 3C1.2) |
| Total | 10 |

Count Two: 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A)

| | |
|---|---|
| Base offense level | 10 (USSG § 2A2.4(a) |
| Reckless endangerment during flight: | +2 (USSG § 3C1.2) |
| Total | 12 |

Because the Counts group pursuant to USSG § 3D1.2(a), (c), the combined offense level is 12.

Christie's conduct, as found by both the Honorable Alka Sagar of the Central District of California and this Court, endangered the officers responsible for arresting Christie, as described further below.   *See* Ex. B, Transcript of Proceedings before the Honorable Amit P. Mehta (Feb. 17, 2023) ("Revocation Tr."); Ex. C, Transcript of Proceedings before the Honorable Alka Sagar (Dec. 23, 2022) ("C.D. Cal. Detention Tr.").    It amply warrants the application of this enhancement.

The pertinent facts, as established in two detention hearings and as stated correctly in the PSR, are as follows.   The FBI, in anticipation of Christie's potential for resisting arrest, initially attempted to arrest Christie through a routine traffic stop carried out by local police officers. Christie refused seven commands to exit his vehicle and, when told he could be arrested for obstruction, sped off.[7]   PSR ¶ 23-24.   Next,

> The FBI determined that a Special Weapons and Tactics (SWAT) team would be the safest way to arrest defendant Christie in light of his past behavior and ownership of firearms. After the SWAT team breached defendant Christie's door, he refused to exit the apartment and yield to arrest. The FBI employed various tactics, in escalation, meant to bring about the defendant's surrender, including deploying pepper spray and shutting off the water to the residence. FBI agents used a robot equipped with a camera to gain visibility into the residence and determined that the defendant had a gun in his right hand. Defendant Christie stated to agents that he was "completely armed and willing to use 2nd amendment rights."
>
> The defendant's attorney and several friends made a half-dozen or more entreaties to the defendant to put away his weapons and walk out the door; however, defendant Christie refused. Finally, more than three hours after the SWAT team arrived at the residence, the defendant emerged from the

---

[7]  The Government submits that Christie's conduct in driving at high speed away from a police car, during rush hour in Los Angeles, constituted reckless and dangerous conduct.  But, regardless, Christie's subsequent conduct in barricading himself in his apartment and brandishing and threatening to use firearms, on its own, warrants the guidelines enhancement here.

residence and was placed in custody. The FBI considered defendant Christie's conduct, effectively, a barricade situation.

PSR ¶¶ 25-26.

At the detention hearing in Los Angeles, the Government offered the testimony of FBI Special Agent Eric Turner and other evidence. Christie, represented by counsel, presented a witness as well. Judge Sagar, in ordering Christie detained pending trial, found that "even after Mr. Christie's counsel told him that the agents had a lawful arrest warrant and a search warrant, and he needed to come out without his guns, [ ] he refused to do so, and made statements indicating that he was prepared to use violence against the agents." C.D. Cal. Detention Tr. at 96. Judge Sagar also found that "the subsequent search of [Christie's] residence revealed that he did, in fact, have a loaded firearm with him." *Id.* Judge Sagar ordered Christie detained pending trial.

Christie moved to revoke the detention order, and this Court heard testimony of FBI Special Agent Eric Johnson and received other evidence related to the barricade situation caused by Christie. The Court found that "the facts are undisputed that Mr. Christie did not come out of his apartment for close to three hours after that door was breached. During that time, he not only refused to come out at the request of FBI personnel, but both his lawyer and a close friend of his both came to the scene, on the phone with him, those are recorded conversations, and he refused to come out even then." Revocation Tr. 54-55. The Court further found that "there's no dispute that for some point in time, [Christie] not only had physical possession. . . of a gun while federal agents were there to arrest him . . . there were two weapons found in his room when agents did finally go in to search the apartment." *Id.* at 55. Addressing Christie directly, the Court concluded, "***this sequence of events clearly establishes that you pose a serious danger to a person***

***or the community*.**"   *Id. (emphasis added).*

These facts more than sufficiently establish, by a preponderance of the evidence, that Christie "recklessly created a substantial risk of death or serious bodily injury" while refusing to submit to arrest in December 2022.   The § 3C1.2 enhancement should be applied accordingly. *See, e.g., United States v. Easter*, 553 F.3d 519, 523-24 (7th Cir. 2009) (per curiam) (reaching for a loaded gun while fleeing from a police officer, regardless of intent, justified enhancement).

### c.   USSG § 4C1.1 Does Not Apply Because, among other Reasons, Christie Possessed a Dangerous Weapon in Committing His Crimes

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.   Section 4C1.1 does not apply in this case, however, because Christie possessed a dangerous weapon.

Specifically, § 4C1.1 provides that in order to obtain the "adjustment for certain zero point offenders," the defendant must, *inter alia*, "not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense."   Here, there is no dispute that Christie carried a metal hammer during the crimes.   Further, the Court found in its verdict that (i) the hammer was a dangerous weapon, Verdict at 32; (ii) Christie "put the hammer into his belt loop the morning of January 6th with the intent to go to the Capitol and to use it for protection," *id.* at 37; and (iii) the "in relation" element of Section 1752(b)(1)(A) was established beyond a reasonable doubt because "Christie's wearing of the hammer exposed on his belt loop was neither coincidental, nor entirely unrelated to his crimes, and clearly had the potential to facilitate the offenses," *id.* at 39. The Court's factual

finding that Christie possessed the metal hammer in connection with the offenses thus forecloses the application of Section 4C1.1 here.

Moreover, the Court should not apply § 4C1.1 here for the further reason that the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions").[8]

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the

---

[8] Moreover, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack.

government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[9]

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of incarceration at the midpoint of the Guidelines range.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Christie's felonious conduct on January 6, 2021 contributed to a massive riot that nearly succeeded in frustrating the peaceful transition of Presidential power and throwing the United States into a Constitutional crisis.   Moreover, Christie was no idle bystander at the Capitol riot: rather, as the Court aptly stated in issuing its verdict, "[a]s to disorderly and disruptive conduct, it is hard to know where to start with Mr. Christie's behavior" on January 6.   Verdict at 28.   Christie exhorted rioters with a bullhorn to storm the Capitol at critical junctures when rioters overran police lines.   Christie joined a mob in racing across the East Plaza toward the East Rotunda Door at a time when it was barely defended and would soon be breached.   Christie flaunted the rioters' overtaking of the police by mounting a police vehicle, a brazen act that likely encouraged other rioters to similarly engage in chaotic and

---

[9] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under § 4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

disruptive conduct.   Worse yet, Christie did all this while carrying an exposed metal hammer, which as, the Court noted, "had the potential to facilitate his ability to disrupt government business or official functions. It potentially enabled him in undertaking the acts that he did, which were both disorderly and disruptive."   *Id.* at 40.

Moreover, the Guidelines range here is impacted by Christie's reckless and dangerous conduct in resisting arrest.   This conduct needlessly, and extensively, placed at risk the law enforcement agents charged with arresting Christie.   Christie's threat to use firearms at the arresting officers further placed at risk Christie's neighbors and anyone in the vicinity who would have been impacted if the situation had further deteriorated.   (As the Court noted during the revocation hearing, "I think I've once in my career had somebody barricade themselves in when the FBI was out there to arrest them, and it doesn't always end well."   Revocation Tr. at 55.)   The nature and circumstances of Christie's offenses were serious and fully support the government's recommended sentence of 13 months of imprisonment.

### B.  Christie's History and Characteristics

Christie has no criminal history points and a stable employment history.   His criminal conduct on January 6, however, was not an isolated incident, but rather part of a series of actions in which he dangerously disregarded basic directives of law enforcement.   Nearly two years after breaching police lines, mounting a police vehicle, and urging rioters to storm the U.S. Capitol Building while members of Congress were sheltering inside, Christie refused basic law enforcement commands to exit his vehicle during a traffic stop.   Days later, he barricaded himself in his residence and threatened to use firearms, posing a serious danger to law enforcement.   When

finally arrested and detained, Christie expressed disdain for the criminal charges against him, telling a journalist, "[T]rying to call it a deadly or dangerous weapon. Please." Christie's relevant history and characteristics reflect his lack of respect for the rule of law and his lack of remorse for his conduct. This factor thus also supports the Government's recommended sentence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Christie's criminal conduct on January 6 was the epitome of disrespect for the law. Christie's refusal to follow law enforcement commands following January 6 further demonstrates the need in this case to promote the respect for the rule of law through imposition of a meaningful sentence.

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

weighs heavily in favor of a significant term of incarceration.   Christie has not expressed any remorse for his conduct.   He has not demonstrated any recognition that he and the mob that he willingly joined caused tremendous harm to the brave police officers defending our Capitol.   Nor has he demonstrated any recognition of the threat that the Capitol riot posed to our democracy. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")   To the contrary, Christie gives interviews from prison in which he makes the bogus assertion that he is a "political prisoner."   *See* Ex. D, "A Right to Know" at 3:00 – 6:00.[11]   He further asserts that January 6 was not an "insurrection" but a "Fedsurrection" for which the FBI is responsible.   *Id.*   He asserts readily disproven notions, such as the allegation that permits were issued for protesters to enter the restricted area, as well as absurd conspiracy theories, such as the allegation that January 6 was an entrapment operation led by former Speaker of the House Nancy Pelosi.   *Id.* at 6:00 to 7:30. Needless to say, Christie did not even try to offer evidence of any of this at trial, indicating that he knows that he is peddling misinformation—and he does so anyway.

Christie's sentence must be sufficient to provide specific deterrence, that is, it must be sufficient to cause him think to twice about engaging in similar—or worse—criminal conduct in the future.

---

[11] The government has submitted Exhibit D, which is a video, directly to defense counsel and the Court via USAfx.

E.      **The Importance of the Guidelines**

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

F.      **Unwarranted Sentencing Disparities**

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United*

*States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Daniel Leyden*, 21-cr-314 (TNM), Sent. Hrg. Tr. at 38 ("I think the government rightly points out generally the best way to avoid unwarranted sentencing disparities is to follow the guidelines.") (statement of Judge McFadden); *United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier

'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[12]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009).   *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[13]   Here, the government proposes a sentence at the midpoint of the Guidelines range, which would serve to curtail any "unwarranted" disparities with similar offenders.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentence imposed in *United States v. Alford,* 21-cr-263 (TSC), bears consideration.   Alford was found guilty after trial of violating 18 U.S.C. §§ 1752(a)(1) and (a)(2), as well as violations of 40 U.S.C. §§ 5104(e)(2)(D) and(G), Entry and Disorderly Conduct in a Capitol Building, and Parading, Demonstrating, or Picketing in a Capitol Building.   Alford walked past obvious signs that the Capitol was closed and restricted; entered through a broken-open door, despite visible shattered glass and an audible, continuous alarm; refused to leave the

---

[12] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[13] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Capitol—and, indeed, sought to go deeper inside—after police ordered him and other rioters to leave; celebrated his participation on social media, and mocked the pain and trauma suffered by officers, in the immediate aftermath of the riot; spread disinformation about the riot via social media; and demonstrated a lack of candor and honesty during his trial testimony.   Judge Chutkan sentenced Alford to 12 months' incarceration.   Unlike Alford, Christie did not enter the Capitol, nor did he testify falsely at trial; however, unlike Alford, Christie did openly carry a dangerous weapon at the Capitol and later twice resisted arrest, the second time barricading himself in his apartment (with his guns) for almost three hours while the FBI and his own lawyer attempted to coax him to surrender.   A sentence of 13 months' incarceration for Christie, similar to the sentence of 12 months' incarceration imposed on Alford, is warranted.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.   § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a

subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).  Christie was convicted of a violation of an offense under Title 18, and the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.  *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).  Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.  *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019)

24

(quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[14]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses.   Exercising that discretion would be appropriate here: as this Court held in the January 6 case *United States v. Webster*, "given the nature of the overall conduct, you can't have any particular person responsible for all $2 million, but it's certainly safe to say that the $2 million in damage could not have happened but for the collective action of each individual person who was there on January the 6th. And so everybody who was there in a sense, whether they directly destroyed property or not, certainly contributed and caused it."  No. 21-cr-208 (APM), Sent. Hrg. Tr. at 23-25 (Sept. 01, 2022); *see also Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the

---

[14] Both statutes permit the sentencing court to decline to impose restitution when doing so will "complicat[e]" or "prolong[]" the sentencing process.  *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require Christie to pay $2,000 in restitution for his convictions on Counts One and Two.   This amount fairly reflects Christie's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order would avoid any sentencing disparity.

## VIII.     CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 13 months incarceration (which is the midpoint of the Guidelines Range of 10 to 16 months calculated by the Government), 36 months supervised release, $2,000 in restitution, and the mandatory special assessment of $200.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


By:     _____/s/ Jason M. Manning_____
        Jason M. Manning
        Raymond Woo
        Assistant U.S. Attorneys, Detailees

26